# EXHIBIT A

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

JENNIFER SHEEHAN

C.A. No. 05-364S

vs.

THE NORTH AMERICAN MARKETING.
MARKETING CORPORATION and
DELAIR GROUP, LLC

DEPOSITION OF FRED SCHALL, a Witness in the above-entitled case, taken on behalf of the Plaintiff, before Linda L. Guglielmo, RPR-RMR, a Notary Public in and for the State of Rhode Island, at the offices of David Maglio & Associates, 101 Dyer Street, Providence, Rhode Island on May 18, 2006 at 11:00 A.M.

APPEARANCES:

FOR THE PLAINTIFF.....REED & GIORDANO, PA
BY: BARRY C. REED, JR., ESQ.
101 TREMONT STREET
BOSTON, MA 02108

FOR THE DEFENDANT.....BLISH & CAVANAGH, LLP
(Delair)
BY: MARY CAVANAGH-DUNN, ESQUIRE
30 EXCHANGE TERRACE
PROVIDENCE, RI 02903

FOR THE DEFENDANT.....RICE, DOLAN & KERSHAW
(Namco)
BY: MARK DOLAN, ESQUIRE
101 DYER STREET
PROVIDENCE, RI 02903

ALLIED COURT REPORTERS, INC.
115 PHENIX AVENUE
CRANSTON, RHODE ISLAND 02920
401/946-5500

A. 1966.
Q. After that did you go to college?
A. Yes.
Q. Where did you go to college?
A. Troy State College, Angola, Indiana.
Q. What was it a BS degree?
A. I did not finish there.
Q. Did you resume schooling?
A. No.
Q. Okay. How many years did you go to college?
A. One year.
Q. And why did you leave?
A. I had a job opportunity in California.
Q. And again, you indicated that you've been working for Delair Group for how many years?
A. 37 or 8 -- 37.
Q. Have you had any technical schooling in, say, engineering or design work or anything like that?
A. I've had sporadic courses over the years.
Q. What kind of courses?
A. Stress analysis from Vishay.
Q. You don't hold yourself out as an engineer, correct?
A. Degreed engineer, no.
Q. Do you feel that you qualify to make engineering



judgments?
A. In certain cases.
Q. What kind of background do you have in engineering?
A. One year of college.
Q. You studied engineering?
A. Yes.
Q. Now, where is Delair Group based?
A. Delair, New Jersey which is in Pennsauken, New Jersey.
Q. What does the Delair Group do, primarily?
A. Manufacturing swimming pools and ornamental fence.
Q. When you talk about ornamental fences, are we talking fences around like a yard as opposed to a pool, or both?
A. They're perimeter fences, picket, aluminum fencing that looks sort of like wrought iron but it's aluminum.
Q. Now, the pools that they design, are they inground and aboveground or just aboveground or what?
A. Both.
Q. Okay. They're aboveground?
A. No, both. Inground and aboveground.
Q. And inground pools, what construction are they?



A. Extruded aluminum panels which are welded together, painted, and they have a vinyl liner.
Q. Your aboveground pools, what typically is that construction of?
A. Either aluminum or steel.
Q. How long has Delair Group been manufacturing and designing aboveground pools?
A. 1967.
Q. And with respect to the aboveground pool, has that design changed at all in any significant way since the 1967?
A. Yes.
Q. In what way or ways?
A. Originally it was a completely extruded aluminum pool.
Q. What do you mean by that?
A. The extrusion process is a process to form aluminum by heating it and squeezing it out through an orifice and a press where you get a defined shape and the panels and pool parts were made of the extrusion process. Later on, they were made of both the extrusion process and coil aluminum, which is made via a rolling process.
Q. Is it fair to say that those processes that you've talked about involves the manufacture of the



