# EXHIBIT C

COPY

**In The Matter Of:**

*Jennifer Sheehan v. The North American Marketing Corporation and Delair Group, LLC*

---

*Jennifer Sheehan*
*November 7, 2006*

---

*Reporting Associates*
*10 Dorrance Street*
*Westminster Square Building Suite 617*
*Providence, RI 02903*
*(401) 351-1660*

*Original File NOV7TM.TXT, 86 Pages*
*Min-U-Script® File ID: 2563237873*

**Word Index included with this Min-U-Script®**

Q: All right. When you returned to Rhode Island, were you a motor vehicle owner?
A: Yes.
Q: Was your car still registered in North Carolina?
A: Yes.
Q: Did you have any motor vehicle accidents of any

Page 8

kind in North Carolina?
A: Yes.
Q: Any that involved injury to yourself?
A: No.
Q: Okay. Up until this accident had you ever injured yourself in any accident of any kind?
A: No.
Q: Had you ever made claim, other than this accident, for injury to yourself in any lawsuit filed in any court in any state?
A: No.
Q: When you returned to Rhode Island in July of '02, had you stopped your employment with Merrill Lynch? Were you on vacation? What was the situation?
A: I was on vacation for the last two weeks. The first — the first few weeks that I was here I worked at Merrill Lynch in Wellesley. I then went on vacation for two weeks, in which this accident happened.
Q: All right. So your intent was to return to Greensboro and your normal employment?
A: No. My intention was to continue employment in Wellesley.
Q: Okay. So it was going to be a transfer for you;

Page 9

is that correct?
A: That's correct.
Q: And was your title to be in Wellesley the same as your title was in Greensboro?
A: It was.
Q: Director of administration's assistant?
A: When I first returned, but technically, wasn't going to be going back initially.
Q: Okay. What was the reason — excuse me. Go ahead.
A: But the salary and such was remaining the same.
Q: And at that time it was approximately a thousand a week, your salary?
A: I'm not sure. It was about $40,000 a year.
Q: Okay. So divided by 52, whatever?
A: Yeah.
Q: When you came back to Rhode Island for that brief period of employment in Wellesley and then vacation, where were you staying in Rhode Island?
A: My mother's house.
Q: And where was that?
A: In Warwick, Rhode Island. Not far from Mr. Nadiger's house.
Q: And besides you and your mom, was anyone else living at that address?

Page 10

A: My stepfather and my mother and me.
Q: Did you have any siblings, brothers or sisters?
A: I do have two brothers and a sister.
Q: And with regard to your sister, older, younger?
A: Older. All older.
Q: And where is your sister located?
A: Maine.
Q: Married?
A: Divorced.
Q: Children?
A: Two.
Q: And how about the two brothers?
A: Two brothers. One is in Warwick and one is in Virginia.
Q: All right. The one in Warwick —
A: Both have one child.
Q: Okay. And what's the brother's name in Warwick?
A: Gary.
Q: And the brother, other brother?
A: Timmy.
Q: And your sister?
A: Debbie.
Q: Okay. Was it — I can only ask what your intention was at the time, but at the time had you formulated a plan to stay at home with your mom or

Page 11

would you have been intending to get a place up in Wellesley?
A: I would have gotten another place. I was not going to stay with my mother.
Q: Okay. Fair enough.
Now, today we're here at, what is it, 64 —
A: Scenic Drive.
Q: — Scenic Drive. And you — I thought I heard you say you rent this place?
A: That is correct.
Q: And before you moved here, where did you live?
A: I was in a nursing home before here.
Q: Okay. Did you go from the nursing home to this location?
A: Yes.
Q: And I notice there's a van outside that appears to be, you know, equipped for assisting you; is that correct?
A: Yes.
Q: And are you able to operate the van?
A: No.
Q: It's operated by who, generally?
A: My roommate.
Q: And who is that?

Page 12

A: Patrick Verdon.
Q: And I notice you have a handicap ramp. So it's possible for you to, using your wheelchair, go out into the van and be transported —
A: Elsewhere, yes.
Q: — for pleasure or errands or doctors; is that fair?
A: Mm-hmm.
Q: Would you just say yes?
A: Yes.
Q: Thanks.
Presently, I would like to understand your sources of income. Do you receive some kind of a benefit through Merrill Lynch?
A: Yes. Long-term disability.
Q: And how much is that presently, approximately?
A: Eleven.
Q: One thousand, one hundred?
A: Maybe $1100, maybe.
Q: Any other benefits that you receive from any government source?
A: Social Security.
Q: Okay.
A: I get about 11 from them as well.
Q: Okay. And are you on Medicare or some other —

Page 13

A: Medicare. And I do have a continued Merrill Lynch insurance that I got.
Q: For the health?
A: Yes.
Q: Okay. Any other sources of income at the present time? Not talking about

savings; talking about like a private disability policy that pays you so much a month, that type of thing.

A: No. I do work with the Paralyzed Association of Rhode Island. It's called PARI. They help me with my aides and things like that.

Q: Okay. Great.

Now, I would like to discuss with you, if I could try to segment this so you can focus on it, your experience in swimming, diving, that type of thing. Okay?

A: Mm-hmm.

Q: As you recall it, did you know how to swim on the date of this incident?

A: Yes.

Q: And from when had you been a swimmer?

A: From when I was young.

Q: How old would you think?

A: I can only remember back maybe as far as ten.

Q: Okay. Did you take lessons to become a swimmer at

Page 14

the local Y or something like that?

A: I believe when I was young, yes. Like a McDermott Pool.

Q: Okay. Did you ever have training as a lifeguard or any kind of an aquatic, you know, type person?

A: No.

Q: Did you ever dive, take training as a diver?

A: No.

Q: Other than learning to swim originally at McDermott Pool or wherever, did you ever subsequently have any training?

A: No.

Q: When I say training, I mean in aquatic swimming.

A: No.

Q: So would it be fair to say you were just a person who, when the opportunity arose, would swim recreationally, if I can say it that way?

A: Yes.

Q: No training, no specialization —

A: No.

Q: — in the sport of swimming, diving?

A: No.

Q: Anything like that?

A: No.

Q: When had you swum prior to the day of your injury?

Page 15

A: In North Carolina.

Q: Would it have been within the month or longer?

A: I would say probably the previous month. Perhaps in June.

Q: You mentioned you lived in an apartment complex in North Carolina.

A: That's where I would have swam.

Q: They would have had a pool there?

A: Yes, they did.

Q: And did they have a diving board associated with that pool?

A: No.

Q: Would it have been your practice to do laps in a pool or simply sunbathe and recreationally use the pool?

A: A little of both —

Q: Okay.

A: — of those two items.

Q: Okay. On average in the season in North Carolina, meaning the warmer time of the year, how often would you use the pool at the complex?

A: At least twice a week.

Q: Would you go to Nags Head or the ocean to use the beach in North Carolina?

A: Not in North Carolina. We were three hours from

Page 16

the beach.

Q: Okay. When you came home to Rhode Island for that period at Wellesley and on vacation, did you use the beach at all when you came home to Rhode Island before your injury?

A: I went to the beach, but I didn't go swimming.

Q: Okay. Sunbathing type of thing?

A: Yeah.

Q: Okay. Was that where you had been that day, the date of your injury, in Newport?

A: Not at the beach, but I was in Newport.

Q: Okay. We mentioned that you met Joe when you had come back here during this interval working in Wellesley. About how many times had you been in each other's company up until the date of your injury?

