# EXHIBIT G

**In The Matter Of:**

*Jennifer Sheehan v. The North American Marketing Corporation, et al*

---

*Thomas C. Ebro*

*May 22, 2007*

---

*Reporting Associates*
*10 Dorrance Street*
*Westminster Square Building Suite 617*
*Providence, RI 02903*
*(401) 351-1660*

*Original File EBROLO.TXT, 153 Pages*
*Min-U-Script® File ID: 4064158608*

**Word Index included with this Min-U-Script®**

Q: Did he tell you anything else?

A: I've summarized the details that —

Q: Okay.

A: — kind of reinforce some of the things I just said in summary.

Q: Fair enough. The high-low merit evaluation, did you record what the high and the low were?

A: The high I just shared with you. And there are issues that should have been corrected, and there's the dragging and passing of the buck type of conduct. There's a shared responsibility and industry awareness that should have been applied and delays in doing it and incompleteness in applying the measures that were called for and prescribed by the industry. Those I thought were highs. And lows, I understand there was alcohol consumption issues. I shared with him that those typically pose problems, speed bumps, depending on how they fit into the case, as well as those characteristics that arise out of alcohol

Page 8

consumption, the failure to observe signs, equilibrium. I related those to the facts he'd shared with me already.

Q: Were you familiar with the type of pool involved —

A: Yes.

Q: — as of that time?

A: Yes. I knew it was an aboveground pool, and just generally the characteristics, just not detail, but generally. I asked specifically if it had a cap, a flat cap, as opposed to a different shaped cap, and whether it was signed, and whether it had an accompanying deck, general characteristics like that.

Q: And you learned from him, I take it, that there was no accompanying deck, right?

A: That's correct, yes.

Q: That it was signed?

A: Yes. That there were some signs on there.

Q: And that there was no cap on the coping. Is that —

A: Well, I use those terms, cap interchangeably with coping. Coping, edge, cap are all terms that have been used interchangeably. I think I know what you're getting at. I've read some things here where subsequently another expert refers to a cap to be placed over the coping. But just so we're straight, if I use the word "coping" cap or cap, it's usually

Page 9

what the industry has used to basically treat the top of the wall structure aesthetically, cover up the bind of the liner and attachment of the wall sections. And many of the early pools were designed with this flat appearance that beneath it it had those components of tying things together and camouflaging the unsightliness.

Q: All right. When was your next contact?

A: Next contact would have been, would have been when I received a retainer agreement, a letter to that effect, and some preliminary discovery materials.

Q: When was that, sir?

A: That occurred on January — well, the letter was written on January 26th, which I consider the retention date. I opened the file on the 28th, on the day that I received the material.

Q: What year?

A: Of 2004.

Q: When you said discovery materials, do you have a record of or do you remember what you received?

A: Yes. And maybe to subsequent questions, I can just tell you how I keep my books. Anything that does not fit into a case file, which is a green file I'm holding up for you. It has four sections in it. There's more things in here that it doesn't contain.

Page 10

I spill things that I can't contain into a Expando file. Depending on how many, there's corresponding dots on it. I have two here showing that this case, which would include the green file, is what the case is all about. So one of these green files contains in chronological and numerical order all of the discovery I've seen from the beginning up to, you know, present time. And to make things easier for you, I have a — my preparation for this deposition consisted of a sheet that I call case activity log. And here it lists the chronology, some of the dates I've already read from here, when was I contacted and so on, all the way as to what I consider to be important dates. Beneath that it has the discovery material I just referenced in numerical order, as well as the dates when I received them. These numbers correspond with the numbers. And these, and the rest of this section, I might also add, has captioned the name of the actual document. And anything that's highlighted there I attempted to also summarize in handwritten form, so I don't have to be messing through those. I can look at my notes. With that question in front of you now, or that answer in front of you, yes, I do have. I have four discovery items that I received on January 28th. And I have

Page 11

them listed here, or I could read them if you like.

Q: What were they?

A: They were the Rhode Island Hospital Discharge Summary with photos, the Physician's Transfer Discharge Summary, the Spaulding Hospital Discharge Summary, and photos which showed Jennifer Sheehan sitting in a wheelchair, and also No Diving warning signs on the aboveground pool. It was on a photocopy of a photo.

Q: All right. Do you have that?

A: Yes, contained in here.

