UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

JENNIFER SHEEHAN,
Plaintiff

vs. C.A. NO. 05-364 S

THE NORTH AMERICAN MARKETING CORPORATION and DELAIR GROUP, L.L.C.
Defendants

COPY

DEPOSITION OF **THOMAS C. EBRO, AQUATIC SAFETY SPECIALIST**, taken on behalf of the Defendant, Delair Group, L.L.C., Tuesday, May 22, 2007 at 1:00 p.m. pursuant to the Federal Rules of Civil Procedure at the offices of Blish & Cavanagh, LLP, 30 Exchange Terrace, Providence, Rhode Island before Linda F. Oakley, RPR, Inc., Notary Public.

APPEARANCES:

REED & GIORDANO, P.A.
BY: BARRY C. REED, JR., ESQ.
Counsel for the Plaintiff

RICE, DOLAN & KERSHAW
BY: STANLEY PUPECKI, ESQ.
Counsel for The North American Marketing Corp.

BLISH & CAVANAGH
BY: JOSEPH V. CAVANAGH, JR., ESQ.
Counsel for Delair Group, LLC
WITH WHOM APPEARED:
Mary Cavanagh Dunn, Esq.

REPORTING ASSOCIATES
Westminster Square Building
10 Dorrance Street, Suite 617
Providence, RI 02903

# I N D E X


| DEPONENT | PAGE NO. |
|---|---|
| Thomas C. Ebro | |
| Examination by Mr. Cavanagh | 3 |
| Examination by Mr. Pupecki | 145 |

| DEFENDANT DELAIR'S EXHIBITS | DESCRIPTION | PAGE NO. |
|---|---|---|
| A, I.D. | Photostatic copy of two-page document of Aquatic Risk Management dated April 23, 2007 to Mr. Barry C. Reed, Jr., Attorney At Law | 20 |
| B, I.D. | Photostatic copy of four-page Biomedical Expert's Report for the Jennifer Sheehan Injury By Jamie R. Williams, Ph.D. | 33 |
| C, I.D. | Photostatic copy of two-page handwritten Case Activity Log | 37 |
| D, I.D. | Photostatic copy of Jennifer Sheehan's Supplemental Answer to Defendants' Expert Disclosure Interrogatory | 38-39 |
| E, I.D. | Photostatic copy of eleven pages of photographs | 56 |
| F, I.D. | Color laser copy of four photographs, front and back | 90 |
| G, I.D. | Photostatic copy of Curriculum Vitae of Thomas C. Ebro, Aquatic Safety Specialist | 139 |

(May 22, 2007)

**T H O M A S  C.  E B R O**, was duly sworn and testified as follows:

**EXAMINATION BY MR. CAVANAGH**

Q For the record, would you state your full name, please.

A Thomas C. Ebro.

Q Where do you live?

A 19207 Pristine Place, Lutz, spelled L u t z, Florida 33558-9044.

Q And how old are you, sir?

A I'm sixty-six years old.

Q How long have you been an expert in aquatic safety?

A I've had my own practice and thus provided consulting services since 1985.

Q Okay. And your consulting services includes giving advice to law firms on swimming accidents?

A Yes.

Q Okay. When were you first contacted about this particular matter?

A I was first contacted on April 3, 2003.

Q By whom?

A By Attorney Barry Reed via telephone.

Q Did you know Mr. Reed?

A I hadn't met him before.

Dr. Kazarian and plaintiff's biomechanical expert.
Q You're referring to Dr. Williams?
A Yes.
Q You've read that report as well?
A I have, yes.
Q Let me ask you, based on your review and your knowledge, would you agree that Dr. Kazarian and Dr. Williams concur on how this injury occurred?
A Yes, I do. I've noted that right at the onset that they would. And to elaborate, inasmuch as I know and have worked with and am currently in some cases with Dr. Kazarian and have a high regard for him and would have found it odd if subsequent appointed expert would disagree with him. So I, it didn't surprise me that plaintiff's expert would be essentially stating the same conclusions regarding, important, regarding this scenario that Dr. Kazarian picks up, essentially from midair and materializes the accident scenario from flight on. And both experts do this. So this missing area, in terms of trigger or what precipitated that flight, was not addressed by Dr. Kazarian or the other expert.
Q Right. But there's no question that the plaintiff dove, right?
A There's no question that the plaintiff ended up in a

head strike position that, that many people that dive find, or hindcasting the accident finds them to have committed maybe the dive, but this kind of injury can also be triggered or caused by different other triggering elements.

