# EXHIBIT 1

# In The Matter Of:

*Jennifer Sheehan v. The North American Marketing Corporation, et al*

---

*Thomas C. Ebro*
*May 22, 2007*

---

*Reporting Associates*
*10 Dorrance Street*
*Westminster Square Building Suite 617*
*Providence, RI 02903*
*(401) 351-1660*

*Original File EBROLO.TXT, 153 Pages*
*Min-U-Script® File ID: 4064158608*

**Word Index included with this Min-U-Script®**

Q: — opinion, did he? Didn't you just tell me —
A: I said that.
Q: — ten minutes ago that Dr. Kazarian, you noted, did not use the word "dive"?
A: I corrected you when you attributed that word to him. And I corrected you by saying he didn't use it. He calls it entry into the pool. And so that's the answer to that question.
Q: And Dr. Williams does call it a dive?
A: I read that word, as you pointed out in your, your report.
Q: Fair enough. And you, do you think she fell in?
A: Well, before we go further, —
Q: The question, sir, do you think the plaintiff fell into the pool?
A: She experienced a descent that, in my opinion, that was not controlled and, therefore, by definition is a fall.
Q: All right. Another definition, could it be an uncontrolled dive?

Page 36

A: There are definitions that could be applied to falls that are uncontrolled dives.
Q: Okay. Are the injuries suffered here consistent with a dive?
A: Yes.
Q: Are they consistent with a fall?
A: Yes.
Q: All right. And how would you make, how would you define the difference of whether someone fell or dove?
A: You'd have to analyze the triggering mechanism to the scenario. Just to be complete —
Q: No, I'm not. There is no question pending. I don't want you to make any more speeches, so I'm going to cut you off.
MR. REED: Okay. But —
MR. CAVANAGH: All right?
MR. REED: But, in fairness, I mean, if he has —
MR. CAVANAGH: In fairness —
MR. REED: Wait a sec. Now, let me finish. I mean, he has a right to complete his answer, Joe. And that's all he's trying to do here. He's here, he's, you know, he has a right as an expert to express his full opinion and his basis

Page 37

thereof. I mean, if you're going to cut him off at each nook and cranny, I mean, we're going to just have to, the record will speak for itself, but we're going to have to talk to the judge about that.
MR. CAVANAGH: Well, the record will speak for itself. I'm not cutting him off. He's making speeches. And I just told him I'm not going to let him I make any more speeches. That's all. So we'll go on, and you can do whatever you think's appropriate.
(Deponent conferring privately with Mr. Reed)
Q: So this chronology that we now have a copy of, which we'll mark as C, please.
(PHOTOSTATIC COPY OF TWO-PAGE HANDWRITTEN
CASE ACTIVITY LOG WAS MARKED DEFENDANT'S EXHIBIT C, IDENTIFICATION ON BEHALF OF DELAIR GROUP, L.L.C.)
Q: Are you with me, sir? Have you got your own copy of it, or do you want it?
A: Yes, I have the same copy.
Q: Okay. You've got a chronology that you prepared when?
A: Yesterday.
Q: All right. On the second page after you stop the Number 31, there's some notes. It says, what is that

Page 38

word? Removed?
A: Guide me again to what page.
Q: Second page of Exhibit C after the line that has 31. Then there's something that starts removed or renewed?
A: Oh, yes. There's a caption that reads: Reviewed applicable reference resources from my aquatic library.
Q: And these are all the resources that you reviewed?
A: That's correct. They're captioned by the groupings that characterize their content.
Q: Okay. When did you first give your opinion to Mr. Reed?
A: April 23, 2007.
Q: Did you give him any opinions before that time?
A: I can't recall. I don't have any, any documents that are entitled opinions, so.
Q: Do you have any notes that indicate that you communicated with him, other than what you've described so far here today?
A: Not other than what I've described. The chronology shows the dates that communication took place and the type.
(PHOTOSTATIC COPY OF JENNIFER SHEEHAN'S
SUPPLEMENTAL ANSWER TO

DEFENDANTS' EXPERT DISCLOSURE

Page 39

INTERROGATORY WAS MARKED DEFENDANT'S EXHIBIT D, IDENTIFICATION ON BEHALF OF DELAIR GROUP, L.L.C.)
Q: Exhibit D is a document filed by Miss Sheehan in this case entitled Jennifer Sheehan Supplemental Answer to Defendants' Expert Disclosure Interrogatory. Have you ever seen that before?
A: Yes.
Q: When did you first see it?
A: It was sent to me in the February 6th compilation of discovery materials.
Q: Is that Number 7?
A: Yes.
Q: Okay. And you, did you notice that you were listed as an expert?
A: Yes.
Q: On page 4 of Exhibit D?
A: Yes.
Q: And it indicates what your opinions are going to be in this case? Take the time to read it.
A: Yes.
Q: Okay. Paragraph 2 says: Mr. Ebro — He will explain coping and decking systems as well as the warnings used in this pool. He will also explain decking requirements currently followed in the pool industry.
A: Yes.