component parts of the pool?
A. Yes.
Q. How about, I guess I'm talking about the design of the pool itself, you know, when looking at the finished product, has that changed at all since 1967?
A. Yes.
Q. Okay. In what ways has the design of the pool changed?
A. The earlier pools were either eight or ten sided, like a stop sign, more flat, the sides were long. Then they evolved into a circular wall made out of coiled aluminum with a frame around them. The earlier ones were, because the sides or modules were longer, they had to be stronger and bolted with fasteners; where, the present ones, they have more sides to them, so each section is smaller.
Q. When you say the circular wall of the more recent design, is that one continuous piece of metal?
A. Yes, it has a seam in one place, but it's a continuous piece of a coil.
Q. In terms of the dimensions of the pool, of the aboveground pool, have they changed at all over the years?

A. Yes.
Q. In what way have they changed?
A. They started out at 46 inches high, got to 48 and are presently around 52. The sizes have evolved. For a while they were 22 and a half foot, 19 and a half feet, now they're a 15, 18, 21. They've evolved.
Q. I see. And the reason behind the height has increased over time; is that what you're saying?
A. Yes.
Q. Why is that, is there a reason behind it?
A. Other than consumer demand, not that I'm aware of.
Q. They wanted a little deeper pool?
A. Correct.
Q. Now, how about this -- what we're going to be talking about during the course of this deposition, the coping that's around these aboveground pools, what is coping, how do you define that?
A. Coping is a piece of metal -- no, it could be plastic. It's a material that's around the top periphery of the wall that connects the various uprights together and prevents damage to the top surface of the wall.



Q. So the design intent of the coping is to what, support the pool itself?
A. It's one of the frame members, yes. It connects the uprights which are the vertical members together and prevents damage to the upper edge of the wall.
Q. Is the coping designed to allow people to stand on it?
A. Not in that form, no.
Q. Are you aware that people that use these aboveground pools are standing on the coping?
A. Other than this particular case, no.
Q. So you've never been aware, since 1967, that kids, adults, children, may, from time to time, stand on this coping?
A. Well, let me go back. When you add options to the pool, the coping is the innermost six inches, basically, of horizontal surface. You can add a patio connect to it, which would be a carpeted welded structure to increase or to give you an area to have ladders and furniture. When you do that, that accessory mounts to the edge of the coping. So as you walk across the deck, you would stand on the coping before entering the water. So in that case they would be standing on



the coping, and I'm aware of that.
Q. I guess my question, sir, let's exclude for the moment the pools that have a deck on it, but an aboveground pool that only has this coping, you're not aware over the use of these pools that people from time to time stand on this coping?
MS. CAVANAGH-DUNN: Objection. You can answer.
A. I don't know that I was ever aware of that.
Q. Is that something that the pool is not designed to do, to permit people to stand on the coping?
MS. CAVANAGH-DUNN: Objection.
THE WITNESS: Do you wish me to answer?
MS. CAVANAGH-DUNN: Yes. All my objections -- you can answer, despite my objection.
A. You could stand on it, it's not wide enough for a good stand, and it's not very rigid. It's flexible so it certainly wouldn't be a wise idea.
Q. There is certainly some inherent risk with people standing on the coping, is that fair to say?
A. Yes.
Q. One is because the coping is somewhat unstable?
A. Yes.



Q. Okay. Do you have -- have you ever affixed any warnings on your aboveground pools telling people not to stand on the coping?
A. No.
Q. The only warnings you have, sir, is that they should not dive?
A. There is other warnings as well.
Q. In the context of what happened here, the primary warning or one -- strike that. One of the primary warnings that you affix to these pools is that people should not be diving?
A. Correct.
Q. And if the pool doesn't have a decking, then the way they would be diving -- one of the ways in which they would be diving is to get up on the coping and dive?
MS. CAVANAGH-DUNN: Objection.
Q. Is that fair to say?
A. I don't believe I've ever heard that before.
Q. So in the years that you've worked at Delair, you've never heard of a situation where someone has dove into a pool, one of these aboveground pools, by getting up onto the coping and diving in?
A. Correct.