A: Almost every day of those couple of weeks.

Q: Okay. Do you recall where you met Joe?

A: My brother's friend. He's a friend of my brother or somebody my brother knew.

Q: And is that Gary?

A: Yes.

Q: Okay. If you know, do he and Gary still have any kind of a relationship with each other?

A: I believe they do.

Page 17

Q: Okay. And with reference to Joe's home where the incident occurred, had you been to that home at any time prior to the day of your injury?

A: Yes.

Q: About how many times?

A: Almost every day.

Q: All right. And so you had had some interaction with his three children?

A: Yes.

Q: Had you used the pool in the backyard at any time prior to the day of your injury?

A: No.

Q: With reference to your experience with swimming pools, in a general sense, that pool that the incident occurred in at Joe's is what's called an above-ground pool; is that correct?

A: Yes.

Q: And the pool that you used at your apartment complex in North Carolina I'm assuming is what I would call an inground pool?

A: That is correct.

Q: Okay. When you went into Joe's pool the day of your injury, had you ever swum, swam, whatever, in an above-ground pool?

A: Yes.

Page 18

Q: Where had that happened?

A: Throughout childhood I've been in above-ground pools.

Q: Okay.

A: More than —

Q: More than inground pools?

A: — inground pools.

Q: Did you and/or your family where you grew up have at any time an above-ground pool?

A: No.

Q: But you would have in the neighborhood, friends or relatives, have had the opportunity; is that fair?

A: Yes.

Q: And had any of your experiences at above-ground pools led you to dive when you were at this type of pool?

A: I don't remember.

Q: Okay. Typically, in comparison to the pool that you were in at Joe's,

were these pools that you've described to us that you might have used during your childhood similar in size and depth of water?

A: Yes.

Q: And were they similar in the sense they would have a ladder on the outside that you would climb up in order to enter into the pool?

Page 19

A: Yes.

Q: Would any of those pools that you used in your childhood have had any kind of a decking around them or would they have had a perimeter similar to Joe's pool?

A: Some of them had a deck surrounding them.

Q: And did others — were others similar to Joe's?

A: Yes.

Q: Did you ever stand up and dive from the perimeter of these pools similar to Joe's pool at any time during your childhood use?

A: Maybe.

Q: Did your use of above-ground pools as a child include anyone, an adult or playmate warning you against diving into that type of pool?

A: Not that I recall, no.

Q: Did any of those pools have warnings on them saying no diving or words to that effect?

A: Maybe.

Q: When it came time for you to enter the pool at Joe's the day of your injury, did you use the ladder to go up and enter into the pool?

A: Yes.

Q: And did you see the sign under the ladder as you went up?

Page 20

A: I did not.

Q: Did you at any time, at any place on the pool, inside or out, see a sign saying no diving?

A: I didn't at the time.

Q: Mm-hmm. Did anyone at any time warn you against diving while you were using the pool at Joe's that day?

A: Not that I recall.

Q: Was Joe diving at any time?

A: No.

Q: Were any of the three children, if they were in the pool, diving?

A: No.

Q: How long would you say you spent in the pool before your injury occurred?

A: Maybe 20 minutes.

Q: If we could go back to the day of your injury, as you recall it, what time did you get up that morning?

A: Maybe 9:00.

Q: Okay. And where did you go once, you know, you dressed and cared for yourself? Where did you go that day?

A: I went to the spa on Goat Island in Newport.

Q: Okay. Had you used that spa before?

Page 21

A: Yes.

Q: And what services did you have from the spa that day?

A: I had a massage and I had a water treatment that day.

Q: What does that mean?

A: It's like a massage but with water.

Q: Okay. All right. And when you finished with your treatment, about what time was it when you left?

A: I was there for about three hours. So maybe one.

Q: And when you left Goat Island, where next did you go?

A: I went to lunch with Joe or Marvin.

Q: I didn't hear the last part you said.

A: I went to lunch with Marvin. We called him Joe. So his name is really Marvin, but we called him Joe. So when I say Joe, I mean Marvin.

Q: Okay. And where was lunch?

A: The Islander, Chinese restaurant.

Q: That's in the Warwick area?

A: Yes.

Q: Had you been to that restaurant before?

A: Yes.

Q: How — did Joe meet you there? Did you pick him up? What's your recollection?

Page 22

A: I'm not sure. I guess I picked him up.

Q: When you say you picked Joe up, did you pick him up from his workplace or from his home, if you know?

A: I'm not sure.

Q: All right. Actually, his home and his workplace are almost side by side; is that right?

A: Yes, that's correct.

Q: In any event, you end up at the Islander at about what time would you say?

A: Between 1:00 and 2:00 maybe. It would be after 1:30. It took me that time to get back.

Q: 1:00 to 2:00 p.m., approximately?

A: I'm going to say 2:00, somewhere in there, yes.

Q: How long did you spend there before you finished and left?

A: Maybe a little over an hour.

Q: Okay. Other than you and Joe having lunch together, were there any third parties involved that might have joined you?

A: No.

Q: When you left the Islander, where next did you go?

A: We went to a club on the beach, Oakland Beach.

Q: Do you recall the name of that club?

A: I can't remember.

Page 23

Q: All right. Do you recall what street it was on or anything about the place?

A: Well, it was right on the beach in Oakland Beach, so there's only about four or five buildings there.

Q: All right. And about how long did you spend there?

A: Maybe an hour or two there.

Q: And when you left that location, where next did you go?

A: Back to Joe's house or Marvin's house.

Q: And what's your best estimate of what time you would have reached Joe's or Marvin's house?

A: Between 5:30, 6:00 o'clock. Because the baby-sitter was there.

Q: All right. Now, I want to review with you a different topic but the same day. And that is what you had to eat that day. When you got up in the morning about 9:00 o'clock, did you have a breakfast or anything to eat?

A: I went to Dunkin' Donuts.

Q: All right. And as you recall it, what did you have?

A: I usually ate bagels back then. I would say that I probably had a bagel.

Page 24

Q: Okay. With cream cheese?

A: Mm-hmm. Yes.

Q: Low fat?

A: No.

Q: Regular?

A: Yes.

Q: Okay. Just one?

A: Yes.

Q: And coffee?

A: Yes.
Q: Any juice?
A: No.
Q: Okay. Did you go from there to Goat Island for your massage, etcetera?
A: Yes.
Q: Okay. When you next ate after Dunkin' Donuts, was that at the Islander?
A: Yes.
Q: And what did you have there?
A: I know that I had chicken wings. I might have had some chow mein. I know that we had some appetizers and we had some regular food, and so I remember that.
Q: Okay.
A: But I don't know exactly what.

Page 25

Q: A pu-pu platter probably?
A: I don't think it was that much.
Q: And did you ever eat again after that time that day up till your incident?
A: No.
Q: Now, same subject, drinking. Okay? You had coffee in the morning?
A: Yes.
Q: When you next had any liquid that day, what was it?
A: Water in the spa.
Q: Okay. When you next had liquid, when was it and what did you have?
A: It was at the restaurant.
Q: Okay. And what do you recall having?
A: Scorpion Bowl.
Q: Being a beer drinker, you lost me on that one. What would that be, a type of exotic drink of some kind?
A: Yes.
Q: And is that something that you were familiar with —
A: Yes.
Q: — that you ordered?
A: Yes.