Q: Could I see it?

A: Okay. The four items I just mentioned —

Q: Thank you.

A: — I'm handing to you.

Q: I notice that you highlighted the sign that said, the warning sign Danger, No Diving, Shallow Water?

A: Yes.

Q: Did you do that?

A: All those highlights are mine, yes.

Q: Those are all yours. Okay. Why did you highlight the sign?

A: I just highlight anything I think that I might want to refer to later.

Q: Is that a high or a low?

A: It's an information item.

Page 12

Q: I mean, in your evaluation, is it — a low, I take it, would mean that that meant that it wasn't good for the case?

A: I didn't label them for that reason, but I can answer your question.

Q: No. But let me ask you the question. A low means it's not good for the case, right?

A: Yes.

Q: A high means it's good for the case?

A: A high would be a, yes.

Q: Okay. That sign that you highlighted, is that a high or a low?

A: That sign, as I recall, of the three that were present, the one that is beneath the ladder stanchions on the level surface is a reduced format of the ANSI approved sign; and, therefore, that would be a high, high meaning a appropriate thing to do. But in the context that you showed, it could be a — I cautioned Attorney Reed that that would be probably a high for the defense, that they would capitalize and seek to justify things on.

Right?

A: Yes.

Q: And then to the right of that is a figure showing someone vertically going into the pool and hitting their head on the bottom of the pool, right?

A: Yes.

Q: And it clearly signifies prohibited, right?

A: It's an industry depiction or a pictogram, we call it, that is required to be shown with an ANSI-approved sign.

Q: Well, what does that signal to you? Does it look like that's prohibited?

A: Yes, that conveys prohibition.

Q: Okay. And what you're telling —

A: What first, what portrays it is the circle and the slash that that underlying black depiction is prohibited, by virtue of the overlaid red circle with a slash through it.

Q: Yes. And there's the big word " danger" right next to that, right?

A: Yes.

Q: And it says No Diving, right?

Page 58

A: Yes.

Q: And then it says Shallow Water, right?

A: That's right.

Q: Diving May Cause Death or Permanent Injury?

A: Yes.

Q: And that's what happened in this case, right?

A: It caused permanent injury, yes.

Q: Right. There was danger?

A: Yes, it's a dangerous outcome.

Q: Right.

A: It acted, at least, to this kind of an outcome.

Q: Right. And it's dangerous because the pool is shallow?

A: That's correct.

Q: Now, to an adult, in your experience, looking at an aboveground pool such as this one, would it be obvious that the pool is not deep?

A: I'm an adult, yes, I'd agree with that. But beyond that, I think there's a difference between other adults and myself because I've had greater exposure to this topic. But the last part of that is, to me, yes. It, from looking at an aboveground pool and confirming that it did not have a, you know, that it had a level surface at the level that it was at, four feet, that it, that that with the water below its rim

Page 59

would constitute shallow water.

Q: Right. And if you look at Photo 2, the second page of Exhibit D — I'm sorry — Exhibit E, that is a good shot of the aboveground pool, which would signal to a reasonable adult how high this pool was; fair?

A: Fair.

Q: And then, of course, you know, at least you had found out after you read Miss Sheehan's deposition on February 6th of 2007, — I don't know if you knew it before — that she actually dove into the pool and had played in the pool and, therefore, knew the depth of the pool; right?

A: Yes.

Q: And you and I will both agree that that was shallow at that water level, right?

A: I'm sure you do, and I certainly accept that as water too shallow to support or to encourage diving into.

Q: All right.

A: Level five feet at the very minimum for certain dives would be met, required.

Q: And we can both agree 'cause we know the structure of this pool, that this water was probably in the range of three and a half feet?

A: Yes.

Q: And that's because the height of the pool itself is

Page 60

four feet, and the water has to be down to a certain level to be in the skimmer, right?

A: That's correct.

Q: So we know that the plaintiff in this case indicated she didn't read the signs, right?

A: That's right.

Q: But she had the benefit of going in the pool —

A: That's correct.

Q: — without diving first?

A: She had been in the pool, and she also executed a dive.

Q: Right.

A: To be accurate.

Q: Right. She'd been in the pool first, got out, dove, and then was back in the pool again?

A: Yes.

Q: Right?

A: Yes.

Q: And you've read her deposition, and it's clear that she understood that this was shallow water?