Q Like what?

A In other words, Dr. Kazarian, and the point that, you know, I've essentially --

Q Give me the other triggering elements that you were thinking of as an alternative to a dive.

A A dive is a intentional voluntary execution of a maneuver. And if, as in this case, in my opinion, if that dive fails to be executed as planned, then it is not a dive, but then the focus or the hindcasting investigation focus goes to why was this not a dive, but why was, you know, in terms of its outcome, what prevented this from being an intended dive. And then comes, you know, the variables that have been the subject matter of the studies I referred to earlier. I could summarize this also by saying to you that I disagree, essentially, with Dr. Kazarian's last paragraph, where he states that, where he essentially characterizes this compression flexion spinal cord injury under the banner or the caption of slip, fall, trip, stumble, tumble, crumple scenarios, dash, which

one is it? And he concludes by stating that, that Ms. Sheehan's accident was not the result of a slip, fall, stumble, tumble, or crumple, but the result of headfirst entry into a shallow body of water. So he doesn't use the word "dive." I concurred that it was a entry, but, again, that missing part was one of those elements that he, it was his mission to address in that paragraph, and he failed to do that. Clearly, it was as a result of a maneuver that went awry from what I've concluded as an imbalance triggered by the narrow coping cap, the force that is supplied rearward. When you're trying to move forward, you're relying on the traction on your feet to enable you to flex your feet and kind of propel yourself forward. And with one foot kind of dropping over the edge of that narrow platform, there is a human instant reaction to that. Instead of going down, there's a countermeasure, and the foot kind of flies up; and, of course, the corresponding forward upper body, shoulders would then correspondingly immediately drop in that reaction; and it would account for that very sharp trajectory that she had as she penetrated the water column and struck her head.

Q So, actually, what it was is a poorly executed dive?

A No.
Q No?
A She had --
Q What was it? What was it, sir?
A Well, it was --
Q As you just described it. She was diving, and her foot slipped? What was it?
A I don't characterize the poorly executed dive. I characterize this that she was hampered by, her dive was hampered by the fact that she had an unsuitable diving platform onto which she was invited; and using that platform, disenabled her to maintain traction with that rear foot. Had that been on a deck with a slip-resistant surface, the foot would have merely retained its elevation, gone back and sought, and at least she would have been able, even from that one foot and with that partial stability been able to launch the type of intended dive. She wouldn't have had that sudden rotation triggered, but for the fact that this surface lacked the fifteen-inch ANSI NSPI requirement as a minimum width for swimming pool flat walking surfaces. And because of its character and appearance invited and, in my experience, continues to invite people to access these coping caps. It was because of that

preceding scenario that she found herself on an unsuitable platform attempting to execute a dive that she had been successful at before, but for the unsuitable platform that should not have been there, she was caused to have her trajectory sharply changed.

Q Okay.

A And the catastrophic outcome arose from that situation.

Q Okay. Where do you get, where do you find that she slipped?

A She says so.

Q Where?

A In her deposition.

Q What page?

A She says so on page 35. She says so on page 83. And in context, while she doesn't use the word "slip," she describes a maneuver that translates to me that scenario that I described earlier.

Q Where does she describe your context?

A She describes that in stating on page 34: I lost my balance and fell into the pool. On 34, except --

Q Was she asked why, if she knows how she lost her balance?

A She was asked, but she could not adequately explain.

What she does explain is that she had confidence in that maneuver. She just immediately prior earlier executed it. She describes a getting into the stance, where she describes what that stance is, which is that flexed knee intent to repeat what she accomplished successfully before and talks about, from that: I just didn't get that far. She speaks about the stance and says that she was going to prepare. And she again repeats: I just lost my balance and slipped, fell in the direction of the pool.

Q Where's that?

A I don't --

Q What page is that?

A Well, let me just give you the pages, then. On 34 up here are the words: I lost my balance and fell into the pool.

Q Right. Okay.

A On 34 --

Q And where in her answer is a slip?

A Well, I'll get there.

Q On 34. That was -- okay.

A I'll get there.

Q Fair enough.