Page 40

Q: Is that right?
A: Yes.
Q: And then next paragraph says: He is expected to testify that given the narrow width of the subject pool's coping/deck system, six to seven inches, that there ran an inherent risk that a person standing on the coping could easily slip and/or lose one's balance. Right?
A: Yes.
Q: That, is that the same opinion you're going to give here today if I ask you those questions?
A: Yes.
Q: All right. And you intend to give that opinion before the Court?
A: Yes.
Q: Is that right?
A: That's correct.
Q: Okay. And you arrived at that opinion when?
A: Well, you asked me that question. It's —

**Q:** I think you said April of '07, but I'm just asking you.

**A:** No, I don't think I gave you a date. I said that the, that I had formulated my written one document in this folder. The manner in which I wrote it within that context, which is more information than this

Page 41

sheet you gave me. And it's been an evolution or a development of that opinion to its more refined state. And one version was authored by counsel on this document that I received on page, on — dated February 6th, 2007. I've been talking about it. I've been referring counsel, rather, experts to him with that understanding of issues in mind.

**Q:** You see the issue here, right? Correct?

**A:** I see the issues that you just read into the record.

**Q:** You see the issue this was filed in August of '06, right?

**MR. REED:** Well, now, let me pose an objection because that's, I think, a little unfair. This is something that was drafted by myself and signed by the plaintiff. I have a right to my own impressions, based upon discussions with Mr. Ebro and other experts. And to hold him responsible for these opinions that were drafted by me, I think is a little unfair because he's just stated this is an evolutionary process. With that objection, I'll let the witness answer the question.

**MR. CAVANAGH:** Did I hold him responsible?

**MR. REED:** I think you did.

**MR. CAVANAGH:** All I did was ask —

Page 42

**MR. REED:** You said: You saw the issue. But the issue was created by me, I think.

**MR. CAVANAGH:** Whose issue is it?

**MR. REED:** I think the issue was created by me.

**Q:** You didn't get the material that's marked in Defendant's C, you didn't get anything other than one picture of the pool, a picture of Miss Sheehan, and the medical records; other than that, you didn't get anything until February 6th of '07 about this case, did you?

**MR. REED:** Well, you mean — and I'll have to object. You're talking about just documents, other than discussions that he may have had with counsel. Right?

**MR. CAVANAGH:** Absolutely. I'm talking about documents.

**MR. REED:** Okay. All right.

**Q:** Right, sir?

**A:** Yes. I've shared with you the sequence in which I received —

**Q:** All right.

**A:** — these documents.

**Q:** Fair enough. So that, you certainly before February 6th of 2007 had never reviewed the

Page 43

deposition of Jennifer Sheehan, right?

**A:** Not before that date.

**Q:** Okay. And you hadn't done a summary of the deposition of Marvin Nadiger, right? Is that true?

**A:** I'm trying to find his name on February 6th, the date you're —

**Q:** It's Number 6, sir, on —

**A:** Yes. That all came on February 6th.

**Q:** Right.

**A:** The date of the document that you're asking me about.

**Q:** And all of the rest of that material came as well?

**A:** That's correct.

**Q:** Okay.

**A:** Up to the Item 16. That's the information I had at the time that, in the time frame of this document that you're asking me about.

**Q:** Okay. So what I'd like to know is, the opinion that you just told me you arrived at that's contained in Exhibit D, you said you didn't reach your opinion until you got the supporting documents. Right? That's the way you do your work, right?

**A:** Sir, I do my work by relying on my professional education, training and experience, case works, the discussions that we had about, generally about the case, and the grasp I had of the; and, of course, as

Page 44

these documents came, that opinion that I was nurturing and sort of, you know, solidifying has been the process up to this present time. It's not, it's not an epiphany that occurs. It's a matter of it's a process.

**Q:** Right. And, actually, you didn't have any documents to figure out how the accident occurred until February 6th of 2007.

**A:** I had several conversations with counsel. And I could get a, had a pretty good idea of what was going on, of what was occurring.

**Q:** Okay. Did you hear my question?

**A:** I did.

**Q:** Did you have any documents that you could rely on as to how this accident occurred before February 6th of 2007?

**A:** I did not have documents before that date besides the ones that you asked me about before.

**Q:** Besides the medical records, the picture of the pool, and the picture of the plaintiff?

**A:** Those are the documents, yes, that I had before. On the 6th I received all those documents listed, as well as this document that had sort of pulled it together. And I was able to match the documents, our previous conversations, and my professional training

Page 45

and education, and felt comfortable in, in signing this document as an opinion based on those elements.

**Q:** And you didn't feel, you wouldn't feel comfortable giving your opinion until you had reviewed those documents, would you?

**A:** Well, sir, I —

**Q:** Answer "yes" or "no."

**MR. REED:** If you can.

**A:** Yes, I would feel comfortable in incrementally opining, knowing the process that from documents it goes into a deposition like this and translates all the way to a courtroom. And depending on what my exposure is, those opinions get either refined or modified.

**Q:** So let's go back to Exhibit D, which you've got right in front of you. And this is a statement of your opinion that was given to us in August of '06.