Q. But you have heard of people diving into these pools; is that fair to say?
A. Yes.
Q. In fact, you've heard of people who have been injured by diving in these pools; is that fair to say?
A. Yes.
Q. Okay. What is the mode of entry, if you know, when they dive into these pools and injure themselves?
A. I know they can dive from the entrance ladder and I know they can dive from the deck area.
Q. Does Delair Group keep records of injuries that have occurred through the use of their pools?
A. Some, yes.
Q. And explain to me, if you would, this process of maintaining these records?
A. Well, there is no process. If we are served with a case, we obtain counsel and forward it to them and work with them to defend it.
Q. So you're talking about a formal litigation?
A. Yes.
Q. When Delair Group has been sued by an individual who has been injured through the use of the pool?
A. Correct.



Q. Are there times when you get maybe a complaint, you know, a letter in writing that says, you know, we think a certain aspect of the pool is unsafe and we'd like you to consider this? Did you ever get letters like that?
A. I don't believe we ever have.
Q. So, other than being notified via a formal lawsuit, that is -- you don't have any other records of complaints with the pools that you manufacture other than receiving formal notice of a complaint?
A. Well, no. Regarding injury, yes. If you're saying regarding like leaks in the liner or something that rusts, we get these in our customer service department, but not injury.
Q. Let me ask you this question, have you ever received, to your knowledge, have you ever received a complaint from a consumer that they felt that, for instance, the coping presents a danger to users via they could stand on it and fall out, either out or into the pool?
A. Not that I'm aware of.
Q. And would you -- if such complaints were forwarded to Delair Group, would you be receiving those complaints?



A. No. The customer service group would.
Q. Okay. Prior to coming here today did you make any inquiry with the customer service group if they have in fact any such complaints?
A. I talk to them frequently, every day.
Q. But with respect to this litigation, did you inquire as to --
A. No, not in that particular question.
Q. Okay. Are you aware, sir, that one of the areas that I would be asking you questions on is with respect to any lawsuits or complaints relating to injuries sustained by the use of any aboveground pools manufactured by Delair from 1980 to the present.
A. Yes, that's what was written there.
Q. Are you the person sitting here today with Delair Group the most knowledgeable with respect to that area, the question of any lawsuits or complaints?
A. Yes, I am.
Q. That have caused injury. Let me ask you this, from 1980 to the present, can you give me an indication as to how many lawsuits have been filed against Delair Group relating to injuries caused by their -- relating to aboveground pools?
A. I don't know.



Q. Is it because it's so many?
A. No. I just don't count them.
Q. Is it -- can you give me a rank, are we talking more than ten, less than ten?
A. Probably more than ten.
Q. More than 20?
A. Probably not.
Q. Okay. Is it fair to say that maybe on average would you get one complaint a year involving an injury by a pool manufactured by Delair Group?
A. Probably less than that, but sometimes they're not injuries, we get litigations for product-related issues not injuries.
Q. With respect to a person claiming injury through use of your pool, on average, it's less than one complaint a year?
A. I believe so.
Q. Okay. Certainly you have records of these complaints, right?
A. Some, yes.
Q. What do you mean by some? Do you throw them away?
A. I don't keep them forever from the '60s or when the first one came.
Q. From 1980 to the present, do you have copies of any complaints?

A. I have some.
Q. When you say -- who makes the decision of retaining these complaints and destroying these complaints?
A. I do.
Q. Do you have a policy in terms of how long you're going to retain these complaints?
A. No.
Q. Okay. What is your basis for then getting rid of a complaint?
A. I guess basically age. If it's very old, we don't retain it.
Q. What do you mean by very old, are we talking five years, ten years, fifteen years?
A. There is no plan. Whenever we thin the files down, we take the old ones. If it has been closed for a long time, they go.
Q. Your company is on the Internet, right?
A. Yes.
Q. I assume you derive -- it's a profitable corporation, correct?
A. Yes.
Q. Your volumes of sales must be -- on an annual basis does it exceed $500,000?
A. Yes.