Page 26

Q: What would be the principal taste or ingredients in something like that? Is it an orange drink, a coconut drink?
A: It's a shared drink. It's a fruit drink —
Q: Okay.
A: — that has various fruit juices and alcohols in it that you share with a couple of straws.
Q: So it's like a big —
A: Yes.
Q: — extra big Cosmopolitan glass with two straws type of thing?
A: Yes.
Q: And besides that did you have anything further to drink?
A: Not there, no.
Q: Do you have just one of those, as you remember, or more than one?
A: I know that I had one.
Q: Okay. And when you next had something to drink, was it at the beach place in Oakland Beach?
A: Yes, the beach place.
Q: What did you have there?
A: I had some beers.
Q: Anything else?
A: I remember — I remember some tequila, but I'm not

Page 27

sure how much.
Q: This Scorpion Bowl, did Joe share the drink with you?
A: Yes.
Q: I realize sometimes these things are difficult to judge, but did he have his half and you have your half, or did he do better than you or you better than he in consuming it?
A: I'm not sure. I'm not sure I — I would have to say it would be pretty equal.
Q: Okay. And how many beers would you think you had at Oakland Beach?
A: Two or three maybe.
Q: Okay. Were they, you know, like a Bud Light or a Budweiser type of beer or a draft?
A: Corona, I believe.
Q: Corona. Okay. Twelve-ounce standard bottle?
A: Standard bottle.
Q: Okay. And the tequila, was this in a shot or —
A: Yes.
Q: How many of those would you think?
A: I'm not sure how many of those.
Q: Would it be like one with each beer or more or less?
A: No, no, it wouldn't be one with each beer.

Page 28

Q: Okay. What's your best recollection?
A: I would say at best two at the most, but it's just a guess.
Q: Okay. Fair enough. So when you left home that morning, was it your intent to end up swimming over at Marvin's pool?
A: No.
Q: Okay. Did you have some kind of a swimsuit with you that you could use?
A: Yes.
Q: And how was it that you did have the suit with you?
A: Because I kept it in my car.
Q: Okay. All right. So when you got back to Marvin's about — I think you said 5:30, 6:00 o'clock, approximately, who was there, as you remember it?
A: The three kids —
Q: Yeah.
A: — and baby-sitter.
Q: Okay.
A: But the baby-sitter left immediately.
Q: Okay.
A: So it was just the three kids and Marvin and myself.

Page 29

Q: Okay. And did you have anything to eat when you got to Marvin's?
A: No.
Q: Anything further to drink when you got to Marvin's?
A: No.
Q: Was it fairly immediate that you decided to go swimming?
A: Yes. It was a few minutes after we got there. The kids suggested it.
Q: Were the kids in the pool or were they —
A: At the beginning, yes.
Q: No. When you got to Marvin's, were they in the pool or were they in the house?
A: No. They were in the house.
Q: All right. So once the decision was made to go swimming, did you change?
A: Yes.
Q: Okay. You go to the pool with the kids and Marvin?
A: Yes.
Q: Okay. And how long would you say it was before your incident occurred?
A: Maybe a half an hour after I was in the pool.
Q: Okay. So I'm just focused on that period now.

Page 30

You go out. You go up the ladder. And how did you enter the pool?
A: I just walked down the ladder into the pool.
Q: Okay. All of us have seen some

photographs of the pool, and the water is below the lip, the metal top of the pool. How is your recollection in regard to how much water was in the pool that day?
A: I don't remember that.
Q: Do you remember seeing like the liner, you know, showing above the water?
A: I don't think I looked. I don't remember.
Q: All right. Once you were into the pool by using the ladder, did you ever leave the pool completely and go back in the house for any reason, use the ladies' room, get a drink of water, or whatever?
A: I took the littlest kids out of the pool.
Q: Okay.
A: And then went back into the pool.
Q: So prior to your incident how many times would you have gone up the ladder to enter the pool, two times?
A: Two times. Once initially and once when the kids were out.
Q: So you would have made two round trips up the ladder, out of the pool, down the ladder on the

Page 31

outside, back and forth?
A: Yes.
Q: So you would have gone in, out, in?
A: Yes.
Q: Three half trips I should say. Okay. And as you recall it, were you guys just hanging out in the pool playing with the kids? What was happening?
A: Yes, we were just playing with the kids, splashing around and — yeah.
Q: Okay. Now, did there come a point in time when you, for whatever reason, did something in terms of getting out of the pool and then diving or jumping into the pool?
A: I did go up onto the edge of the pool.
Q: Okay. And was that just, you know, your decision or did someone say do it or —
A: It was my decision.
Q: Okay. And how would you have gotten up on the metal edge of the pool? Would you have approached it from the pool, facing it, or would you have like turned around and hopped up with your butt up onto the metal, if you remember?
A: I think I came from behind it and pulled myself up.

Page 32

Q: Okay. And once you sat up on the pool — you're sitting on the metal rim of the pool; am I understanding?
A: Yes.
Q: And how wide would you say that was?
A: Maybe six or seven inches.
Q: And was it like a metal type of thing as distinguished from wood or plastic or some other material?
A: It was like sheet metal.
Q: All right. Did it have any kind of a nonskid surface that you observed?
A: There wasn't any, like, nonskid things, but I think there were dents in it.
Q: Like little grooves?
A: Yes.
Q: And once you sat up on the edge of the metal, as you've described it to us, what next did you do?
A: I stood up.
Q: Okay. And then what?
A: And I dove into the pool.
Q: Okay. And did anything happen on that occasion?
A: No.
Q: Okay. And did you do — return and sort of repeat your exit out of the pool a second time?

Page 33

A: I pulled myself up from behind again and sat up on the side of the pool again, yes.
Q: Now, did Marvin say anything to you about diving?
A: Not that I recall.
Q: Did anyone say anything?
A: No.
Q: Okay. And when you dove in the first time, did you make some kind of a dive, like a swan dive or was it, you know — can you just describe for me the type of dive you made?
A: It was a shallow dive to get to the other side.
Q: Okay. Would you have gone —
(Brief interruption).
BY MR. KERSHAW:
Q: Was it something where you stayed under water to the other side and came up at the other rim or, you know, did you come up and swim across to the other side?
A: No. I was under for most of it.
Q: All right. And when you exited the second time, did you go back to where you had been the first time and exit the second time, or did you go to a different area of the rim of the pool?
A: No. The same area, same spot.
Q: And what next happened after that?

Page 34

A: Well, there I sat on the edge of the pool. Then I stood up —
Q: Yeah.
A: — on the, that lip platform.
Q: Yeah.
A: But there I lost my balance and fell into the pool.
Q: Okay. I'm just trying to envision your words, okay? You're standing on this metal perimeter; is that correct?
A: Yes.
Q: Are you facing inward to the pool?
A: Yes.
Q: And what was there about that position that caused you to slip? I mean, did you make some kind of a move to move around the perimeter by, you know, shuffling your feet in some way or what?
A: No. It was identical to the first time except the balance wasn't there.
Q: Okay. The first time you would have come out of the pool, so your feet were wet. You stood up, and you dove, as you've described it, a shallow dive?
A: The first time, yes.
Q: The first time.

Page 35

A: Mm-hmm.
Q: And you didn't slip in that - in the execution of that maneuver. You did not slip; is that correct?
A: No. That is correct.
Q: The second time you do the same thing. You have your back to the perimeter. You use your arms to lift yourself and seat yourself up on the rim; is that fair?
A: Yes.
Q: And from that position do you then stand erect?
A: Yes.
Q: Okay. When you're erect, you're facing inward to the pool?
A: Yes.
Q: Okay. And what is it that slips?
A: I don't know. I just lost my balance and slipped.
Q: Okay. And when you lose your balance, do you fall in the direction of the pool?
A: Yes, I fell in the direction of the pool.