A: Yes, she acknowledged that this was water by definition shallow that she could, that she felt confident in being able to handle safely.

Q: Right. Now, let's see. You've, how many pools did you oversee in your career?

Page 61

A: Fifty, I think, in the early part of my career in Los Angeles, in Multnomah County. During the Marine Corps I had responsibilities of a pool. So I would say a lot.

Q: Have you ever had experience with someone being injured diving in shallow water in any of the pools that you were in charge of?

A: No.

Q: Would you permit diving into shallow water in any of the pools you were connected with?

A: Let's put it this way. It has evolved, in that there was a period in my career when diving from the shallow end of the pool was, in fact, the norm with even elevated starting blocks situated there. And during swim coaching there would be people that, you know, taught and blew the whistle and required competitive swimmers to dive from that. So that has changed. Those blocks are now in the deep end because of the injuries even to competitive swimmers that occur when headfirst entries are executed. So my, would I allow? No. If I was operating a pool, I would be in compliance with industry standards, more so than the standards that were violated in this case concerning the package of signs. The operative sign here and the language you

Page 62

described to be effective needs to be positioned differently and, and in a much more communicative state, larger and in a path where you're not preoccupied with climbing a ladder and have that momentary flash that, that you experience when you're crossing the ladder's top portion.

Q: Okay. Right. I understand that. But you would agree that you wouldn't allow any diving in a shallow pool?

A: That's correct.

Q: Because even experienced swimmers, who know how to do swimmer's dives can get hurt diving in a shallow pool; that's proven by the evolution of this over the years; isn't that what you just told us?

A: I've told you that there were circumsta—- well, again, dive, we have to go back into visiting that. The experience or the situation I described

question?

MR. REED: Let him finish the answer.

A: If I don't, if I'm not answering your question, I apologize. I'll stop right now.

Q: Yes, that's good.

MR. REED: Well, have you finished? Well, has he finished? Are you going to let him finish?

MR. CAVANAGH: Do you know the question?

MR. REED: I, I, I —

MR. CAVANAGH: Do you think he's finished?

MR. REED: Well, I can't remember. I don't think he was finished. I don't believe he was finished.

MR. CAVANAGH: Go finish. Why don't you finish.

A: All right. My, I think my understanding of the question is that you, you asked a question, and I interpreted it. I made that interpretation clear.

Q: I know. You don't even remember the question. I don't, either.

A: The text, I'll read the text. I'm going to read and sign the document. So I think I am right in answering the question.

Page 75

Q: Would you eliminate all that that's nonresponsive when you do it?

A: I think it is responsive.

Q: No. Would you do me a favor and eliminate the nonresponsive stuff, though, when you read it and check it?

MR. REED: He doesn't. You just have to just review and respond to it.

A: I think the judge will do it. I don't know that I'd cut anything out of the deposition transcript. I won't eliminate anything.

Q: This will speak to the judge. That's for sure.

A: I think that it serves as an attraction to come on there. And there were not, as my report indicates, steps, in light of the evidence that's increasingly creeping in that signs do not necessarily work. In spite of the fact that we, the industry has said, has published words "warnings do save lives and is totally dependent on it," I think more needs to be done. And, certainly, you start with the engineering principle of ruling out or designing out the chance of a danger. And if you can't do that, then you barrier. And an excellent barrier accommodation was available by modifying the invitational quality.

THE REPORTER: I don't understand what

Page 76

you just said. ". .if you can't do that, then you. ." what?

A: (Continued) Then you modify the invitational characteristic and make this platform unsittable, unstandable, unwalkable. And then, in my opinion, this accident wouldn't have occurred.

Q: Okay. Now, the deck that you advise could be there as another option, would that be unsittable, unstandable, and undiveable?

A: Oh, it would allow for all those things, but the val—- the reason I said that, sir, is because the very, the kinematics of this accident was that it was so narrow, you can probably sit on it for a while, hoping the, you know, hopefully, not teeter off, and that's the danger. Walk on it, that, again, means you either land the long way down or are prone to dive.

Q: This is the balance beam?

A: A narrow walkway. And it serves as a place to dive. And if you're going to do that unadvisable thing, then it would be helpful to have your foot on a horizontal plane, as opposed to falling off the edge.

Q: Got it. It would be helpful, if you're going to dive, to have a more sturdy platform to dive off?