A Because I indicated --

I fell on the coping, you know, I would have noted that she does not put the words "slip" and "coping." I don't know that she even knew that word 'cause she doesn't use the word "coping." So what I'm sharing with you is what the words were and what the context were, and where in the, where it applies in her deposition that conveyed to me what she did --

Q Fair.

A -- that was different from the first time.

Q I'm with you. Okay. And you saw, of course, on question 35, on page 35 -- have you got her deposition?

A Be with you in a minute here. All right. Ask me the questions you wanted to ask me.

MR. REED: Can you give us the line you're reading from.

MR. CAVANAGH: Yes, I will.

Q Page 35.

A Yes. Yes.

Q Line 15, Question: Okay. And what is it that slips? Answer: I don't know. I just lost my balance and slipped. Is that her answer? Is that what you were relying on?

A Yes.

Q Okay.

A I continue to rely on Line 19: Yes, I fell in the direction of the pool. I continue to rely on page 36: No, I didn't get to dive the second time. You asked me earlier about Dr. Kazarian's conclusion that she dove. I didn't get to dive, she says, the second time. I just fell in.
Q All right.
A And so on.
Q Do you think she fell in? Is that what your opinion is?
A Well, again, --
Q Sir, is that your opinion, that she fell in?
A Well, sir, wait. What do you want to know?
Q Is it?
A I'm trying to answer.
Q I'm not --
A And you cut me off. Wait a minute. I was --
Q Okay.
A I was cut off.
Q You were cut off?
A Yes, sir, by you.
Q Okay. Then go ahead and finish.
A Thank you, sir. These terms have significance to me. You need to have one experience before it translates into the other. So she has what she's attempted to

Q Dr. Kazarian didn't use the word "dive," you said, right?
A In the page we were looking at he didn't, no.
Q He didn't use it in his whole --
A Well, you --
Q -- opinion, did he? Didn't you just tell me --
A I said that.
Q -- ten minutes ago that Dr. Kazarian, you noted, did not use the word "dive"?
A I corrected you when you attributed that word to him. And I corrected you by saying he didn't use it. He calls it entry into the pool. And so that's the answer to that question.
Q And Dr. Williams does call it a dive?
A I read that word, as you pointed out in your, your report.
Q Fair enough. And you, do you think she fell in?
A Well, before we go further, --
Q The question, sir, do you think the plaintiff fell into the pool?
A She experienced a descent that, in my opinion, that was not controlled and, therefore, by definition is a fall.
Q All right. Another definition, could it be an uncontrolled dive?

Q Is that right?
A Yes.
Q And then next paragraph says: He is expected to testify that given the narrow width of the subject pool's coping/deck system, six to seven inches, that there ran an inherent risk that a person standing on the coping could easily slip and/or lose one's balance. Right?
A Yes.
Q That, is that the same opinion you're going to give here today if I ask you those questions?
A Yes.
Q All right. And you intend to give that opinion before the Court?
A Yes.
Q Is that right?
A That's correct.
Q Okay. And you arrived at that opinion when?
A Well, you asked me that question. It's --
Q I think you said April of '07, but I'm just asking you.
A No, I don't think I gave you a date. I said that the, that I had formulated my written one document in this folder. The manner in which I wrote it within that context, which is more information than this

lose their balance while standing. In addition, there was no warning prohibiting persons from standing on the coping.

A That's correct, yes.

Q Was that your opinion?

A Counsel paraphrased or reduced what I've been sharing with him into these words, yes.

Q Well, --

A It does characterize my opinion.

Q When did you share that with counsel?

A In the, in preceding time. I, you've asked me about that for specifics. I just have a mental recollection that I don't invent this out of the air. I was comfortable in knowing that this, this was an opinion based on what I knew at the time.

Q Okay. And that still is your opinion?

A Oh, it's expanded beyond that opinion that I shared at that time.