**MR. REED:** Signed by Jennifer Sheehan.

**Q:** Are you with me?

**A:** Yes.

**Q:** I'm picking up where it says: That the pool, pools industry knew or should have known that pool users could easily gain access to this type of narrow deck. Further, that placing a warning of Do Not Dive is not sufficient because there is no warning that one can

Page 46

lose their balance while standing. In addition, there was no warning prohibiting persons from standing on the coping.

**A:** That's correct, yes.

**Q:** Was that your opinion?

**A:** Counsel paraphrased or reduced what I've been sharing with him into these words, yes.

**Q:** Well, —

A: It does characterize my opinion.
Q: When did you share that with counsel?
A: In the, in preceding time. I, you've asked me about that for specifics. I just have a mental recollection that I don't invent this out of the air. I was comfortable in knowing that this, this was an opinion based on what I knew at the time.
Q: Okay. And that still is your opinion?
A: Oh, it's expanded beyond that opinion that I shared at that time.
Q: Right. And, okay. So then you go further. It says: Further, knowing that a 6-7 inch coping platform is dangerously narrow, the defendants should have taken steps to either increase the width of the platform to remove the risk of pool users losing their balance or they should have designed a coping system that prevents access to narrow platform entirely, such as

Page 47

a rounded cap. Had the defendants taken a more active approach and incorporated such design changes into the coping, the accident would have been avoided. Is that essentially what that says?
A: That's what it says.
Q: Okay.
A: I didn't have any disagreement with that, the way it was characterized.
Q: Right. And that's your opinion, is that right?
A: Yes.
Q: And did you share that, those impressions and opinions with Mr. Reed?
A: Yes.
Q: And you did that prior to August of '06?
A: Those elements of the opinion were discussed and shared with Mr. Reed, yes.
Q: All right. And those are the very same elements of your opinion that are dated April 23rd, 2007, right?
A: Yes.
Q: Okay. So you actually reached your opinion before you had looked at any material, other than the documents that you received on January, in January 2004? "Yes" or "no."
A: Give me a moment, sir, please. Yes.
Q: You didn't have Mr. Nadiger's deposition. Right?

Page 48

A: That's correct.
Q: You didn't have anybody's deposition.
A: No, that's not correct. I had Miss Sheehan's deposition.
Q: You got that February 6th as well, 2007?
A: Yes.
Q: You didn't have any depositions when you formulated those opinions and gave them to Mr. Reed before August of 2006. Right?
A: I did not have the documents prior to the dates that I've indicated the receipt on this sheet.
Q: Correct. All right. And Exhibit C tells us all the documents you didn't have.
A: No. It tells you all the documents I did have.
Q: You didn't have as of August '06?
A: If you phrase the question that way, yes.
Q: All right. And you told us earlier that this reference to your testimony that's in Exhibit D, which was filed in August of '06 was your, that was what you had been sharing with Mr. Reed, right?
A: That I agreed with that characterization.
Q: Right.
A: Yes.
MR. CAVANAGH: Let's take a break.
(Recess from 2:15 p.m. to 2:20 p.m.)

Page 49

Q: Now, I noticed nothing in the expert disclosure that we've been talking about about accident reconstruction. Have you been asked to give an opinion on accident reconstruction?
A: I stated earlier I have not been given specificity with regard to what to do. I've been merely, I do what I'm going to do. And you guys are going to refine as to what I'm going to be allowed to speak about or not.
Q: Okay.
A: Particularly in a Daubert setting.
Q: Earlier you talked about a video. Who asked you to do a video?
A: Nobody asked me to do, other than to perform my investigatory work, render opinion. And I consider as part of that to seek opportunities to arm myself with whatever court exhibits and material that enables me to better convey opinions that might be otherwise more difficult to grasp.
Q: Okay. Well, do you intend to arm yourself with a video?
A: Counsel, I would have done this yesterday, but I, for reasons I did not and have already proposed to counsel that it would be my desire to do so. If he asks me to, then I shared with him and be happy to

Page 50

share with you as to what the content of that video would have. It's up to him. He's going to be paying for it. And it really should be his decision because I won't do it unless I have his request.
Q: What would the video be focussed on?
A: On the kinematics, on that human movement that I explained earlier. A person of light weight and size getting into the, what Miss Sheehan describes the ready position and some video surface and underwater of what that looks like when a person executes a dive, such as she described. And then followed by those conditions or the alteration that occurs of that maneuver when a foot descends past the narrow platform that she's standing on and the automatic reaction of the body to compensate, which drives her leg up and the forepart of her body down and results in a greater than thirty-degree downward angle. And I would have spotters there to, essentially, grab or pick up that scenario and spot or catch the subject before the, you know, trajectory through the water occurred. And that would be supplemented by some other video that shows jumps into the water in realtime showing the speed with which the human body travels through that shallow water column and strikes the bottom. And some other

Page 51

things that, that I may find helpful to convey to the jury with visuals, as opposed to words.
Q: Okay. We know that the top of her head, crown of her head struck the bottom of the pool in order to cause this injury, right?
A: That's right.
Q: And it was the symmetrical nature of the fractures that indicate that she impacted the center of her head, right?
A: It was the conclusion of the biomechanics in unison that that was the reason that, reasoning for their conclusion.
Q: And they, and that there was a force and energy that generated this to cause her injuries, right?
A: Well, I think, you know, that's their terms. I think it's from the fact that she was subject to gravity and that angle. And her head, you know, her head

form on the ladder is not intended for diving?