Q. Does it exceed a million?
A. Yes.
Q. 2 million?
A. Yes.
Q. 10 million?
A. Yes.
Q. On an annual basis, how much is your volume of sales?
A. Approximately 15 million.
Q. Certainly with a corporation that size, it's going to have computers and whatnot, correct?
A. Yes.
Q. Are any of these complaints entered into your computer system?
A. No.
Q. When you get a complaint, you keep them in a file someplace?
A. Yes.
Q. And then after a period of time, you houseclean and you get rid of these?
A. Yes.
Q. On average, can you tell me in terms of, like we're now in 2006 --
A. Correct.
Q. In terms of years dating back, when is the



earliest complaint that you think you still may have?
A. Probably early '90s.
Q. They're still -- can we agree through your counsel that during the course of this litigation, that you will not destroy any complaints relating to injuries sustained by people using your pool?
A. Yes.

MR. REED: I would ask you, if it's all right without a motion to produce, I think I brought a motion to produce the complaints.

MS. CAVANAGH-DUNN: Yes. We have objected once in our first response and once in our supplemental as to the scope. I believe the request was similar to the area of inquiry dating back to 1980. We're in agreement to produce records narrowed a bit in scope in terms of years.

MR. REED: We'll talk about that.

Q. So, let me ask you this, your memory of reviewing these complaints, have you ever come across a complaint where somebody has injured themselves similar to the way Jennifer Sheehan did, meaning, she dove from the coping into the pool?
A. No. I've looked, there are no cases.
Q. Okay. So tell me the type of cases typically that



you can recall where you guys have been sued, what type of cases are we talking about?
A. I was asked to look at cases ten years prior to date of loss in Safari pools. There was a young girl, approximately 10 or 12 years old, if I recall, in 1999 in Rhode Island, that got a cut on metal and required stitches in her head, shoulders or face, I don't recall which. And then there was a case, Burkhardt (phonetic), in western Pennsylvania, early 1990s, that dove into a pool during a party from a deck.
Q. And what happened to that person?
A. He's a quadriplegic, I believe.
Q. How old was that person?
A. I don't recall.
Q. Over 20?
A. I think so.
Q. Was alcohol involved?
A. Yes.
Q. Now, the subject pool that we're talking about was manufactured by you people, correct?
A. Parts of it were, yes.
Q. And when I say you people, we're talking about Delair Group?
A. Yes.

Q. What parts were manufactured by you people?
A. The frame and wall.
Q. Does the frame and the wall include the coping?
A. Yes, it's part of the frame.
Q. Do you know -- I think in your answers to interrogatories you gave me a time frame, do you know approximately when it was these parts were manufactured?
A. I'm sure I gave you a time frame and I don't recall what it was.
Q. I want to say '94 to '98?
A. Something like that.
Q. Do you keep records today of all pools that have been manufactured and sold by you people?
A. No. There's no serial numbering. The liners are marked but the liner in this pool was not one of ours.
Q. You made a site visit, right?
A. Yes.
Q. When was?
A. About a month ago.
MS. CAVANAGH-DUNN: April 27th.
Q. That was to the homeowner's place of residence?
A. Yes.
Q. You took some pictures?



A. Yes.
Q. Did you speak to the homeowner?
A. Yes.
Q. Did you ask them what happened?
A. No.
Q. And by your visit, were you able to determine that this was one of your pools?
A. The frame and wall was, yes.
Q. Again, that includes the coping, correct?
A. Yes.
Q. Do you know typically with respect to all of your aboveground pools, how are they distributed to the consumer? Are they sold to other agencies or companies, how do consumers buy your pools?
A. They're sold through distribution retailers. They go either directly to retailers or to distributors to distribute to retailers.
Q. Are one of these distributors the other co-defendant, Namco?
A. Yes.
Q. Do you know what percentage of your pools are distributed to Namco?
A. No.
Q. Is it more than 50 percent?
A. No.