Q: And do you have any recollection of what happens after that?
A: The next thing I remember is staring at the bottom of the pool.
Q: Okay. So your recollection — I just want to make sure I'm understanding. Your recollection would

Page 36

be that you did not slip as you dove a second time into the pool?
MR. MAGLIO: Object to the form of the question.
Q: Is that correct?
A: No, I didn't get to dive the second time.
Q: Right. You just fell in?
A: I just fell in.
Q: All right. Okay. From there I know you go to the rescue, you go to the hospital. And then your predicament and situation takes its course. I'm not going to get into that with you. Okay?
A: Okay.
Q: I've enjoyed meeting with you this afternoon and seeing you. I see that you have some ability, fortunately, to move. Could you just describe for us presently what your abilities are as far as movement is concerned?
A: I have some upper-body movement, some grasping in my left hand.
Q: Okay.
A: But I don't have very much strength or triceps or anything from here down (indicating).
Q: You're saying like from your waist or higher?
A: From my chest.

Page 37

Q: From your chest down?
A: Down, I don't have anything.
Q: I notice you're able to speak with me. You're moving around a little bit in your - with your upper body and in order to talk with me.
A: Yes.
Q: That must represent a considerable improvement over what the situation was immediately after your injury; is that correct?
A: Immediately after the injury, I couldn't move at all, yes.
Q: Right, right. Is this ability that you have something that's come back to you or is it as a result of therapy from —
A: It was the result of lots of therapy.
Q: Okay. So you've worked hard to achieve what you have?
A: Yes.
Q: Okay. Can you tell me today — you know, not today, today, but I mean, present, contemporaneous through our meeting, what type of exercises and efforts that you make in this regard?
A: I have a tilt table to stand to put pressure on my bones. I have a bicycle that moves my legs for me. I have upper-body weights and punching bags

Page 38

and stuff to do on a daily basis.
Q: Okay. So that keeps you pretty busy, I guess, just doing that?
A: Yes.
Q: How many hours would you say in a day you would spend in these endeavors?
A: About three to four hours a day, depending on the exercise.
Q: Do you have an opportunity to get out of the house at all besides — I know you perhaps go medically out of the house.
A: Yes.
Q: But, you know, recreationally, do you get a chance to get out of the house at all?
A: Some, to dinners and things, but not to a lot of social functions, not really.
Q: Okay. Visit your brothers or anything? Mother? Is your mother still alive?
A: Yes.
Q: So do you go to family functions at all?
A: No. I can't enter any of those dwellings.
Q: Because of the handicap limitation?
A: That is correct.
Q: Your companion, Patrick, you mentioned, —
A: Yes.

Page 39

Q: — is he employed?
A: Yes.
Q: What type of work does he do?
A: He's an electrician.
Q: And he's not here today because he's working, I assume?
A: That is correct.
Q: How did you come to meet Patrick?
A: I was friends with Patrick for — since my early 20's. We've been friends for a long time.
Q: Okay. Is — obviously, he in effect is a caregiver to you?
A: That is correct.
Q: He drives you and assists you?
A: Yes.
Q: Does he need to help you in and out of bed —
A: Yes.
Q: — or do you make that yourself?
A: Yes. I cannot move myself in and out of bed.
Q: Do you have any kind of an assist or is it just Patrick's arms?
A: Just Patrick's arms that move me at the moment.
Q: And do you dress or he dresses you?
A: He has to do most of that.
Q: And as far as, you know, bowels and that type of

Page 40

thing, how is that handled?
A: No control. I have to — I have to — I have Depends and things, so.
Q: So he helps you in that regard?
A: Yes.
Q: And does he like work a full-time job?
A: Yes.
Q: So you're here alone most of the time in the day?
A: I have aides in the morning to get me up and dressed. And then I'm here in the afternoons by myself until he comes home.
Q: How about like cooking a dinner, or do you bring it in? Does he cook? Do you cook? How does that work?
A: My aide makes something for me before she leaves. And then Patrick makes something at night or we go someplace to eat at night.
Q: Does he work for a company?
A: Yes. Well, the union, yes.
Q: What company does he work for?
A: Coastway.
Q: What is it?
A: Coastway Electric — Coastal Electric.
Q: Is that here in the North Kingstown area?
A: Newport.

Page 41

Q: Newport. Okay.
MR. KERSHAW: That's all I have. I thank you very kindly for your attention to me.
THE WITNESS: Thanks.
MR. KERSHAW: Joe, do you want to sit here?
MR. CAVANAGH: Sure.

EXAMINATION BY MR. CAVANAGH

Q: Would you like to take a break?

A: No, I'm okay.

Q: You let me know if you want to take a break.

A: I'll just keep maneuvering myself. So if you think I'm falling over or something, I'm not. I just have to move a little bit here and there.

Q: Fine.

As I indicated to you off the record, I'm Joe Cavanagh, and I represent Delair Group. They manufactured the above-ground pool that we've been talking about. I just have a couple of follow-up questions.

You graduated from Pilgrim in '87, right?

A: Yes.

Q: Did you participate in any sports at Pilgrim?

A: No.

Q: Okay. Give us an idea of what sports you

Page 42

participated in in your lifetime.

A: I played basketball for St. Peter's when I was in, I don't know, elementary or junior high. I did track and basketball in the Air Force in '89. I think I was there in '89. Otherwise, everything else I did kind of on my own. I did a lot of exercise in the gym. I did a lot of aerobics and things like that daily.

Q: Okay. When you say you did that, was that after high school you did aerobics and gym work?

A: Yes.

Q: When you were in North Carolina, for example?

A: Especially in North Carolina, yes.

Q: And would you regularly go to the gym and work out?

A: Every day, yeah.

Q: What would you do for exercise at the gym?

A: Mostly aerobics.

Q: Okay. Did you ever do any gymnastics?

A: Only in like elementary school or junior high school. I didn't do anything professionally or, you know, like that.

Q: Did you take lessons or go to gymnastics class or locally when you were a little girl?

A: No, just the gym in the school.

Page 43

Q: So were you ever taught how to do a flip or a somersault in school?

A: In school?

Q: Yes.

A: I would say yes.

Q: And who taught you that?

A: Oh, I wouldn't know. I don't know.

Q: Gym teacher?

A: A gym teacher for sure.

Q: Okay. And would you — were you afraid to try it? Would you do a somersault or a flip?

A: No. I did those.

Q: You were able to do those?

A: Yes.

Q: Okay. Now, you mentioned the Air Force. You went in the Air Force after you left Pilgrim?

A: Yes.

Q: And how long were you in the Air Force?

A: Only eight months.

Q: Okay. And did you — did they have basic training?

A: I did basic training.

Q: Where was that?

A: San Antonio, Texas.

Q: Okay. And you were only in for eight months. Is

Page 44

there any particular reason why?

A: I wasn't really good with authority when I was young.

Q: Okay. So was it a mutual parting of the ways sort of?

A: Sort of, yes. I was generally discharged, yes.

Q: And you understood why?

A: Yes, I did.

Q: All right. Fair enough.

Now, you mentioned that you had — you had done a shallow dive —

A: Yes, sir.

Q: — in the pool.

And what did you mean by a shallow dive?