A: It's nothing to do with sturdiness. Sturdiness is

Page 77

another aspect, you know, that if you're going to stand, it doesn't play big. If you're going to walk, it would trigger imbalance because it has a, it has some flexion associated with it.

Q: Okay. So the bigger deck, you think, would be safer than the balance beam type of coping that's there?

A: A walking surface that is, that follows industry standards and meets at least the minimum fifteen inches would be certainly safer to walk on or do anything else on, including if you're going to contemplate a dive from such a surface, as opposed to something much narrower because of what I just described.

Q: Right. The industry standard you're talking about applies to decking, not coping, though, however, right?

A: Well, I — those are the words used. But, you see, it's this manufacturer that chooses to create words for his own benefit.

Q: All right.

A: In combination with something attached to it, in other words, this coping with this additional thing looks identical to it. Now, to add some inches it's suddenly called a walking platform or some words to that effect. Their own pictures, the defendants' own

Page 78

pictures show, and if you look where the foot is located, you'll see that that is located on the component that, if you take that other component away, is this narrower coping. And suddenly by putting this additional section to it or a deck, for that matter, it is now called a deck. It's clearly intended to be stood on or to be, you know, to have your body in contact with. And for that reason it's a play on words, I believe. If you don't want people on that, you know, accessing it, walking on it, sitting on it, or standing and possibly contemplating a dive from it, there's a way of doing it. Engineers are very familiar with that. It's a guard that simply takes some imagination, purposeful imagination to precludes its use.

Q: Mr. Ebro, the deck, the deck you're talking about is a platform that you say should be a minimum of fifteen inches, is that right?

A: That's the minimum for a walkway.

Q: Okay. For a walkway. Now, that's an attachment that would be added on to the type of pool we're talking about now, right?

A: No. That's a component, in addition to what is on there, that would ultimately measure the distance of fifteen, in accordance with the standards.

Page 79

Q: There's no minimum standard requiring this type of pool without the component that you're talking about to be any different than it is now designed?

A: No. Except that defendants' own publications, in fact, tout a much larger surface and, in fact, use language to the effect that all, you know, we have seven and so forth, when in fact it had six. So bear in mind that by that standard, their own standard, they fell below their own standard, as far as the width of this coping cap.

Q: Well, this coping cap wasn't intended for standing or diving, was it?

A: Well, that's right. It certainly was not, but by its, it certainly was conducive. And if you make something conducive and if you accept what the industry has studied and conveyed to people, to its membership, then anything that is elevated above the

water or protrudes above the water is, by definition, by this understanding definition an invitation to dive.

Q: So a walking deck is an invitation to dive?

A: That's correct. And that's why you have to use signs.

Q: A fifteen-inch platform is an invitation to dive?

A: That's, again, why you have to take steps to educate

Page 80

people against that in a complete package fashion.

Q: Right. And the narrow six-inch balance beam that we've been talking about is an invitation to dive?

A: It is, it is equally an in—- it approach—-

Q: Equally an invitation to dive —

A: Oh, absolutely.

Q: — as the platform?

A: If it can be accessed, it will be used for diving.

Q: Sure. Okay. I just want to make sure that I understand what you're telling us here today.

A: I think ask some questions. That's what the purpose is.

Q: Right. So that, you're saying it would be better to have a longer deck than the narrow balance beam type of coping that existed there for purposes of preventing people from diving?

A: If it is wide enough to accommodate standing, it will invite people to stand on and use it as a diving platform. If it is an inch or, in fact, if it has things that will, you know, be, you know, will deter people to use it for purposes of walking, sitting, or standing, then it stops being a place over which you worry that people will somehow, you know, go and injure themselves. But it's about surfaces above the water that protrude upward and over and into. Those

Page 81

are surfaces that invite diving. People that develop from swimming facilities to aboveground pools and inground pools have to concern themselves in that. And that's why the ANSI compliment of signs, the way they've been designed with their five elements, are certainly a first step towards achieving that objective. The objective being that we don't have people diving into shallow water.

Q: Is the purpose of the sign, do you think, on a pool of this nature to indicate that the water is shallow or to indicate that there should be no diving, or both?

A: The purpose of the sign, you're asking me about. The purpose of the sign is to call attention, to attract attention. That's why the word "danger" is there. And then it is to convey the prohibition, No Diving.