Q Right. And, okay. So then you go further. It says: Further, knowing that a 6-7 inch coping platform is dangerously narrow, the defendants should have taken steps to either increase the width of the platform to remove the risk of pool users losing their balance or they should have designed a coping system that prevents access to narrow platform entirely, such as

a rounded cap. Had the defendants taken a more active approach and incorporated such design changes into the coping, the accident would have been avoided. Is that essentially what that says?
A That's what it says.
Q Okay.
A I didn't have any disagreement with that, the way it was characterized.
Q Right. And that's your opinion, is that right?
A Yes.
Q And did you share that, those impressions and opinions with Mr. Reed?
A Yes.
Q And you did that prior to August of '06?
A Those elements of the opinion were discussed and shared with Mr. Reed, yes.
Q All right. And those are the very same elements of your opinion that are dated April 23rd, 2007, right?
A Yes.
Q Okay. So you actually reached your opinion before you had looked at any material, other than the documents that you received on January, in January 2004? "Yes" or "no."
A Give me a moment, sir, please. Yes.
Q You didn't have Mr. Nadiger's deposition. Right?

be done to seek that safe outcome.
Q Now, the decking. The decking, I understand your opinion to be that the decking should be wider.
A If you're going to have decking, it needs to be sufficient so that your foot doesn't drop off the edge and cause this reaction that would cause the sharp trajectory.
Q Now, the purpose of the decking is not to enhance the ability to dive, is it?
A Well, in this in--- yes, it would have, in my opinion, you know, prevented this particular unintended fall and strike against the bottom scenario because of the, because of the kinematics that I explained earlier.
Q Yes. What, I'm trying to get your logic here. What you're saying is that a bigger deck would have been safer?
A A bigger deck would have not triggered this aberration that was the difference between what Miss Sheehan intended to do and found her body doing.
Q Yes. We've already agreed, though, that any diving of any type in a shallow pool by a normal adult is dangerous?
MR. REED: Let me object. Go ahead.
Q Have we not, sir?

the package, in my opinion, of the signs so presented, so that they are able to be really internalized and understood. And where you don't have it as a matter of flashing at you, those flashing at you have a, those flash signs, which, incidentally, those side signs were not, and the omission on the part of the manufacturer to fail to put those on each of the stanchions deviating from that practice that competitors have, in this way having eight symbolic pictograms, reinforcing consequence conveyed in each, deviating from that and putting his own initials on there, not putting that, that, you know, that type of sign on the one and eleven o'clock position, but merely focusing all of the signage content on one sign that had limited ability to be internalized.

Q Okay. So what I wanted to ask you about is the deck. Your opinion, as you said in the third paragraph, the narrow six-inch coping deck is inherently dangerous, since persons can easily stand on the top rail, which subjects them to the risk of losing one's balance, which could put them at a risk of falling into or out of the pool. Right?

A That's correct.

Q Okay. Now, the purpose of the coping is not to

you just said. ". .if you can't do that, then you. ." what?

A (Continued) Then you modify the invitational characteristic and make this platform unsittable, unstandable, unwalkable. And then, in my opinion, this accident wouldn't have occurred.

Q Okay. Now, the deck that you advise could be there as another option, would that be unsittable, unstandable, and undiveable?

A Oh, it would allow for all those things, but the val--- the reason I said that, sir, is because the very, the kinematics of this accident was that it was so narrow, you can probably sit on it for a while, hoping the, you know, hopefully, not teeter off, and that's the danger. Walk on it, that, again, means you either land the long way down or are prone to dive.

Q This is the balance beam?

A A narrow walkway. And it serves as a place to dive. And if you're going to do that unadvisable thing, then it would be helpful to have your foot on a horizontal plane, as opposed to falling off the edge.

Q Got it. It would be helpful, if you're going to dive, to have a more sturdy platform to dive off?

A It's nothing to do with sturdiness. Sturdiness is

another aspect, you know, that if you're going to stand, it doesn't play big. If you're going to walk, it would trigger imbalance because it has a, it has some flexion associated with it.

Q Okay. So the bigger deck, you think, would be safer than the balance beam type of coping that's there?

A A walking surface that is, that follows industry standards and meets at least the minimum fifteen inches would be certainly safer to walk on or do anything else on, including if you're going to contemplate a dive from such a surface, as opposed to something much narrower because of what I just described.

Q Right. The industry standard you're talking about applies to decking, not coping, though, however, right?

A Well, I -- those are the words used. But, you see, it's this manufacturer that chooses to create words for his own benefit.

Q All right.

A In combination with something attached to it, in other words, this coping with this additional thing looks identical to it. Now, to add some inches it's suddenly called a walking platform or some words to that effect. Their own pictures, the defendants' own