A: That's correct.

Q: And how, do you think the platform on the ladder is intended for standing?

A: Yes.

Q: And do you believe the coping is intended for standing?

A: No. Because it doesn't have handholds. The ladder is also intended for sitting because of its, you're less apt to fall backwards, and you have handholds.

Q: Do you think the coping is intended for sitting?

A: It's not intended for it, but people sit on it very much because of the conducivity for both standing, walking, and sitting.

Q: Okay. Let's go through your report, Exhibit A, if you would. Do you have it in front of you?

A: Yes.

Q: All right. As I read the third paragraph where you are talking about the narrow six-inch coping, it's inherently dangerous because people could stand on the rail and fall in or out of the pool.

Page 97

A: That's correct.

Q: Right? Okay. Now, do you understand in this case that this injury occurred as a result of someone standing on the rail and falling into the pool?

A: Yes.

Q: And you've described for us already why you think it's a fall?

A: Yes.

Q: Okay. Another expert for the plaintiff has described it as toppled into the pool. Do you agree with that?

A: That's another term for a fall, yes.

Q: Well, what does toppling connote?

A: Toppling means that the upper, upper torso ends up being the leading body part in the fall scenario.

Q: Javelin-like?

A: Well, no, I wouldn't agree with javelin-like. It may end up in that fashion.

Q: Okay.

A: But javelin connotes to me something that's intended. Something has to be kind of, you know, shaped and planned for. It suggests a much more sleek entry mode.

Q: Okay. So in your re-creation of this, how in fact did Miss Sheehan fall into the pool? How do you — tell me how she did it, and how do you know that?

Page 98

A: On her second attempt she ascended —

Q: You're reading from some notes, right? By the way, I'm going to ask you — I'm going to ask you to make copies of all those notes 'cause you've used those to testify from today, haven't you?

A: Of course.

Q: Okay. Thanks. Go head.

A: Would we make it more formal? 'Cause I have little notes. Were you just going call it an exhibit and mark it?

Q: I'm going to call it an exhibit and mark it.

A: And I, to be clear, I'm looking at Jennifer Sheehan's deposition, so that I can track with her and fill in the blanks. She's clear, in that she describes that she was, that she had boosted herself up by turning her back to the side, to the wall and placing her arms on there. And because of the buoyancy of the water, accomplished a small hop and, and exerted the pressure from her arms, thus managed to have a clean maneuver, end up in a sitting position on the, on that coping cap. She proceeded from that into nimbly, into arising into a standing position and intent on executing the same forward dive, which entailed her flexion of her knees, dropping down on her knees and sort of allowing the center of gravity

Page 99

to move forward sort of shifting her arm, doing all those compon—- intended components that precede the actual launch. At that point I'm filling in the blanks. She experienced one of her feet that were planted on the coping cap essentially dropping off that sharp, 90-degree rear edge. And in doing so —

Q: Excuse me. What edge?

A: The rear coping cap's outside edge.

Q: The rear, the outside edge?

A: The outside edge.

Q: How do you know that?

A: Well, it wouldn't have been the inside edge because I've identified for you what I've reconstructed. My training allows me to go and hindcast these. I've been trained as a deputy coroner in the medical examiner's office. And I've applied the technique here. Now, —

Q: Fair enough.

A: That's what you asked for.

Q: Let me just inquire, though. And I'm going to interrupt you. When you say the rear edge, that would be the edge of the coping facing the grass?

A: That's correct.

Q: Okay.

A: So we have —

Page 100

Q: And that's based on your training; there's nothing in the testimony or any of the records you've seen, which indicates that if she slipped, that the slip was off the rear edge?

A: That's correct.

Q: All right. This is your theory?

A: That's correct.

Q: Go ahead.

A: So in this position, and I would — I would envision this to be that both feet are not perfectly aligned. It would have to be that she got up and one foot is behind the other.

Q: Okay. Now, again I'm going to interrupt you. That, too, is pure theory that's not based on any testimony of any of the witnesses?

A: That's correct.

Q: Go ahead.

A: And then she, I'm picking up what she states then, that she dropped into her stance. Shared with you earlier what that, what she describes and what that is. That's essentially this flexion of the knee dropping down allowing the center of gravity with her upper torso to sort of teeter, begin to teeter over the water. And what she had done before in order to have executed this is not theory. It's just what

Page 101

happens. She would need to then extend her legs, and she has some control how violently or strongly she does that and when she does it. And that exquisite maneuver enables her to end up parallel in her flight over the water, and the angle of entry into the water and the trajectory achieved by her leading arms and a shallow, either slight penetration into the water or skimming along the top. Those are what, these are characteristics that accompanied her first dive. And this is what she intended to do successfully this time. But for, and this will save you saying it, I don't have anything except an eyewitness that says something awkward went on, you know, totally different entry mode. Described it as a jackknife. Described a glide path that didn't take her anywhere near where she had ended up before.