Q. Less?
A. Absolutely.
Q. Do you know whether or not this particular pool was sold or -- strike that. Do you know whether or not this particular pool was distributed to Namco at some point in time?
A. I don't know.
Q. You have no records to reflect that one way or the other?
A. Correct.
Q. It could have been distributed to Namco, it may not have been, but you don't know sitting here today?
A. Correct.
Q. Now, I guess -- what percentage of your pools are distributed to Namco, if you know?
A. I don't know. We don't track that.
Q. Is Namco a national company, if you know?
A. No, predominantly in the Northeast.
Q. Do you provide pools to the entire country?
A. Yes.
Q. So, what percentage of the pools that you distribute to the Northeast are distributed to Namco, if you know?
A. Don't know that.



Q. Is it higher -- I think you said 30 percent?
A. I didn't say 30 percent.
Q. Okay. In terms of -- do you know who the major distributors are in the Northeast?
THE WITNESS: Distributors in general or distributors of our product?
MR. REED: Of your product.
A. Namco would be a large one, there is Harrow's in New York. I'm sure there is other ones. I don't recall who they are.
Q. Say for the Rhode Island, Massachusetts area, is Namco the chief distributor in that area, if you know?
A. They may be. There is other dealers we sell as well to.
Q. You can't think of any, other than Harrow's?
A. Cut-Price.
Q. Any others?
A. There are; I just don't recall the names.
Q. Now, the design of this particular aboveground pool, how high was it?
THE WITNESS: This particular pool?
MR. REED: Yes.
A. The wall was 48 inches high.
Q. That's a standard size, is it?

Page 26

A. Yes.
Q. And then the coping around the pool, how wide was that?
A. Six inches.
Q. At any time did you guys consider -- your designers ever consider making that coping wider?
A. Yes and no.
Q. Tell me when -- first of all, tell me when did you consider making it wider?
A. Well, the coping has always been six inches, but we have an option that attaches to the coping, it's not coping, but it makes it wider, so you can walk on it and it includes a fence, but that's not coping at that point, it's called walk deck.
Q. Okay. So there is an attachment that a pool owner could buy to the coping that makes it a little wider and there is a fence attached to it?
A. Correct.
Q. Is that the pool fence kit that your literature refers to?
A. Could be.
Q. What is your understanding of the pool fence kit?
A. Actually, it wouldn't be. A pool fence is a fence that attaches directly to the pool with coping to restrict entry.

Page 27

Q. Where is the fence installed, is it around the coping or around the ladder or both?
A. It's around the top periphery of the pool, which would be around the coping but it's not really attached to the coping, it's attached to the upright below the coping, so you can still put a winter cover in place.
Q. Was there any consideration -- I assume that then fencing is erected, you've got the pool where the water is, you've got the coping and then the fence lies outside the coping; is that right?
A. Right.
Q. Was there any consideration ever made about putting that fencing inside the coping?
A. You can't.
Q. Why not?
A. You'd restrict -- you couldn't put a winter cover on. You couldn't replace the liner, you also have nowhere to attach it in there.
Q. Well, okay, again, this would be a question for your designers, but couldn't you design the fence in some fashion to be attached like, say, to the coping as opposed to like the liner or down below or something like that?
MS. CAVANAGH-DUNN: Objection.

Page 28

A. No, you really can't.
Q. Why is that?
A. You can't attach it to the liner because you then have to go through the liner and the wall. The wall is not sufficiently strong enough to withstand fasteners. Also, if you attach on the inside, the coping then becomes a climbing ledge for small toddlers and you violate the Boca and CPSC access requirements.
Q. Is that what, ANSI codes?
A. NSPI is an ANSI code but that's based on Boca which is the building -- it's ICC presently, but that's based on the old Boca code and Consumer Product Safety Commission guidelines.
Q. Okay. So, these fence kits that you have designed for these pools enable the coping to actually come with a deck; is that fair to say?
A. No.
Q. I thought you indicated that these fence kits make the coping wider?
A. No. Well, you're talking about a pool fence. Pool fence is a fence kit that fits up against the coping only. Then there's an option called the walk deck. The walk deck makes the coping effectively wider and includes a fence.