A: I mean that I wasn't looking for depth. I was looking for length.

Q: Okay. And had you been taught how to do a shallow dive?

A: I don't think formally.

Q: Okay. Even informally. How did you know how to do a shallow dive?

A: I don't know. I guess I just picked it up along the way.

Q: And when you describe it as a shallow dive, that's as opposed to a deep, vertical dive?

Page 45

A: That is correct. I wasn't aiming down. I was aiming across.

Q: Why were you aiming across and not down?

A: Because there wasn't anywhere to go down.

Q: You were aware that the pool was shallow, fair?

A: Yes.

Q: Right?

A: Yes.

Q: So you were intentionally trying to dive in a way that would avoid hitting the bottom?

A: Yes.

Q: And were you aware of that risk from having been in the pool earlier?

A: No.

Q: But when you say you knew it was shallow —

A: Yes.

Q: — and you were trying to dive in a manner to avoid the bottom —

A: Well, I was diving shallowly to get to the other side.

Q: Okay.

A: I wasn't purposely avoiding the bottom. I just wasn't aiming towards the bottom.

Q: And when you say aiming, did that mean that you had to bend your knees and push off?

Page 46

A: I couldn't push off. It wasn't far enough. I couldn't pick up that much speed. It wasn't that far across the pool for you to be able to push off.

Q: But I mean when you said you were aiming to get to the other side of the pool, how did you try to accomplish that on your first time that you dove?

A: I just — I'm not sure how to answer that. I guess I just — I guess I just kind of do where I wasn't under the water very much. I didn't — I didn't use force to —

Q: You didn't?

A: — to push myself across.

Q: Okay. Were you standing on the rim?

A: Mm-hmm.

Q: Right?

A: Yes.

Q: And you're not holding onto anything?

A: Correct.

Q: You're just standing there?

A: Yes.

Q: How long did you stand there before you dove, do you remember?

A: Not long. Maybe 20 seconds at most.
Q: Do you remember where the other people in the pool

Page 47

were during the time you were standing on the rim?
A: Yes. Joe — Marvin was to the left of where I was going.
Q: Okay.
A: I believe his daughter was over there too.
Q: Let's see if we can just orient ourselves. You climbed in the pool by way of the ladder?
A: Yes.
Q: Right?
A: Mm-hmm.
Q: And then at some point if you turned around and faced the ladder — are you with me?
A: Yes.
Q: — when you decided to dive, did you go to the left side of the ladder or the right side of the ladder as you faced it from inside the pool?
A: Up the ladder. And I was on this side (indicating), the right side.
Q: Okay.
A: I was on the right side of the pool, closest to the house.
Q: Okay. Tell you what. I have a picture or two. Let me just see if that helps you.
MR. CAVANAGH: There's a whole series of pictures. Why don't we mark this as an exhibit.

Page 48

(Defendant's Exhibit A1 through A11 for I.D.: Photocopies of photographs)
Q: I just have to make sure — Exhibit A, I want to make sure — let me see. There's 11.
MR. REED: I have more.
MR. CAVANAGH: Do you have the wood decking? There's a wood decking here.
MR. KERSHAW: Here. We'll match them up.
MR. REED: Do you want to take a break at all?
THE WITNESS: No. Just keep it going.
BY MR. CAVANAGH:
Q: I'm showing you a photo and ask you if you can identify that, okay?
A: Yes.
Q: That is Exhibit A. I'm numbering the pages, and that's A2, that photo. Okay?
A: Okay.
Q: Now, is that how the pool looked at that time?
A: Yes.
Q: At the time of the incident?
A: I believe so.
Q: And that's the ladder and that's where you think it was located?
A: Yes.

Page 49

Q: All right. So you climbed in. And you were in the pool for some period of time with the family?
A: With the little kids, yes.
Q: With the little ones.
And as you — if you were facing the ladder from inside the pool —
A: Mm-hmm.
Q: — all right?
A: Yes.
Q: Can you picture that?
A: Mm-hmm.
Q: When you dove for the first time, did you dive off the edge on the left side of the ladder or the right side of the ladder as you face the ladder?
MR. REED: Do you understand?
A: As I face the ladder?
MR. KERSHAW: From the perspective of the photograph, left of the ladder or right of the ladder?
MR. REED: Why don't you —
A: To the right of this side, so it's the left of that side.
Q: Let me start again because I've been putting you in the pool, and that's getting you disoriented I think.

Page 50

A: I was here (indicating).
Q: Let me see.
A: (Witness indicating).
Q: Right. That's where I thought you were. Okay.
A: So if I'm in the pool, —
Q: Tell you what.
A: — left and —
Q: I'm going to ask you, if you would, with this red pen just mark Exhibit A2, if you can do that.
Can you do that for us?
A: Mm-hmm. Like here (indicating).
Q: Right over there just with some red.
(Witness complies).
Q: Thatta girl. Thank you.
Now, I'm going to improve on these red marks. It's right over here (indicating)?
A: Yes.
Q: Okay. Good enough. So you stood up there on that rim, not holding onto the ladder?
A: That's correct. I was farther away from the ladder.
Q: And you dove across the pool to the other side; that was your goal?
A: Yes.
Q: Fair?

Page 51

A: Yes.
Q: Now, earlier I asked you, when you said you described it as a shallow dive, you said you were doing that to get across the pool, right?
A: Yes.
Q: Now, did you bend your knees and thrust yourself off the edge?
A: There wasn't much thrust, if there was any, because it wasn't a long distance. So it was more isolated.
Q: Well, you didn't jump in?
A: It wasn't — no, I did not jump in.
Q: You didn't drop in?
A: No, I did not drop in.
Q: You went head first into the pool?
A: Arms first.
Q: Arms first, leading your head, right?
A: Mm-hmm.
MR. MAGLIO: Say yes.
A: Yes. Oh, sorry.
Q: And you — I'm just asking, do you have a memory of thrusting yourself with your legs in order to dive forward?
A: I don't — I don't remember.
Q: Okay. Had you — I take it from what you've said

Page 52

to us, you have dived in the past?
A: Yes.
Q: And you don't remember if you ever have dived in an above-ground pool?
A: I don't remember.
Q: Okay. But you do remember having dived in an inground pool?
A: Yes.
Q: Okay. And the pool that you most recently had been in in North Carolina was an inground pool?
A: Yes.
Q: Would you from time to time dive into that pool?
A: Yes.
Q: And would you dive off the side?

A: Yes.
Q: All right. And before you dived, would you make sure you knew how deep the water was?
A: No.
Q: Okay. Would you dive in — was there a deep end and a shallow end to the pool in North Carolina?
A: Yes.
Q: Would you dive into the shallow end?
A: Not particularly.
Q: Well, okay. In your life experience did you appreciate the difference between a shallow end of

Page 53

a pool and a deep end of a pool?
A: I guess I was just usually in the middle of the pool. And so I didn't really think of it, I don't think.
Q: I'm asking you if during your life you became aware of the fact that there would be a shallow end of a pool and a deeper end that might be over your head.
A: Yes.
Q: Okay. And were you ever aware of the fact that it could be dangerous to dive into a shallow end of a pool?
MR. MAGLIO: Object to the form of the question.
But go ahead.
Q: You can answer.
A: Okay. Say it again?
Q: In your life experience, both as a child, as an adult, up to the point where in August of 2002 this incident occurred, had you appreciated or recognized the difference between a shallow and a deep end of a pool and the fact that it could be dangerous to jump into shallow water?
MR. MAGLIO: Objection to the form.
A: Um, I guess it's the way that you're asking the

Page 54

question that's confusing me. Can you rephrase it
or —
Q: Okay. You can't answer that.
Were you aware before you went into Mr. Nadiger's pool, that to dive into shallow water could be dangerous?
MR. MAGLIO: Object to the form. Go ahead.
A: Yes.
Q: Excuse me. When he objects, it doesn't mean anything. He's only talking to her. You and I just keep going. Okay?
A: Okay. So I guess the question would be yes — I guess the answer would be yes.
Q: Okay. And what was it that you knew was dangerous about diving into shallow water?
A: I guess because I could get scraped up on the bottom.
Q: Had you ever heard of somebody getting hurt from diving into shallow water ever in your life?
MR. MAGLIO: Object to the form.
A: No.
Q: Had you ever been warned by anybody, don't dive into water that's not deep?
A: Not — I wouldn't say formally.