Q: Right.

A: Then it is to tell why. That is to say, Shallow Water. Then it is to communicate the consequence, if you in fact disobey that. And you can include, you know, suffer death, or break your neck, or picture of a wheelchair, and accompanied, and study shows us that those words, a lot of people are disinclined to understand or read words. So that, to give them force, there should be this specialized pictogram

Page 82

that tells or communicates that same message, gives it a double whammy force. And that needs to be large. It needs to be outside where you approach it, where you see it, and where you have a chance to have it internalized, as opposed to it just in one place, where you're less apt to see it and then not repeat it with that force elsewhere, and to have in this case the eight additional opportunities to convey it with a pictogram substituted for initials.

Q: Okay. If you'd look in Exhibit E, which is the packet of photos which we identified.

A: Yes.

Q: There's the eighth photo in —

A: I'm there.

Q: — says Danger, No Diving, Shallow Water, right?

A: I'm not on the same one. I guess this is my eighth one.

MR. REED: The one before. Before that. No. Before that one.

A: Okay. I'm there.

Q: Do you see that?

A: Yes.

Q: Okay. And, by the way, have you seen the pool in question?

A: Yes. I saw it yesterday.

Page 83

Q: You saw it yesterday?

A: Oh, I'm sorry. I did not see the pool. I saw a facsimile pool yesterday.

Q: Okay. So you've never visited the site of this accident?

A: No.

Q: Okay. And do you understand that there was another sign similar to this, which says Danger, No Diving, Shallow Water on the other side of the pool as well?

A: I understand that those words were at the eleven and one o'clock positions to, relative to the ladder.

Q: Now, is it your opinion that there should have been a warning that one could lose their balance while standing on the coping?

A: Do I have that understanding, that someone could lose their balance? Is that what you're asking?

Q: No. Is that your opinion, that there should have been a warning that someone can lose their balance when they stand on the coping?

A: I conveyed a much more pregnant opinion that included the loss of balance as part of that mechanism that, that interferes with getting the desired dive accomplished.

Q: So, okay. Now, this is a desired dive that is a prohibited use of the pool, right? It's prohibited.

Page 84

A: The dive that she executed the first time was not advisable. And a package of warnings would have driven that point home to her. And, in my opinion, she would have — we'll never know, but in my opinion she would have had a better grasp of that consequence than the one that she testified to, which was not the paralysis and loss, and then to death that, that upon study would have at least been gleaned from that one sign. Those other two signs failed to convey that consequence and have been deemed by the studies to be essentially worthless.

Q: Mr. Ebro, the decking that you recommend is not intended at all to enable diving, is it?

A: That's correct.

Q: Would it make diving more easy, a deck?

A: My opinion is that a deck would preclude this kind of scenario, where the foot ends up dropping off a narrow surface in the course of getting ready to dive. And, therefore, something that is not appreciated or, for that matter, I believe known by anyone, except people that study the kinematics, that just like touching a hot stove results in an instant reaction, similar, that foot dropping off results in a movement, quick and deadly because it puts the body into a very vertical entry mode.

Page 85

Q: So you're saying a deck would make it better, it would make it easier

PHOTOGRAPHS, FRONT AND BACK WAS MARKED DEFENDANT'S EXHIBIT F, IDENTIFICATION ON BEHALF OF DELAIR GROUP, L.L.C.)

Q: Exhibit F are some photos of the pool in question.

A: Yes.

Q: Do you see there that there's a small platform just beyond this sign that we've already discussed that says Danger, No Diving, Shallow Water, Diving May Cause Death or Permanent Injury?

Page 91

A: Yes.

Q: Do you see that?

A: (No further response)

Q: Okay. And that platform that, someone could easily stand on that and dive into the pool if they wanted to, right?

A: That's correct.

Q: Could they slip off that, by the way?

A: It depends, you know. Could they?

Q: Yes.

A: If it was not slip resistant, I would think so, yes.

Q: Okay. Well, even if it was slip resistant, if someone got on the edge of it and lost their balance, could they slip?

A: It would have far less propensity for the back foot to drop off 'cause it looks like a fairly, you know, large platform relative to the narrow six-inch, coping cap below it.

Q: Right. But if you don't know where someone placed their feet, if they placed their feet on the edge of the platform, they could as easily slip off that as they could off any other surface; fair?