Q: Signaling what?

A: Signaling that this was a sharp

entry mode close to her takeoff point at an angle greater than 30 degrees. Because it's shallower, angles like that are usually survived. And biomechanics have both been in unison in terms of describing this, this, both the angle and the loading that occurs from it. But to get there, nobody would have, you know, I'm now applying my understanding of my area of aquatics,

Page 102

that if you maneuver — if you experience this drop-off of one of the rear or leading, the rear leg, intending to push from it, as you are from the first, intending to push forward on it, like a competitive swimmer does off of a starting platform and it, in fact, loses traction and, indeed, drops off the back, it's poor placement of the feet, if you will, drops off, then the downward movement. This downward gravity pull movement of that foot that back there dropped off results in a instant body reaction. I use the example of touching a hot stove. Where the body compensates for that dropping foot and kicks it up, muscles tighten and so forth. And the body, and the leg goes up, and you pivot on this remaining standing support leg. And by the legs moving up, correspondingly causes the shoulders and upper torso to move down, sort of like a, like a swing on a fulcrum. And immediately goes down and — and she doesn't remember this because the action happened very quickly, but it would have the appearance of a jackknife, as opposed to what she did before. It would carry with it the sharp angled entry mode. And, certainly, because the water and her steps does not have any slowing down capacity, it would then resemble diving into an empty pool and sustaining a

Page 103

strike force, as the biomechanic folks have described. That is what happened here, in response to your question.

**Q:** Okay. So it was a dive but it was, according to you, affected by the fact that she lost her balance?

**A:** Yes. That's about the third one in. The foot's droppage is what caused her to ultimately lose her balance and bring her 'cause she was already moved forward, —

**Q:** Well, wait a second.

**A:** — already into the dive, into the fall.

**Q:** Couldn't she have lost her balance and then slipped?

**A:** I don't think so.

**Q:** Or you wouldn't know, would you?

**A:** I wasn't there, no.

**Q:** Right. And she didn't know, either.

**A:** She didn't know, no.

**Q:** Right. Okay. So what I'm just asking you is, you've made certain assumptions that her left — do you know if it was her left or her right foot that went off the rear edge?

**A:** No.

**Q:** Okay. That would be a guess by you as well?

**A:** It wouldn't matter which one it was to me, but it would be something that I would have to recon—-

Page 104

I would have been filling in the dots and reconstructing from, from the pieces that I have available.

**Q:** All right. So what if the wind blew and she lost her balance?

**A:** That would be like asking if there was an earthquake.

**Q:** Right.

**A:** I don't believe those things happened.

**Q:** What if she had been drinking a lot and lost her balance?

**A:** This is a factor as well. She —

**Q:** Okay. Right.

**A:** I wasn't there, and I'm unable to put myself in her shoes the way she describes it.

**Q:** Fair enough. She wasn't wearing shoes, either, right?

**A:** Oh, I meant that as a euphemism.

**Q:** And when she was standing up there, and she doesn't know how she lost her balance; she was trying to execute a dive; and she doesn't know what she did with her arms or her legs; and she knows she entered headfirst; and the next thing she remembers is she saw the bottom of the pool; is that a fair characterization, summary of the testimony?

**A:** It's not only a summary, but that also emphasizes or

Page 105

characterizes the very, you know, rapid succession of events.

**Q:** Right.

**A:** As opposed to, you know, what one sees more associated with the loss of balance, which usually involves whirl, you know, attempts to try to regain balance. And that would be rememberable, as opposed to the context of just this instant scenario that would be more apt to be of not, not remembered.

**Q:** Right. And, in fact, if someone lost their balance, the more likely thing would be someone teetering and trying to regain their balance, like you see someone on a balance beam, sometimes as they try to stay up there, fair? Is that what you meant?

**A:** Yeah. And the motions that you made, for the court reporter, is lateral side movements; in other words, extending out to the side as a balance beam, falling to the right or left. And that would require an orientation parallel to the balance beam. That's not what we're talking about here. We're talking about standing, as balance beamers do sometimes is they stand 90 degrees —

**Q:** Fair enough.

**A:** — to this. And that gives them a smaller stance to stand on. And in this case we know that that's where

Page 106

she was standing, and her movement of the upper torso was heading towards the water. So the movements would not be so laterally with her arms windmilling, but they would be something to, you know, fore and aft, forward toward the water and away from the water, so as to make some attempt to try to regain, some attempt to become erect.

**Q:** And the only witness we have said nothing about that, right?

**A:** Again, that's correct. And that led me to conclude what I have concluded.

**Q:** The only witness we have, actually, would indicate that there wasn't this attempt to regain balance; there was a dive into the water, right?

**A:** He describes a maneuver that, to him, appeared to be a jackknife dive.

**Q:** Right. Right. He doesn't describe either foot slipping off the back?

**A:** He doesn't describe it, and I would never expect him to see that. It happens very rapidly. And what would be overt would be this figure standing on edge, you know, essentially coming towards you. And the discrimination of the kinematics associated particularly down there would, I would not expect him to have —

Page 107

**Q:** Right.

**A:** — had the skill to notice and to connect that dot in the reconstruction of this scenario.

**Q:** So like you say, would he have a better shot at knowing what happened or would you?

A: I think he would be from a visual standpoint able to and had been, was helpful to describe what happened, but he would not bring into that the experience I'm trying to bring into my answers to your questions.