Page 29

Q. These walk decks, how wide are they?
A. If I recall correctly, they're 15 inches.
Q. And do they go around the whole periphery of the pool?
A. They can.
Q. Or one side?
A. They can do whole or half.
Q. Okay. Then the design intent of these walk decks is to enable people to actually get up and walk on the deck?
A. Yes. It assists when you're maintaining the pool with a vacuum, you can vacuum by not getting in the pool.
Q. Certainly on these walk decks, you know, it would anticipate children, say, jumping, not diving but jumping in off the deck into the pool?
A. Yes.
Q. Okay. Again, your warnings, the only -- is it fair to say that with respect to these aboveground pools, that the only way that you're trying to take out the risk of diving into these pools is to merely say to the user, do not dive in these pools, is that fair to say?
MS. CAVANAGH-DUNN: Objection.
A. Well, via a number of different methods, we

provide warnings to warn against the hazard of diving, yes.
Q. With respect to these aboveground pools, you at no time have taken any steps to prevent people from getting access to the coping; is that fair to say?
A. Well --
Q. If you can answer my question first.
A. We haven't, but the people who make A-frame ladders, if you buy a pool such as in this case where there were no accessories, the people who made the A-frame ladder put a handrail on each side of the ladder which contains you within the handrail, unless you manage to step over it or around it, but yes.
Q. Again, I guess my question is with respect to the coping itself, Delair Group has ever contemplated any design which would prevent or hinder people from getting up on the coping, is that fair to say?
A. Yes. I'm not aware of any design that would preclude that.
Q. You're not aware of any design or you just haven't given it a thought?
A. I'm not aware of any design.
Q. Maybe a little attachment -- by the way, these



copings are made out aluminum, is it?
A. In this particular pool, yes.
Q. Do you think that you can make some sort of attachment that would snap over the coping, either circular in nature or triangular in nature, do you think that's at all feasible?
MS. CAVANAGH-DUNN: Objection.
A. Without knowing more about what you're proposing, I don't know. It might present a risk of its own.
Q. What kind of risk might it present?
A. If people fall on it or get hurt by it with sharp edges, or it protrudes and you come out of the water and hit your head on the overhead and the projection of it. If it protrudes on the dry side and the kids are running by, they could run into it with their head.
Q. But this is something, you would agree with me, that this is something that your designers have never even contemplated, correct?
A. I don't believe my designers have, no.
Q. Nor have you ever contemplated this?
A. No.
Q. Since 1967 these pools that have this six-inch coping have stayed the same, right?



A. More or less, yes.
Q. I mean, essentially this design of the coping is just six inches, which you would agree with me that a six-inch wide coping, someone standing on it could very easily lose their balance; is that fair to say?
MS. CAVANAGH-DUNN: Objection.
A. It's not intended to stand on, nor does it meet government regulations for catwalks or walking surfaces.
Q. And sir, if you were aware in your position at Delair Group that people were standing on this, does that in your mind create any obligation to maybe consider a design which would hinder or prevent people from standing on the coping?
MS. CAVANAGH-DUNN: Objection.
A. If we were aware of it, we would have tried to do something or warn against it.
Q. And you've never come across any pictures, any brochures, any advertisements that show children or people standing on the coping?
A. Not that I recall.
Q. Nor has anyone in your company, to your knowledge, ever seen any advertisements or pictures of people standing on the coping?