Page 55

Q: Well, how about informally?
A: No, I don't think — because I didn't have a pool, I don't think I rarely got the rules.
Q: So when you went into these inground — above-ground pools as a child and in your teenage years, no one had ever said, "Be careful. The water is shallow"?
A: Not that I recall.
Q: Okay. Did you yourself recognize that you couldn't do certain things in water that wasn't deep that you could do in deeper water?
A: I don't think so.
Say the sentence again? Ask the question again?
MR. CAVANAGH: Could you ask her again?
(Whereupon, the requested portion of the record was read back by the court reporter.)
A: Yes.
Q: Okay. What did you notice?
A: In particular, well, kind of like before, like you could get scraped up on the bottom if it's low and, you know, if the bottom is there, or you could slip or - if it's too shallow.
Q: Okay. And what did you think would be shallow water?

Page 56

A: I would say a few feet.
Q: Okay. Did you believe that the water was shallow in Mr. Nadiger's pool?
A: Somewhat, yes.
Q: When you dove for the first time, were you aware of the fact that the water was what you would think somewhat shallow?
A: Somewhat shallow.
Q: Okay. And you were aware of that, fair?
A: I knew the depth of the pool.
Q: Did you dive in a manner so as to avoid getting scraped on the bottom?
A: Yes.
Q: And you did that on purpose?
A: Yes.
Q: And that was because you knew, having been in the pool already, that it wasn't over your head?
A: It wasn't over my head, no.
Q: In fact, where did it come up to you?
A: I'm not sure.
Q: Waist high?
A: I'm not sure.
Q: Okay.
A: Maybe even higher than that.
Q: Okay. In any event — and you told us earlier

Page 57

that you don't remember if Mr. Nadiger said anything to you after you dove the first time?
A: I don't remember if he said anything.
Q: Okay. Let me ask you generally. I know that you've indicated that you remember seeing the bottom of the pool after you went in the second time off the edge.
A: Mm-hmm.
Q: Do you have a — do you — do you have a good memory of all the events that occurred up until that memory of seeing the bottom of the pool?
A: I would say yes.
Q: You do. Okay. So you can remember what you were doing with your arms and your feet?
A: Oh, I don't think I remember that.
Q: Okay.
A: I wasn't doing anything. Because when I was looking at the bottom of the pool, I couldn't move.
Q: Fair enough. I meant before that when you were standing on the edge.
A: I can't remember exactly what I was doing with my arms or hands.
Q: Okay. You told us earlier you can't remember what caused you to lose your balance, as you said.

Page 58

A: That is correct.
Q: Was it windy that day?
A: Not that I remember.
Q: All right. How long — I think you may have been asked this, but I'm going to ask it again. How long do you

recollect you were standing on the edge of the pool the second time before you entered the water?
A: That would be a little less time than the dive.
Q: Okay.
A: More maybe ten seconds.
Q: Okay. Were you preparing to dive again?
A: I was going to get into the stance. I just didn't get that far.
Q: Fair enough. Now, when you say the stance, is that for a particular type of dive?
A: Just for it to be a shallow dive as opposed to a deep dive.
Q: Okay. Have you done deep dives in your life?
A: Not many.
Q: But you have done some?
A: I've jumped off a diving board before, yes.
Q: Fair enough. Have you ever tried a jackknife?
A: No.
Q: Do you know what a jackknife is?

Page 59

A: I've seen other people do it.
Q: Have you ever — you've never tried one?
A: No.
Q: How about a swan dive, have you ever tried a swan dive?
A: No.
Q: You said you've done shallow dives before?
A: Yes.
Q: You've done deep dives before?
A: Yes.
Q: Have you ever done a flip?
A: No.
Q: Have you ever tried a flip?
A: No.
Q: Now, when you were getting — what was the stance you were going to get into to do the second dive?
A: Just putting my feet together and having my balance was basically my idea of a stance.
Q: Now, let's go back to your first dive for a minute. You couldn't describe for me what you did to push yourself out over the water. But let me ask you again. You didn't jump in and you didn't drop in. And you propelled yourself in some manner; is that right?
A: I would assume, yes.

Page 60

Q: That's what a dive is, right? You dive; you move your body forward, right?
A: Yes.
Q: So you were standing in a vertical position on the edge of the pool, —
A: Yes.
Q: — right?
And you propelled yourself in a manner so that you were horizontal going into the water on the first dive?
A: Horizontal, yes.
Q: So you moved your body intentionally in order to do that.
A: Yes.
Q: Fair?
A: Fair.
Q: And did you hold your hands out in front?
A: Yes.
Q: Why?
A: That's — I don't know. I just always did that.
Q: Okay. All right. Now, the second time you went in the water you were preparing to do the exact same thing?
A: I was going to prepare. I just didn't get that far. I fell before I got to.

Page 61

Q: And you don't know what caused you to fall. You told us that earlier, right? You lost your balance?
A: Yeah, I'm not sure. I lost my balance, but I'm not sure why.
Q: Okay. And do you recall — you told me earlier that you have a good recollection of what happened. Did you put your arms out when you fell when you went in the second time?
A: I don't remember that. I mean, I remember — I remember losing my balance and next thing I remember is seeing the bottom of the pool. So I don't know between — I don't know how I went in.
Q: Okay. You don't know where your legs were, where your arms were, where your head was?
A: I don't recall.
Q: Okay. How much did you weigh at that time, approximately?
A: Probably about 122, 125, something like that.
Q: And how tall were you?
A: Five, six.
Q: Do you recall hitting your head on the bottom of the pool?
A: No.
Q: When you told us that you recall seeing the bottom

Page 62

of the pool, was that as you approached the bottom of the pool or was —
A: No. It was after the fact.
Q: After the fact. Do you remember feeling an impact?
A: No.
Q: Do you remember feeling yourself, any part of your body touch the bottom of the pool?
A: No.
Q: Did you feel pain right away?
A: No, I felt nothing.
Q: Were you able to talk?
A: Yes.
Q: Could you tell us your best recollection of what you talked about when you first came out of the water? And I don't mean out of the pool. I mean when you first came above the surface.
A: I said, "I can't move" were the first things out of my mouth.
Q: Did you know what happened?
A: No.
Q: And to this day you don't really know what happened either, do you?
MR. MAGLIO: Object to the form.
A: No. I know that I lost my balance on that little