A: Well, I think you're, I think what you mean to ask me is that if they placed their feet, you know, towards the exterior end, as opposed to close to the water

Page 92

end of that platform.

Q: We're assuming we're going to the water. We're not going to dive into the grass. We're going to dive into the water, aren't we?

A: Well, no, no. That, I understand that. But a person would be directed that way by the placement of the feet.

Q: Well, what do you think would be more — what would be more dangerous? Diving into the water or diving into the grass?

A: I would think they would be equal, in terms of injury manifestation.

Q: They're equally a stupid act?

A: And equally consequential. But I think that the likelihood of diving into water proves over and over to be more likely than the one diving — I don't remember, other than falling backwards off coping, anyone diving into grass.

Q: Did you in any of the pools — did you teach — have you taught diving?

A: I taught my wife.

Q: All right.

A: I've taught children. Yes, I've taught the mechanics of how to enter the water from the side of a pool.

Q: Okay. Do you know, have you — are you familiar with

Page 93

the dive known as the belly flop?

A: I don't think the belly flop is a dive. It's a belly flop.

Q: Well, —

A: A cannonball is not a dive. A can opener is not a dive. These are entry modes. The dive is characterized in our vernacular as something that achieves a javelin-like trajectory aimed with body planing surfaces. At one time they were sharply, you know, pike scooped on the part of those people that were being taught to enter the water that way. Now they have, that's been curbed to remain close to the surface and directed by the outstretched hands and their fingers pointing up and looking at those fingers. I wouldn't characterize a belly flop as a dive, no.

Q: Would you allow belly flops in shallow pools?

A: No.

Q: Would you allow jackknives?

A: No.

Q: Swan dives?

A: No.

Q: Swimmer's dives?

A: No.

Q: Any dives?

Page 94

A: No.

Q: The decking that you've referred to, the fifteen-inch minimum, that's intended to allow standing, right?

A: And walking, yes.

Q: And walking. And it's not intended to permit diving?

A: If it's around an aboveground pool, it's not intended for diving. That's correct. Anymore than a deck or all these other surfaces I've described to you.

Q: Now, the coping that we're talking about in this pool, that wasn't intended for walking, was it?

A: That's correct.

Q: Not intended for diving?

A: By the manufacturer, he said he did not intend for that.

Q: Right.

A: I'm describing a use that is foreseeable, however.

Q: I understand that. But wouldn't that be equally true of the deck?

A: Of course, but more so conducive. People would walk on a deck because that's what it was intended for. But if it looks like a deck and smells like a duck — deck, then it is, must be a deck.

Q: And I think you've said it's not intended for diving.

A: That's correct.

Q: Okay.

Page 95

A: It's not intended for diving.

Q: Now I'm asking you about the coping. The coping is not intended for diving, either, is it?

A: Course not.

Q: Okay. Not intended for standing, either. You already described how it wobbles all the time, and people couldn't really clean without risking falling into the water, is that right?

A: The answer is "yes." Anymore than this platform that you showed me on the dive, on the ladder, yet it serves as a, probably, in fact, it looks very much like a starting platform at a competitive swimming facility. And so that very much even resembles and looks like something that you would execute a dive on. You need to have really this message, as opposed to partially covered up so you can't see it exiting the pool and only see it going into the pool and serving as, as something that is not readily seen or absorbed.

Q: Okay.

A: Because it lacks the completeness of what the industry standard requires.

Q: Mr. Ebro, stay with me here.

A: Yes.

Q: You've agreed that the decking isn't intended for

Page 96

diving; you've agreed that the coping on this particular pool is not intended for diving?

A: That's correct.

Q: And you've agreed that the plat-

form on the ladder is not intended for diving?

A: That's correct.

Q: And how, do you think the platform on the ladder is intended for standing?

A: Yes.

Q: And do you believe the coping is intended for standing?

A: No. Because it doesn't have handholds. The ladder is also intended for sitting because of its, you're less apt to fall backwards, and you have handholds.

Q: Do you think the coping is intended for sitting?

A: It's not intended for it, but people sit on it very much because of the conducivity for both standing, walking, and sitting.

Q: Okay. Let's go through your report, Exhibit A, if you would. Do you have it in front of you?

A: Yes.

Q: All right. As I read the third paragraph where you are talking about the narrow six-inch coping, it's inherently dangerous because people could stand on the rail and fall in or out of the pool.