Q: I understand. And your, and as you've said, there are missing blanks, which none of us could, are ever going to be able to fill in, but you've assumed that she might have slipped off the back edge?

A: That's an odd question. When you said none of us, I mean, there's a lot of people that could easily, equally come take a hard look at this, familiar with diving and the mechanics of diving. A lot of people, based on your choice, including the jury, I'm hoping can, can watch a video and see and reach its own conclusions.

Q: Yes. But it's you're speculating as to whether her foot slipped off the back edge?

MR. REED: I'm going to object to the form of the question.

A: You call it speculation. I call it a matter of

Page 108

applying the knowledge that I have concerning these, this type of movement and the foreseeable consequences that come from when your foot drops off a very narrow platform.

Q: Okay. Would you expect that she needed to thrust off the coping?

A: You finish the sentence? In order to accomplish the dive? Yes.

Q: Yes.

A: Yes.

Q: So she was intentionally thrusting herself in a dive into the pool?

A: Failure to do that would cause, basically, the equivalent of my holding up a pen here and letting go. It would be a matter of just having a telephone post or a fallen tree end up close to. And that's not what —

Q: That's not what this, this injury didn't occur that way?

A: And I don't see people doing that.

Q: Right.

A: I see dives, and I see dives that are not accomplished for a variety of reasons, including the likely and reasonable scenario that I presented.

Q: This dive necess—- as you've described under your

Page 109

theory, necessarily required her to thrust off the edge of the coping into the pool?

A: The answer is "no." Miss Sheehan testifies that she never got that far. She never got to that thrust part. She, all she did was the moment that this foot came over she, her body pivoted. There was no thrust involved at all. The thrusting leg that you're asking me about, both legs would have thrust. The only leg that now is in a thrusting state or capable of thrusting, her whole weight is on one leg, is merely serving a pivotal fulcrum point in her, in what's happening to her. And as her leg kicks up, the forepart goes down. And it's really based on this, this standing leg that is not doing any thrusting. We know that because of the distance she failed to reach. And we know that by the sharp angle that she struck the water and from that the very close proximity to the wall, by virtue of what the biomechanics have already stated.

Q: So, in other words, when she slips, either foot slips off the back, she's standing up, and her weight would go back because she's not thrusting forward?

A: I didn't understand the question. That's not — I don't think that's what I said.

Q: You're saying that she's standing there and her

Page 110

forward non—- according to your theory, her nonslipping foot was not thrusting forward; she was not using that to propel her body forward; she's just — you said she didn't do that, did you not?

A: I don't know what the question is. Let me answer it. I think I know what you're asking me.

Q: Excuse me. I'll place another question to you.

A: Okay.

Q: You told me, do you believe that her front foot, the nonslipping foot, according to your theory, was not a source of a thrust by her?

A: No. Let me explain.

Q: No, what? You don't believe that?

A: No, I don't believe that.

Q: Okay.

A: Let me explain.

Q: You do believe it was a thrust?

A: Sir, let me explain.

Q: No, no, no, no. I'm asking you questions. I've found that when I ask you to explain, sir, you don't answer the question. You say what you want to say —

A: You're being nasty.

Q: — in a speech. What?

A: You're being nasty.

Q: No, I'm not.

Page 111

A: Well, stop it.

Q: I'm trying not to waste time.

A: I'm trying to —

Q: Do you want to stay here till tomorrow?

A: Sir, you're telling me —

Q: Do you want to stay here till tomorrow?

A: I just want to answer your questions.

Q: Okay.

MR. REED: Can't he answer the question?

A: If you're going to fight with me, stop it.

Q: Answer my question.

A: I'll be happy to.

Q: Okay. The forward foot, the foot that you said didn't slip, —

A: That's correct.

Q: — was there any thrust from that foot, under your theory?

A: No. And let me explain.

Q: Go ahead.

A: In order to have a thrust consummate, the bent knee now has to rapidly straighten in order to have from a bent knee position something that straightens out. I have just demonstrated by getting off my chair. I bent my knee and then I thrust myself back into a standing position. But if I were diving, I would be

Page 112

heading out towards the water. That didn't happen. All that happened was the beginning portion. She never got that far is her testimony. She went down and she merely experienced the beginning of this straightening process that exerted rearward pressure that resulted in the foot dropping off. So it was the very beginning that dropped her foot off. And from that point forward that leg did no thrusting, thrusting meaning launching. No launching. All there was was the experience of traction, challenging that foot to remain in place. It didn't. It went off, it kicked up. The front body went back and she pivoted. No thrusting, no flight, nothing that launched or propelled her out over the water. That's the answer.

Q: Okay. So all of this is premised on her attempting to dive?

A: That was her intent, to go there to dive, that's correct.