A. Not that they brought to my attention.
Q. And had they brought it to your attention, would that have made you consider maybe, we should at least think about maybe making a new design --
MS. CAVANAGH-DUNN: Objection.
Q. -- with respect to the coping?
A. At least look into the issue.
Q. To date, you never looked into this issue about designing the coping which would prevent or hinder people from standing up on top?
A. Correct.
Q. Now, does your company get involved in preparing brochures or advertisements with respect to your pools?
A. Yes.
Q. Okay. And is there a particular department in your company that handles that?
A. We have a marketing department.
Q. Have your -- who do you typically advertise to? Do you advertise to distributors or do you advertise to consumers or both?
A. We generally advertise in some of the trade publications to distributors and dealers, and we prepare flyers or brochures with a picture of the pool describing its features which the dealers

would give to the consumers, if they asked for it.
Q. Have these flyers changed over the years?
A. Yes.
Q. Do they change every year or every five years?
A. They change when models change, predominantly.
Q. What was the model of this particular pool?
A. It was a Safari.
Q. Is there any other identifying name on Safari?
A. No.
Q. Like Safari oval pool, Safari round pool?
A. This particular one was Safari round. They were available in ovals.
Q. How many various models do you offer in aboveground pools?
A. Probably 10 or 12.
Q. How much did this particular Safari pool cost?
THE WITNESS: Cost who?
MR. REED: Good question. Cost the ultimate consumer, if you know.
A. I don't know.
Q. Okay. Do you know how much it cost you to manufacture it?
A. The frame and wall would probably be in the area of -- probably sell to the distributor or



dealer for, it was 18 foot, if I recall, probably 3 or $400.
Q. And when you manufacture this pool, you're providing the frame and the wall and any components to the frame and the wall?
A. The frame is made up of uprights and coping, clips at the top and bottom of the uprights, there is a ring that goes on the ground called wall channel, which we supply, there is another ring that goes at the top where the liner attaches, which we supply.
Q. Do you provide the liner?
A. We offer it. In this case, it did not have a liner.
Q. Oh, okay. This particular pool, could you tell me what items this pool had that did not come from -- originate from you guys?
A. Yes.
Q. What?
A. We did not supply the ladder, the filter, the filter motor, the skimmer, the return hoses, which generally go with the skimmer. I said ladder, the liner was not ours. I don't know what was under the liner, whether it was a sand or manufactured product, but we didn't supply it.



Q. Were there any identifying characteristics as to who supplied the ladder, the filter, the liner?
A. Filter, I think was Hayward (phonetic), the skimmer definitely was. I think the filter was one of theirs. The ladder, I don't know who made it, and the liner, I don't know either. I couldn't see any identifying marks.
MR. REED: Now, in order to obtain these flyers -- is something you will provide us, these flyers he alluded to?
MS. CAVANAGH-DUNN: Yes. We can discuss that.
Q. When you issue a new flyer, do you save the older ones, the previous ones?
A. I have a few of them, I don't have all of them, by any stretch.
MR. REED: Could you get these flyers and give them to your counsel? And then I'll talk to her about what she wants to give me, okay, is that fair?
THE WITNESS: Uh-huh.
Q. Now, do these advertisements ever show people, like, using the pool, swimming in the pool?
A. Yes.
Q. Now, we referred to alcohol use in the past, are



you aware, certainly pool use is a recreational activity, correct?
A. Yes.
Q. And it's something typically done at homes in the summertime, right?
A. It can be.
Q. And you would agree with me when adults are using the pool, that more often than not -- well, many times they will be using alcohol as well; is that fair to say?
A. I don't believe it's many times.
Q. But from time to time some adults will imbibe in alcohol while they're using a pool; is that fair to say?
A. Perhaps.
Q. Would you agree with me that the use of alcohol impairs a person's judgment?
A. At certain levels it does.
Q. And certainly that when someone is using alcohol, some individuals may do things that they wouldn't ordinarily do without the use of alcohol; is that a fair statement?
A. Probably.
Q. Are you aware, sir, of studies that are published in pool magazines that discuss that with respect