Page 63

decking and it propelled me into the pool. But how — where my hands were at that time, I don't remember where my hands were at that time.
Q: Okay. When you just said when you lost your balance and you said, you were propelled into the pool?
A: Well, I fell into the pool, so.
Q: Okay. Was the edge of the pool that you were standing on, was it springy in any way? Could you spring on it or was it sturdy?
A: No. It was — it wasn't springy, but it wasn't sturdy either. It was kind of loose.
Q: It was loose?
A: (Witness nodding head affirmatively). Yeah. It wasn't like solid metal or anything like that. It was more like bendable or, you know, thin metal.
Q: Right.
A: I don't know exactly what it's made of, but —
Q: It wasn't a solid piece?
A: It wasn't springy, but it wasn't stable really either.
Q: Okay. And you noticed that the first time you tried to boost yourself

up and stand up or the second time?
A: I don't know when I noticed that. Maybe while the

Page 64

kids were in the pool.
Q: Okay. So you had an opportunity actually while the kids were in the pool — you were playing around, so you noticed that the edge of the pool was similar all the way around from the ladder on both sides?
A: Did I know it was similar all the way around?
Q: Yes.
A: Yes.
Q: And you noticed that it was not sturdy?
A: Well, it was sturdy enough for me to stand on it. It wasn't — it was sturdy enough for me to stand on.
Q: Let me ask you. You drove from the restaurant, the Islander, to the beach club, right?
A: Yes.
Q: And you drove from the beach club to the house?
A: Yes.
Q: And did you feel you were impaired in any way?
A: Not that impaired, no.
Q: You were capable of driving?
A: Yes.
Q: And when you were swimming with the kids, did you feel impaired in any way?
A: No.

Page 65

Q: When you were diving off the side of the pool, did you feel impaired in any way?
A: No.
Q: And by impaired I mean did you feel the effects of the alcohol you had been drinking?
A: I didn't feel as if I was impaired, no.
Q: Do you remember the kids saying anything to you in between the time of your first dive and the time you got up the second time on the edge of the pool?
A: No.
Q: How much time was there between those two instances, the time of your first dive and the time when you got up intending to dive again?
A: Not long. Enough to get to the other side and back.
Q: And you told us you don't recall any conversation with Mr. Nadiger?
A: No. I thought I heard — I thought I heard him say something, but I don't know what that would have been or was.
Q: Okay. And you earlier told Mr. Kershaw that you have no memory of seeing any signs on the pool?
A: I don't recall seeing them or looking for them.
Q: Okay. Let's just take a look at these pictures.

Page 66

MR. KERSHAW: That will be Exhibit B.
(Defendant's Exhibit B for I.D.: Photocopy of photograph of Danger sign)
Q: Exhibit B is a photo taken at the - right where the ladder intersects with the edge of the pool. Do you recall seeing that as you climbed in and out of the pool using the ladder?
A: No. No, I don't remember seeing that.
Q: Okay. Thanks.
MR. CAVANAGH: That's Exhibit B.
And let's see the exhibit that has the sign on it, this one.
MR. KERSHAW: That one or —
MR. CAVANAGH: This one. This will be C, please.
(Defendant's Exhibit C for I.D.: Photocopy of photograph of sign on edge of pool)
Q: If you look at Exhibit C, you will see that there's some signage on the edge of the pool. Do you remember seeing that?
A: No. But like that (indicating), I wasn't looking for it. I don't know. I don't remember seeing it.
Q: Okay. If you had read this, would you have dived into the pool?

Page 67

MR. MAGLIO: Object to form. Go ahead.
A: Probably, yes.
Q: Okay. Okay.
Earlier today you said that you — when you were getting ready to do the second dive, you were going to assume the stance.
A: Mm-hmm.
Q: Could you describe for us what that stance was?
A: I did. More just putting my feet together and getting ready to go into the water.
Q: Okay. Was there any crouching involved?
A: Not that I recall, but I don't know what I looked like at the moment.
Q: Did you — this is — now I'm asking - I'm going to ask you about the first dive. Did you get into a coiled position in any way?
A: No.
Q: Did you — so did you stand up absolutely straight?
A: Initially, yes.
Q: And then what did you do? Just describe it for us as you prepared to dive.
A: I don't know exactly. I would assume that I bent, bent to go into the water.

Page 68

Q: Okay. When you say bent, where would you bend from?
A: Maybe my - the upper part of my body.
Q: Bend forward towards the pool?
A: Yes.
Q: Towards the water?
A: Mm-hmm.
MR. MAGLIO: Yes?
A: Yes.
Q: Yes. Okay. And the second dive you were preparing to get into that same stance?
A: Well, I didn't get to get into that same stance. So I didn't get to dive the second event.
Q: Right, I understand you've said that.
And when you told us that you don't know how you lost your balance, but you did?
A: I did.
MR. REED: I'll object to the form of that. I don't know if that's a correct representation of what she said, but go ahead.
MR. CAVANAGH: Okay. The record will bear that out either way.
BY MR. CAVANAGH:
Q: And after you got that sensation of losing your balance, tell us what your memory is of anything

Page 69

about your body, the water, the pool, anything. What's your next memory after you lost your balance?
A: I just remember my feet on that little decking and me losing my balance. So I remember seeing that little decking and then I remember being in the water.
Q: Did you have your head down? Is that what you meant by you were looking down at the decking?
A: No, no, no, no. I said I remember thinking — I remember thinking of

the decking and then I fell in.
**Q:** Okay.
**A:** There was something under my feet.
**Q:** What you're calling the decking is the edge of the pool?
**A:** That edge of the pool because that's where I lost my balance.
**Q:** You knew that wasn't a deck, right?
**A:** Right. I'm just calling it decking. It's not a deck, but that's what I'm calling it.
**Q:** Fair enough. You've been in pools that have had decks on them, right?
**A:** Wooden decks attached to the pool, yes.
**Q:** Right. Where there was ample space to walk

Page 70

around, fair?
**A:** Yes, ample space to walk around.
**Q:** And this was not one of them. This pool didn't have that deck?
**A:** Well, it didn't have a wooden deck, no.
**Q:** And I guess what I'm trying to get at is you said you remember being on the edge of the pool, —
**A:** Yeah.
**Q:** — losing your balance, and the next thing you remember is seeing the bottom of the pool?
**A:** Right. I remember falling in the water and seeing the bottom of the pool.
**Q:** When you say remember falling in the water, —
**A:** Mm-hmm.
**Q:** — can you tell us how you fell in the water?
**A:** I don't know exactly how I fell in.
**Q:** Give us any inkling of any memory you have of how you fell in.
**A:** I just remember not having control over it.
**Q:** Okay. Did you go sideways in, shoulders, head first? If you don't remember, tell us. If you do, tell us.
**A:** I don't remember if it was sideways or forward. I don't remember that.
**Q:** Fair enough.

Page 71

Do you have any sense, ma'am, of trying to recover your balance?
**A:** I would have to say that it's an immediate response. Doesn't your body immediately respond somehow to losing your balance?
**Q:** Is that your memory of that?
**A:** I don't really have a memory of it. I don't know what — how I responded.
**Q:** Okay. You don't know if you pushed with your legs; you don't know if you thrust with your arms?
**A:** I didn't push.
**Q:** You don't remember anything? You couldn't tell us
**A:** Well, I don't remember pushing. I don't remember grabbing anything or —
**Q:** Okay. Now, I guess what I'm asking in these questions for a number of reasons, but one of them is that I wanted to know what you remembered. And I imagine after the accident, you wanted to know what happened as well. Fair?
**A:** I remembered most — a lot of it.
**Q:** Did you ever speak to Mr. Nadiger about what happened?
**A:** Briefly in the hospital. We didn't — we didn't really discuss it too much.