Page 97

A: That's correct.

Q: Right? Okay. Now, do you understand in this case that this injury occurred as a result of someone standing on the rail and falling into the pool?

A: Yes.

Q: And you've described for us already why you think it's a fall?

A: Yes.

Q: Okay. Another expert for the plaintiff has described it as toppled into the pool. Do you agree with that?

A: That's another term for a fall, yes.

Q: Well, what does toppling connote?

A: Toppling means that the upper, upper torso ends up being the leading body part in the fall scenario.

Q: Javelin-like?

A: Well, no, I wouldn't agree with javelin-like. It may end up in that fashion.

Q: Okay.

A: But javelin connotes to me something that's intended. Something has to be kind of, you know, shaped and planned for. It suggests a much more sleek entry mode.

Q: Okay. So in your re-creation of this, how in fact did Miss Sheehan fall into the pool? How do you — tell me how she did it, and how do you know that?

Page 98

A: On her second attempt she ascended —

Q: You're reading from some notes, right? By the way, I'm going to ask you — I'm going to ask you to make copies of all those notes 'cause you've used those to testify from today, haven't you?

A: Of course.

Q: Okay. Thanks. Go head.

A: Would we make it more formal? 'Cause I have little notes. Were you just going call it an exhibit and mark it?

Q: I'm going to call it an exhibit and mark it.

A: And I, to be clear, I'm looking at Jennifer Sheehan's deposition, so that I can track with her and fill in the blanks. She's clear, in that she describes that she was, that she had boosted herself up by turning her back to the side, to the wall and placing her arms on there. And because of the buoyancy of the water, accomplished a small hop and, and exerted the pressure from her arms, thus managed to have a clean maneuver, end up in a sitting position on the, on that coping cap. She proceeded from that into nimbly, into arising into a standing position and intent on executing the same forward dive, which entailed her flexion of her knees, dropping down on her knees and sort of allowing the center of gravity

Page 99

to move forward sort of shifting her arm, doing all those compon— intended components that precede the actual launch. At that point I'm filling in the blanks. She experienced one of her feet that were planted on the coping cap essentially dropping off that sharp, 90-degree rear edge. And in doing so —

Q: Excuse me. What edge?

A: The rear coping cap's outside edge.

Q: The rear, the outside edge?

A: The outside edge.

Q: How do you know that?

A: Well, it wouldn't have been the inside edge because I've identified for you what I've reconstructed. My training allows me to go and hindcast these. I've been trained as a deputy coroner in the medical examiner's office. And I've applied the technique here. Now, —

Q: Fair enough.

A: That's what you asked for.

Q: Let me just inquire, though. And I'm going to interrupt you. When you say the rear edge, that would be the edge of the coping facing the grass?

A: That's correct.

Q: Okay.

A: So we have —

Page 100

Q: And that's based on your training; there's nothing in the testimony or any of the records you've seen, which indicates that if she slipped, that the slip was off the rear edge?

A: That's correct.

Q: All right. This is your theory?

A: That's correct.

Q: Go ahead.

A: So in this position, and I would — I would envision this to be that both feet are not perfectly aligned. It would have to be that she got up and one foot is behind the other.

Q: Okay. Now, again I'm going to interrupt you. That, too, is pure theory that's not based on any testimony of any of the witnesses?

A: That's correct.

Q: Go ahead.

A: And then she, I'm picking up what she states then, that she dropped into her stance. Shared with you earlier what that, what she describes and what that is. That's essentially this flexion of the knee dropping down allowing the center of gravity with her upper torso to sort of teeter, begin to teeter over the water. And what she had done before in order to have executed this is not theory. It's just what

Page 101

happens. She would need to then extend her legs, and she has some control how violently or strongly she does that and when she does it. And that exquisite maneuver enables her to end up parallel in her flight over the water, and the angle of entry into the water and the trajectory achieved by her leading arms and a shallow, either slight penetration into the water or skimming along the top. Those are what, these are characteristics that accompanied her first dive. And this is what she intended to do successfully this time. But for, and this will save you saying it, I don't have anything except an eyewitness that says something awkward went on, you know, totally different entry mode. Described it as a jackknife. Described a glide path that didn't take her anywhere near where she had ended up before.

Q: Signaling what?

A: Signaling that this was a sharp