Page 124

warnings are going to really achieve this goal of deterring bad behavior. Dr. Goldhaber says that's not true. And folks like me have to take that into account. And that really in this scenario translates into going back to the drawing boards and fixing the likely place from which a dive is apt to be launched from, which in this case is, depending on your perception of it, a surface that can be stood on easily, sat on, certainly. You can sustain a very serious injury from sitting. You can certainly get a serious injury from walking on it, by virtue of this conversion into a dive. And if you choose to, got to stand before you dive, if you choose to dive and you stand there and don't stand very well because of the narrow width, then you'd risk the scenario with the rear foot slipping, body torso, upper body pivoting and this unexpected, complete surprise, life-long debilitation result, as occurred in this case.

**Q:** Okay. Mr. Ebro, I may have asked you this. But when you started talking about the signs here and the ladder, it reminded me. The platform on the ladder, would you, do you believe it would be an unreasonable use to attempt to dive off that platform?

**A:** Yes, that's correct. I've worked on cases that have and, in fact, your own defendant or one of the

Page 125

defendants has had experience with just exactly that.

**Q:** Okay. Fair enough. You've answered my question. You'll agree with me. And, similarly, would it be an unreasonable use to dive off the fifteen-foot (sic) minimum deck you're talking about?

**A:** Fifteen foot?

**Q:** Fifteen inch.

**A:** Thank you. Yes.

**Q:** Okay.

**A:** It would, it would have —

**Q:** Okay.

**A:** — prevented this dive, I think, simply because it would have afforded that traction. It would have averted this particular dive.

**Q:** Right. But it —

**A:** But you've already asked me about it, and I've already opined it, neither surface, the narrow one or the slightly wider one, compliant fifteen-inch one, all were not advisable to dive from.

**Q:** Fair enough. It's an unreasonable use of those surfaces to dive into an upground pool that's three and a half feet deep?

**A:** No question. It warranted the fullest use of the warning system advocated by the industry and more.

**Q:** Okay. And I take it that your view is that the, that

Page 126

you're saying that an adult would not appreciate the danger of diving into shallow water?

**A:** Counsel, you asked me that question before.

**Q:** Right.

**A:** Want an answer from the beginning?

**Q:** Yes.

**A:** At the risk of saying something a little different, I think I'll try to stay on track and not have you bat me around because of the difference that I might have in my answer. People vary. Just because you say adult doesn't mean that they all fit one little mode. There are people that take the time to learn as much as I have about aquatics and aquatic safety. And there are people that have never been in a pool before and all in between. So I, as a first premise, do people all act and perceive things similarly? No. And one needs to take that, plus the activities and the mind-set and, for that matter, drinks and make, you know, focus in on specific individuals, and know that, and the industry knows this, that there are people that are, for various reasons are going to seek out elevated projected things that appear that you might be able to stand on and seek those areas to either sit on, to walk on, or to stand and launch from for their own reasons, as Sheehan described and

Page 127

testified. And the industry has a responsibility. Armed with that awareness, they had a duty, and they failed in that duty.

**Q:** Someone who makes a balcony in a hotel, do they have to anticipate that someone might sit up on the balcony, the edge of the balcony on the railing?

**A:** I'm not a balcony expert, but depends on, I suppose, if it's ground level, I might sit on it. If it's on the twentieth floor, I might, without a rail in particular, would probably not sit on it. That's twenty floors. Now we were talking about four-foot heights there. I'm a big guy. I don't consider that to be necessarily high. Somebody afraid of heights or more slight, that depends on which way you're facing. When you're facing the water, you know, sliding off of that is no big deal. I can't imagine somebody getting hurt sliding back into a standing position from a sitting position. But the opposite of sliding backwards or toppling backwards is a serious injury. So we have this range. And I beg you to be specific with me, and I'll be certainly helpful and specific with you.

**Q:** Oh, you're doing great, really.

**A:** Thank you. Compliment from you is a big deal.

**Q:** Have you, you've given this opinion you've given us

Page 128

today in other cases, right?

**A:** I think so. If similar questions were asked, I could — I regard my answers as opinions under oath. So if I was asked these same questions, and I've had cases similar to this, I would expect that I've given those same answers. I certainly haven't given different ones, if that's what you're getting to. I don't have those skeletons in my closet.

**Q:** Oh, by the way, it's just as possible that Miss Sheehan just did an intentional dive and misjudged the depth of the pool, right?

**A:** That's certainly possible. Anything's possible.

**Q:** Right.

**A:** I'm —

**Q:** Sure.

**A:** I wasn't there. Anything's possible. I'm trying to be, put this into scientific and real and —

**Q:** Fair enough. You're dealing with the cards you've been dealt, right?

**A:** I never heard that term. And I speak two languages, three languages.

**Q:** You're dealing with the facts that you have?

**A:** That's correct.

**Q:** Right. And you reach your opinion without the facts?

**A:** I can.

Page 129

**Q:** Right. You did here?

**A:** I can reach an opinion based on a hypothetical, sir. So it's a question if that's my job.

**Q:** So Mr. Reed give you hypotheticals?

**A:** He gave me facts and information, and information that at this time has all been corroborated by foundation.

**Q:** Right. And you reached your slip and slide opinion when, that she slipped and she catapulted?

**A:** Slip, I like that, slip and slide. I have

never used the words "slip and slide."