Page 72

**Q:** What's your recollection of everything you ever discussed with him about the incident?
**A:** Just that, what - what angle did I fall in, you know, what — I just wasn't sure what — after I was unbalanced, I don't know how I hit the bottom or if I hit the bottom or that.
**Q:** Did you inquire of him as to whether he could help you with that?
**A:** He couldn't. He just — he could just — he just told me that it was - wasn't right.
**Q:** What do you mean it wasn't right?
**A:** That I was a bit jackknifed or something like that he had said.
**Q:** All right.
**A:** I don't know what my body looked like at that time. He was standing there, so he got the best view of how I actually hit.
**Q:** Okay. Now, we all know that you brought a claim against him, right?
**A:** Yes.
**Q:** And what was it that you are claiming he did wrong?
**A:** He didn't tell me anything about — you know, I've never owned a pool. So I didn't know if there was something I didn't know. You know, he didn't tell

Page 73

me anything that, you know, or protect me in any way, shape or form from doing something that would have gotten me hurt. So that's kind of what that's about.
**Q:** Okay. When you said he didn't tell you, what would you expect him to have told you?
**A:** I don't know, that I could have killed myself in it or be paralyzed from it.
**Q:** From what?
**A:** From being in that pool or from doing certain things in that pool.
**Q:** Certain things?
**A:** I was never warned of any big dangers.
**Q:** Were you warned of any — when you say big — less than big dangers?
**A:** I wasn't warned of any dangers at all from him.
**Q:** By anybody?
**A:** No.
**Q:** When did you first become aware that there were actual warning signs on the pool?
**MR. REED:** You know what? Let me — to the extent I just — this is just for her edification. To the extent that this knowledge may be based upon anything your attorneys said to you, that is something that's privileged. If you

Page 74

know for reasons other than that, then you can share that with defense counsel. But I just would, again, assert if your basis for that knowledge is something that your attorneys have shared with you, that's attorney-client privilege.
**Q:** My question actually — maybe counsel didn't hear it — was when did you first learn that there was warning signs on the pool?
**A:** Not until after.
**Q:** Not until after the incident?
**A:** After the incident.
**Q:** I understood you had told us that earlier. Now I'm asking you when you found out that there actually were warning signs?
**A:** I think after I saw some pictures of that pool.
**Q:** All right. And you saw those pictures about what time after the incident, a matter of months, weeks?
**A:** It was when we were — we had to take pictures of the pool for —
**Q:** The claim against Mr. Nadiger?
**A:** That's the one.
**Q:** Okay. So that you were aware that there were warning signs in Mr. Nadiger's pool that you claim you weren't aware of on the day of the incident,

Page 75

right?
A: Right.
Q: Okay. And after you learned of those warning signs, did that cause you to think about changing your mind about making a claim against Mr. Nadiger?
A: No.
Q: Why not?
A: Because I didn't know that I could be paralyzed for what I was doing. He never said anything or — I don't know.
Q: Okay.
A: He obviously read the sign, so I think he should have said something to me.
Q: Okay. Now, this is a sign that was right at the ladder?
A: Mm-hmm.
Q: And you became aware after the incident that that sign was there?
A: That is correct.
Q: Okay. And after seeing that, did you think that warned you that you could suffer a serious injury?
A: Well, no. I wasn't doing the kinds of dives that should have been — it shouldn't have been next to that. It wasn't — I wasn't aiming towards the

Page 76

the bottom of the pool, so I wasn't intentionally doing anything that would have been in that — I'm not a very good speaker. I wasn't — I was doing it in a more controlled thing. I didn't think it was going to result in any kind of injury because I wasn't —
Q: Okay. When you were doing it in a more controlled thing, was that intentional, to do it in a more controlled way?
A: Well, I was only trying to get to the other side. I wasn't aiming down to come back up or anything. I was just kind of trying to get across. I wasn't doing it in any kind of force or anything like that.
Q: And you were intentionally diving in that way to avoid the risk of hitting the bottom in a shallow pool.
MR. MAGLIO: I object to the form of the question.
A: No.
Q: Right?
A: No. No, not intentionally. It's just there wasn't anywhere to go down. I was going across. I wasn't going down.
Q: When you say there wasn't anywhere to go down, you

Page 77

were aware from having been in the pool earlier that it was not deep.
A: That was the only time I had been in the pool.
Q: Fair. Is that right?
A: That one time, that was it. I hadn't been in that previously.
Q: So you knew how deep it was?
A: Well, I could see from the outside how deep it was.
Q: So the water was clear and you could see the bottom, right?
A: From within the water?
Q: No. When you were standing up on the edge, looking into the water, getting ready to dive in, could you see the bottom of the pool?
A: I don't recall it, but I would think that I could see the bottom of the pool.
Q: In any event, you were aware that the bottom was — the bottom was fairly shallow, fair?
A: I knew where the bottom was.
Q: Okay. And you dove in a manner to try and avoid the bottom?
MR. MAGLIO: I object to the form.
A: I guess I just dove shallowly.
Q: To try to avoid the bottom?

Page 78

MR. MAGLIO: Objection.
A: Yeah.
Q: Okay. Let me just look at a few notes.
In all of your diving experience in your life had you ever had an occasion where you hit the bottom?
A: No.
Q: Okay. Did you ever have an occasion where you miscalculated your dive?
A: No.
Q: Was it a habit of yours to dive at pools?
A: No.
Q: In the North Carolina pool where you dove — I think we left off on that — were you telling me you used to dive in the shallow end of that pool?
A: No. The middle.
Q: The middle. How deep was the middle? Over your head?
A: No. It was probably around four feet, the middle.
Q: And you used to dive into that as well?
A: Yes.
Q: What kind of dives did you do into that pool?
A: The same, shallow dives.
Q: For what reason would you do shallow dives?
A: Those are the ones I knew how to do.

Page 79

Q: Did the depth of the water have anything to with the shallow dives in the North Carolina pool?
A: No. That's basically the only kind of diving I've ever done is shallow, so that's the only dives I really did.
Q: How long were you playing with the kids before you took - before you got up on the edge and dove off?
A: As I said before, probably around 20 minutes or so. And we took the kids out and just Joe and Nicole and me were in the pool.
Q: Do you recall what — were you playing around with them, splashing?
A: Mm-hmm. Yes.
Q: Were they doing — were they going under, the kids?
A: No. They were only two and four.
Q: And was there another one older?
A: Yeah. She was around seven.
Q: Was she in the water as well?
A: Yes. She was probably going under.
Q: Okay. Were you showing them any tricks or anything?
A: I'm sure we played some games or spun around or something.
Q: What caused you to want to get up on the edge of

Page 80

the pool and dive?
A: Nothing in particular. I just felt like it.
Q: If we could go back to Exhibit A. And you had pointed out on A2 where it was that you were standing on the edge of the pool.
A: Mm-hmm.
Q: Could you with a different color pen — I have a blue one.
MR. REED: I have a blue one.
MR. KERSHAW: Wait a minute. I have one here. Oh, you have one.
MR. CAVANAGH: I have one. Thanks.
Q: Indicate where it was that you were playing with the kids, what vicinity, before you got up on the edge of the pool.
A: Probably somewhere around here (indicating).
Q: Okay.



DEFENDANT'S EXHIBIT
A
fm 11/7/06

1



A-2