Q: No. That was me.

A: I use specific terms.

Q: That was me.

A: Okay. Well, I don't agree with it 'cause I don't agree with it.

Q: Fair enough. Now I'll ask you another question. You reached your opinion when the rear foot slipped off, and there was no thrust of the right foot, and she just fell in the water, but her head hit, you reached that opinion when, first time? First time.

A: I've used the word "drop," not slip. It's a difference.

Q: Fair enough. The opinion you already gave us an hour ago, when did you first reach that opinion?

Page 130

A: It was sort of floating at the, you know, the moment I began to hone in and began to understand.

Q: When? Dates. Dates. That's when?

A: Time. When I saw the picture at the very onset of an aboveground pool and its coping cap.

Q: This was in January of 2004?

A: Correct.

**MR. CAVANAGH:** Okay. Let's take another break. Thanks.

(Recess from 4:20 p.m. to 4:25 p.m.)

Q: On your criticism of the signs that were on the pool, I sense what you're saying is there weren't enough of them, is that right?

A: No.

Q: Okay.

A: That is not right, although it qualifies. In order to have this sign package, there would need to be a hierarchy of signs. The two signs that, that were admitted as not out where the critical large ANSI compliance signs that are required on the exterior of the pool wall because they, to an approaching person, stay in the line of sight and direct frontal view and address what is important in a stronger way prior to ever reaching the ladder. The signs that were in place are intended for support. Only one of those

Page 131

three met the ANSI standard, which is the one that was camouflaged partially by the ladders, the platform and available only for a sliver of time to an ascending user. And the other signs that are out there are really not signs. They're words. They lack essential ingredients. They lack the consequence statement. They lack the pictogram because those elements are necessary to stay and keep reminding of what that big sign says. Essentially, what the big signs says is those five elements and strongly say, not that you're going to scrape yourself, you're going to have a life-threatening experience that is apt to leave you paralyzed for the rest of your life. When Cindy was asked about that, when Miss Sheehan was asked about that, she was very telling, in that she associated consequences with anything but that. She saw that as a scrape, as opposed to the condition she's in now.

Q: Well, in fairness to her, she's not that silly. I mean, she said she didn't want to hit the bottom, right?

A: Correct.

Q: Right?

A: Correct.

Q: And she knew, in fact, she was trying to dive in a

Page 132

way that she wouldn't hit the bottom?

A: Well, —

Q: Right?

A: Yes. She stated that, but she said that against that background. Said some people will dive because they have a tolerance or an acceptance of the fact that the magnitude of injury is going to be acceptable or tolerable for them. Big difference is those, that pictogram, what it conveys and those words associated with it.

Q: Mr. Ebro, in fairness, you're saying that she thought she might scrape, but she didn't want a scrape, either, did she?

A: That's correct. Yes.

Q: And she knew that and intentionally dove in a manner not to scrape?

A: I understand that reasoning on her part.

Q: And you remember that in her testimony, right?

A: I remember one line that states that in her testimony.

Q: So she didn't, she was attempting, she appreciated the risk of diving and hitting the bottom?

A: Big difference between the risk she appreciated and what, what the proper complement of signage would have conveyed.

Page 133

Q: But by your reasoning you're saying she would take the risk to scrape, but she wouldn't take the risk to be paralyzed?

A: Correct. That's what she testified to.

Q: But her testimony was she appreciated it to the point where she didn't want a scrape?

A: You're mixing me up. I know —

Q: Didn't she say she dove in a manner, so she wouldn't hit the bottom?

A: Yes. In one part of her deposition she said that. I forgot the context.

Q: And didn't she also say that if she hit the bottom, she knew there was a risk she would scrape herself?

A: That's correct.

Q: Okay. So the signage now, — I interrupted you; it's not the first time — where you were talking about the signage, and we've got a hierarchy of signs, and I take it by that you mean that you would recommend that there be two signs on the outside, there would be a sign at the ladder, and there'd be some interior signs in the pool, and you think the interior signs were inadequate?

A: That's correct.

Q: Okay. So all right. So have we covered your warning criticisms?

Page 134

A: No. I think I earlier started to include that I found it shallow on the part of the manufacturer.

Q: Pool? The pool?

A: No. No.

Q: Okay.

A: Shallow is a term of art I'm applying to the manufacturer. That for prioritizing ego over safety, in the sense that what competitors place on the very convenient junctions of the uprights, they've been for years extruded No Diving. And they've changed now where they basically have the round pictogram with No Diving and that very dramatic in color presentation eight times around the pool, including the signs that I'm critical of that didn't convey the same in a more larger format. So it's a support, support, support scenario. And the criticism I've just focussed on is the fact that why have those eight. Let's remove those and put our initials there instead. I thought that was a compromise of safety.

Q: Fair enough. And that's your subjective opinion about the ego of the manufacturer, right?

A: That's not the — that's my opinion as an expert. I'm not a subjective person. I'm here to give the best opinion I can, unfounded if you like, if you want to hear me.

Page 135

Q: I do. I just wondered why you