IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

```
* * * * * * * * * * * * CIVIL ACTION
JENNIFER SHEEHAN       * 05-364
                       *
VS.                    * SEPTEMBER 21, 2007
                       *
THE NORTH AMERICAN     *
MARKETING CORP, ET AL  *
* * * * * * * * * * * * PROVIDENCE, RI
```

HEARD BEFORE THE HONORABLE WILLIAM E. SMITH

DISTRICT JUDGE

(MOTION FOR SUMMARY JUDGMENT)

APPEARANCES:

FOR THE PLAINTIFF: BARRY C. REED, JR., ESQ.
Reed & Giordano
101 Tremont Street
Boston, MA 02108
(617) 426-1166

FOR THE DEFENDANT: JOSEPH V. CAVANAGH, JR., ESQ.
Blish & Cavanagh, LLP
30 Exchange Street
Providence, RI 02903
(401) 831-8900

Court Reporter: Anne M. Clayton, RPR
One Exchange Terrace
Providence, RI 02903

Proceeding reported and produced by computer-aided stenography

THE COURT: Good afternoon, everybody. We're here in the matter of Sheehan versus North American Marketing.

Let's have counsel identify themselves for the record, please.

MR. REED: For the plaintiff, my name is Barry Reed, Jr.

MR. MAGLIO: My name is David Maglio, and I also represent the plaintiff, Jennifer Sheehan.

MR. CAVANAGH: Joseph Cavanagh for the Delair Group.

MS. DUNN: Mary Dunn for the Delair Group.

MR. LEONARD: Eric Leonard for North American Marketing.

THE COURT: All right. Thank you. So this is defendant's motion for summary judgment. Who's going to argue?

MR. CAVANAGH: I am, your Honor.

Good afternoon. Would it be helpful for you if I went through the background facts or --

THE COURT: I really have the -- I understand the facts, and I guess what I -- I don't want to cut short your argument, but the thing, I'll just tell you right off the bat, that I'm struggling with is how to reconcile some of these cases and try to figure out

whether assumption of the risk -- or was there assumption of the risk here. And if there was, is assumption of the risk a bar to a products liability case such as this.

So as I said, I don't want to interrupt your flow of whatever you plan for your argument, but that seems to me to be the real question here.

MR. CAVANAGH: Fine. I think the initial point I would like to address is the assumption of the risk and the argument, the only argument the other side made with respect to assumption of the risk and that was that the plaintiff did not assume the risk because she did not understand the precise injury that she suffered could be incurred as a result of what she was doing. And they cite to you several cases on that point, and that is an effort to counter our argument on assumption of the risk.

So if that's the area that the Court is grappling with, I think that's the focus area, that's what the other side focused on.

I think what is important, I believe, is that the notion that the precise injury to be suffered when one engages in risky activity, that that precise injury is a part of the analysis of assumption of the risk doesn't make any sense, because, indeed, someone could

escape serious injury but be engaged in something which clearly is dangerous, known to anyone to be dangerous. And the one that comes to mind for me is playing with fire. Any adult would know that you can't play with fire or you shouldn't. And indeed, to argue that one expected, if they were to be burned that it would just be a singe or just a scare, if you will, as opposed to catching on fire and being badly burned. Or for example, to go to the cases, in the Kennedy case, which is the hockey case, where I think the court makes a very careful analysis of the difference between assumption of the risk and comparative negligence and the type of conduct that one looks to on assumption of the risk.

And in that case, the court focused on the notion of encountering the risk and facing the risk and putting oneself into a dangerous situation and that that was the gist of assumption of the risk.

And in that case, the risk was identified by the court as what the court called the flying puck syndrome. The risk was not that someone would suffer an eye injury or any other type of injury within the orbit, if you will, of injuries that one might expect from a flying puck.

THE COURT: Kennedy implies that assumption of

the risk is not a defense to a product liability claim, doesn't it?

MR. CAVANAGH: Well, in a sense, the assumption of the risk cases are really even if a defendant is negligent, if a defendant's negligence can be established, assumption of the risk is a complete defense if, indeed, that's what the plaintiff did.

So that, if you will, it's an excuse for the defendant's negligence, that even though the defendant might have been negligent, if indeed the assumption of the risk factors are met, then that is a bar to liability despite the defendant's negligence.

In this case, I would submit to you that we never get to that point because of a lack of defendant's negligence and certainly a lack of proof on their products liability claim. But theoretically, if you were to look at they proved all of those elements and, in fact, there's meaningful evidence that could lead to that type of conclusion, even if you assume all of that, and conclude, therefore, either under a theory of products liability or under a theory of straight negligence, the defendant is negligent; nevertheless, assumption of the risk is an affirmative defense which overcomes that because of the conduct of the plaintiff.

In other words, the plaintiff, with or without

the negligence of the defendant, recognized the risk, saw it, and it could be that was created by the defendant's negligence. But nevertheless, it exists. And the focus is did that plaintiff confront it knowingly and engage in conduct which would indicate that he or she was willing to take the risk under those circumstances and fully appreciated that. And that makes sense, because that's what assumption of the risk is. The risk could be something created by negligence. In this case, we would respectfully submit, not at all.

THE COURT: It just seems to me that there's some tension in these cases on this point. And maybe at the end of the day your read is right, but to take the Kennedy case as sort of a starting point of that analysis and recognizing that's a 1977 case, the court in Kennedy said that the Kennedy's claim, and this is at the very end of the opinion, that the Kennedy's claim that even if there was no question of fact in the assumption of the risk issue, that the doctrine is not a defense to their breach of warranty and products liability claims. Therefore, they say, there were material issues which should have gone to the jury.

While this portion of their logic is accurate, and then the court cites the two previous cases, it avails them nothing. And it goes on to say why.

So the Kennedy case seems to set up a structure where assumption of the risk is a defense to a routine negligence action but does not carry over as a bar to a claim of product -- that's brought under products liability.

Now, I run that up against the cases like most recently the Bucki versus Hawkins case that is 2007, in which the court seemed to say pretty clearly that diving into shallow water was the equivalent of playing with fire.

And then, I think it's Raimbeault versus Takeuchi Manufacturing, which came in 2001, and there's kind of a long discussion and I won't quote it, but at the end of it, the court says -- well, it's too long to read but if you read from page 1063 through the end of that page over to 1064, there's a long discussion there that to my mind calls into question whether Kennedy is overruled.

In other words, was the Rhode Island Supreme Court recognizing in Raimbeault that assumption of the risk may actually be a defense to a products liability, strict liability kind of case.

So that's really what I'm trying to get at.

MR. CAVANAGH: Okay. I'd like to ask if we could have some time to look at that and maybe

supplement what we filed on that point to clarify it. But I'd also submit, your Honor, that it's a theoretical hypothetical question in this case because of the failure of the other side to prove all the elements of products liability as a matter of law, at this stage of the proceedings anyway.

THE COURT: You think I should go after -- that's another question I had was, well, what comes first here? Do I analyze it from the standpoint of whether there's a failure to establish a products liability, as you suggest, and never get to the question of whether assumption of the risk is an absolute bar to a products liability case, or do I come at it from the other direction and say, Look, the Rhode Island Supreme Court in Bucki six months ago, seven months ago said diving into shallow water is an assumption of the risk and all of this other law tells me that it's an absolute bar. So I don't know which way to come at it.

MR. CAVANAGH: I suppose you could come at it in the alternative. If we were to put aside the products liability issue on a negligence claim, I believe our argument on assumption of the risk knocks out the negligence claims. Our argument on proximate cause knocks out the negligence claims.

With respect to products liability, their failure to prove defect, their failure to prove use in a proper manner and their failure to prove proximate cause knocks it out on that regard. And if indeed assumption of the risk would apply to products liability cases, the Bucki case and the Rhode Island cases on that point would knock it out as well.

So, I mean, from an academic point of view, it would be helpful, and we could try to help answer that question. My belief is that the assumption of the risk doctrine in Rhode Island is alive and well. And I know the Fiske versus MacGregor case, I think, dealt more with comparative negligence than assumption of the risk, but I'm not sure of that.

So as I said, I'd like to clarify that to you, but I think I've suggested ways, because of the way that the facts are in this record, doesn't make any difference. You're either going to have two grounds to do it or one, either one is a knockout in this case. Their failure of proof on the products liability, proximate cause failure; and assumption of the risk and proximate cause failure on the negligence side.

THE COURT: Now, you recognize, and I'm sure you've read, because the plaintiffs rely on it heavily, the decision by Judge Gibney on almost identical facts

in Lakeside Swimming Pool. What do you say about that?

MR. CAVANAGH: Bottom line, I'd say she was clearly wrong on that case, and there are some distinguishing facts. The plaintiff in that case, and apparently she accepted it, said he never dealt with pools, never had experience, and he took the position didn't even know it was dangerous to dive into the pool. So she took that in the light most favorable. You could distinguish that one.

In this case, the plaintiff can't do that, obviously. The plaintiff, in this case, knew it was shallow, dove in once before. In fact, exhibited, from her testimony, a propensity to dive into shallow water. She had done it in her pool in South Carolina months before, and she did shallow dives. She understood fully what she was doing. So those two cases factually are distinguishable.

Then the Bucki case, and I think the Restatement position that seemed to be overlooked by Judge Gibney that makes the same point as Bucki does, and that is there's certain activities, diving into shallow water is one of them, is so obvious and open and clear as a matter of common knowledge to an adult, as a matter law, would have to be viewed to be a dangerous activity that an adult would know about.

So despite the fact that it is a subjective test, and despite the fact that someone could take a position that they didn't know that, that's not binding on the Court as the Restatement said because it isn't conclusive, because there are certain things in common knowledge and practical experience that just cry out for a different result.

In this case, that's true, but added to that is the plaintiff's own testimony. And the only wiggle room they look for here is this notion of the precise injury, which really doesn't make any sense. It just doesn't. The idea that you'd assume the risk that maybe you'd go in and break an arm or knock some teeth out or break a nose or maybe have a neck injury, but if you had a serious paralyzing injury, you didn't expect that to happen, that isn't really the test. And I think when our Supreme Court makes that statement that it's obvious and open, and in that case there was a very serious injury as well, that certainly falls within the scope of what one knows about when they encounter a risk of this nature.

And it was conceded that she knew it was dangerous and risky, but she tried to do it anyway. She was successful once; she wasn't successful the second time.

THE COURT: Is there any effect at all on the legal analysis for the alcohol that was involved here, or is that just a neutral factor?

MR. CAVANAGH: Well, based on this record, it's a neutral factor. There's no way you could conclude that she was impaired in any way by what was presented in this record. There's an analysis by an expert that had some readings, period. There's no indicating of what she was eating or size or how that would affect her conduct, what effect it would have on her body. And in fact, in the light most favorable to her, her testimony is that she didn't feel impaired, that she was capable of driving, that she knew what she was doing.

THE COURT: Wasn't she double the legal limit for driving? I thought she was a .16.

MR. CAVANAGH: Right. But that would be technically over the legal limit for driving, but the question is whether or not she was impaired in some way. There's no evidence here that she was. In fact, the evidence would be that she wasn't, because she was able to drive successfully. She was able to engage in conversation. She was able to play in the pool and understand that it was shallow and know enough to get up, and although engaging in a prohibited activity, to

try to do it in a manner to avoid the risk. If anything, the reasonable inferences from that is that she understood, regardless of what she had been drinking, what was going on. The problem was the second time she botched it.

Now, if indeed she lost her balance because she had been drinking, that's not an assumption of the risk issue. That's just a negligence issue on her part.

So that the very most you can get out of that record is that, if you wanted to surmise that, indeed, that's how she lost her balance, when, in fact, the record is clear that there's no indication whatsoever in this record how or why she lost her balance according to her own testimony.

In fact, the only evidence that goes that way is the uncontradicted evidence of her boyfriend at the time, who observed her dive both times and said that the second dive was at a sharper angle and at one point described it as a jackknife type dive.

Indeed, when you contrast that with her testimony, where she told me at her deposition she didn't know what happened after she lost her balance, and she didn't know how she lost her balance, there's an absolute void in the record at that point.

So if anything, Mr. Nadiger, the boyfriend's

testimony, fills in that blank a little bit and that is that she dove.

Then, of course, the physical evidence, the biomechanical experts agree, indisputably she suffered an axial loading injury, and it had to happen from hitting the top of her head on the bottom of the pool.

So at the end of the day, those issues are such that the notion that she was drunk and that excuses assumption of the risk, there's no basis for that conclusion in this case.

And I've started to talk a little bit about the proximate cause problems that they have, and that's the void. There's just nothing on that point. All there is is conclusions. There's a conclusion that, number one, the coping was defective, but with no demonstration of how it was defective other than the idea that an expert thought it was narrow, but in fact, there's no showing, in fact, the record is clear that this pool in that condition with just coping as opposed to decking met all standards.

And the report by Mr. Paulick, which is in the exhibits, makes that clear. The ANSI standards on 15-inch decking and what it should be, et cetera, doesn't apply at all to this case. This isn't a decking case. This is a coping, rim case. And there's

been no showing that this pool was below those standards at all. It's just a theory by them that it's defective. And it doesn't make any sense, because they concede that it wasn't intended for standing and wasn't intended for diving. And it wasn't designed that way, and that would be an improper use of the pool. Clearly, from all the warnings, it's an improper use; and, clearly, from what the Supreme Court in Rhode Island said that any adult would know that under the circumstances.

So at the end of the day, to conclude that they've proved that they even have facts to reach the conclusion that this is a defect just doesn't make any sense.

And clearly, she was using it for purposes that she shouldn't use it. It was clearly against the warnings, against common sense, et cetera. So that knocks out the products liability case.

And then thirdly, the proximate cause issue. How could you, or a jury for that matter, on this evidence, on this record be asked to find that this alleged defect caused her to go into the pool at that angle and hit her head.

But-for that comes up every hypothetical you asked, the but-for is if she hadn't been diving, if she

hadn't been diving. That's what caused this accident, and it's very clear. And she concedes that she was diving. She actually said she got into the stance, lost her balance and then can't tell us what happened after that. And the experts on the other side would never be permitted, under the Rules of Evidence, to offer those opinions, and you wouldn't give it to a jury in any event.

Let them articulate their very best theory. It's all conjecture, guesswork, fill in the blanks because of this void. Yet, we have Mr. Nadiger saying he watched her dive into the pool with no indication that she slipped, or she was propelled or thrown, and there's no evidence in the record that would justify any testimony about propulsion or springiness or anything like that. It's all conclusions unsupported by fact.

So at the end of the day, the proximate cause theory is just a theory. It's all talk and no action. There's no basis. It would be pure speculation for a jury to be allowed to guess that maybe the rim had something to do with what, when she doesn't know where her arms and legs were, she doesn't know where her feet were. All she knows she lost her balance, doesn't know why, and the next thing she remembers was after she had

hit the bottom, just floating and seeing the bottom of the pool, which is a tragic thought even as I say it, to think of that, how she might have felt.

But the reality is under our system and what we're doing here is that she was the cause of her own injury. She engaged in conduct that was risky and dangerous. She knew it. She exhibited a propensity to know it, and she failed. And for that reason, I think summary judgment would be appropriate.

THE COURT: Okay. Thank you. All right. Who will be arguing for plaintiff?

MR. REED: Mr. Reed, your Honor. Thank you. Obviously, the focus is on assumption of the risk, but I would hopefully like to put to rest the defendant's arguments with respect to proximate cause and defect.

If you look at the plaintiff's memorandum, we have offered the opinion of two experts, an aquatics expert, Thomas Ebro, as well as an engineer, Larry Raffaelli. And they have both set forth the defect as being the narrow, unsteady six-inch coping which was the standing, which was the platform surface where the plaintiff lost her balance and slipped, and that's clearly set forth in the testimony.

And Dr. Raffaelli has indicated that the negligence -- the defect was two scope. One is

allowing a coping that narrow and that unsteady could cause anyone who had access to it to slip and fall. And he also points out that the defect was also the manufacturer allowing plaintiffs to get access, allowing consumers to get access to that coping.

I mean, it's like if you look at right here, your Honor, this is about six inches, and anyone -- you've got to be Nadia Comaneci to maybe negotiate that thing. But there will be, at trial, there will be evidence of advertising materials where people are standing on such coping that is produced by NAMCO.

And Mr. Raffaelli, the engineer, has offered a solution which would have avoided this accident. What he has designed is a cap, and what he has set forth and articulated in his opinion is they should have developed a triangular or a circular cap that could have just been snapped on top of the cap. And had that been done on August 8th of 2002 or before, it would have prevented anyone from standing on that surface.

THE COURT: Now, wouldn't someone just come along and say that that's a defect because someone will still try to climb out on that and it will just be more unsteady because the surface will be rounded instead of flat?

MR. REED: Well, your Honor, it's the

reasonableness of the alternative design. And what he has actually developed is a triangular, very steep triangular cap which prevents anyone from standing on it. And that is what he'll be offering at trial. The rounded piece, someone could fall in and or out or something like that and --

THE COURT: That's exactly the point. If someone climbs up on something that they're not supposed to be on, all right, and you say that it's a defect because it was designed in a way that they could actually climb up there, how is the solution -- and it was unstable because it's six inches, how is the solution to make it essentially more unstable? That's the part of that expert's theory that sort of escapes me.

MR. REED: Well, I think that an assumption is being made that it would be more unstable. And by the expert, we'll be offering his testimony, his opinion that it's not only stable but it prevents access.

And let me add this point. He's developing this as sort of a retrofit so that the manufacturer wouldn't have to produce a whole different kind of coping. But there were alternative designs out there that were readily available at the time where there was no coping whatsoever, where there's just the top structure of the

ridge, if you will, is maybe only, you know, three inches or two inches or maybe an inch wide where it would prevent -- and you still have stability and you prevent access. And this manufacturer should have entertained alternative modes.

If they want to get up there and sell a product and they're saying, you know, this coping is six inches, yeah, people can maybe stand on it, but we don't advise that and we think it's a misuse, and by the way, they don't ever warn about that you're not supposed to stand on it. But then that creates an unreasonable danger.

THE COURT: What about the warnings? I mean, I don't think I have my exhibits with me, but I remember looking at all the exhibits, and there were a series of warnings on the ladder about not diving, about not getting out on the coping.

MR. REED: Yes. Correct. Let me say that this is not a duty to warn case. The plaintiff's case is not about duty to warn whatsoever. It's about there is a physical, inherent design defect in this pool which contributed to the accident. And the warnings cases, I'm glad you brought that up, when my brother talked about open and obvious danger, okay, that doctrine is only applied to duty to warn cases. That doctrine with

respect to pool cases, for instance, it's when the plaintiff is saying the negligence is that the homeowner or the pool manufacturer failed to warn me of the risk that I shouldn't have dove into the pool. Then what the courts do, they take an objective reasonable man approach and they say, well, because the reasonable person should not be diving into a shallow pool, that that is an open and obvious danger, and, therefore, the defendant does not have to warn against that risk. We are not even talking about warning against the risk. We're talking about they've designed a pool that had an inherent defect in it that caused the injury.

What happened here, this poor woman, she dove the first time. She was engaging -- she executed a shallow, flat dive. She intended to do the same thing the second time, but what happened on the second dive, she didn't get that far. She testified she lost her balance and she slipped. Why she lost her balance and she slipped was because of the specific inherent defect in the pool.

THE COURT: What's the evidence of that?

MR. REED: The evidence is she has testified that she slipped and fell on that springy thing, the narrow, springy thing, she said that on a direct

question. If you look at page 54 of her deposition, she said that she lost her balance. She also said she had slipped. She also, and I want to say it's page 72, I don't have it in front of me, but I do set it forth in my brief, where she said that I lost my balance on the narrow, springy thing.

That is questioning from the defendant himself, and it's, again, you're entitled -- there's direct evidence and circumstantial evidence. And clearly, and I would submit to you, your Honor, at this stage, a person who is standing on a six-inch wide platform that the defendants admit is unsteady, that can cause someone to lose their balance. And I don't think it's a stretch for a jury to infer that a woman who is intoxicated to boot is standing on a six-inch platform surface, loses her balances and slips, which she testified to, and falls into that pool at a steeper angle that that is because of the narrow decking.

If this pool was equipped with a deck sufficiently wide enough so she had control over herself, this accident would not have happened. If this was an in-ground pool that has a regular decking surface, she's in control of herself. And if she voluntarily dove in at a steeper angle and knocked her head, well, that's where the assumption of the risk

doctrine comes in. But what we have here is that the injury was produced by a specific defect.

THE COURT: Here's the thing. The problem I have with that is that one doesn't fall into a pool in that way. It's not a natural act. If you're walking on a six-inch coping or decking or whatever you want to call it, and you slip, the natural forces, the natural action is to fall down. You might fall right on top of the coping and hit your leg or your knee. You might go over into the pool. You might crumble over onto ground, I guess. But to take your body and get the head below the feet and to go in at that angle, that's not an act -- I mean, common sense, anyway, tells me that that's not an act that can happen just by a slip.

You have to combine the loss of balance with some kind of an intentional act. And the only act that's in play here is the act of diving, and she testified that that's what she was doing.

So it seems to me that just -- I don't see how a jury could conclude that she was really doing anything other than engaging in the act of diving and perhaps slipped as she was engaging in the act of diving.

So there you have it.

MR. REED: And under that scenario, which is precisely the scenario that we would offer at trial,

that's how she went in, at a steeper angle. And as was articulated by the aquatics expert, Thomas Ebro, the manner in which she slipped to get her to go sort of head-first, I think you might -- if someone slips, maybe they'd go feet first or just tumble forward.

As she was preparing to dive, and I grant you she was preparing to dive, she was preparing to execute the same shallow dive which is propelling herself out. She testified that she didn't get that far. She never pushed off with her feet. As she's leaning forward, she slipped out like this, put her foot down going that way. She lost control of her dive. She lost control of her dive because of the narrow platform on which she was standing on. And that is why this case is very important, your Honor, because --

THE COURT: Why is that different than the Bucki case, which says that when you dive off of a dock into a pond without first checking to see what the depth of the water is you're assuming the risk. Now, why is it different to say that diving off of a shaky platform is different than that?

MR. REED: If I may, your Honor, first of all, and correct me if I'm wrong, I don't want to put words in anyone's mouth, but I think what the Bucki case stood for was not that if you're diving into a pond

that you're assuming the risk, but that if you're diving off of a dock into a shallow lake, that's an open and obvious danger and, therefore, the defendant does not have a duty to warn against, you know, a prohibition against diving.

But I can also distinguish -- the Bucki case raises a very, very good point as to the difference between this particular case and what happened in Bucki. In Bucki, you've got a 20-year-old -- a man in his 20's. He's showing off, and he's partying with his buddies, and he decides that night to take a dive into the lake off the dock. The dock was shallow. He had been there before, but when he dove in, like you said, he didn't appreciate the depth of, the shallowness of the pond and then his head hit the bottom. Okay?

There was no allegation at any time in the Bucki case that there was anything defective with respect to the platform that he went off on. There was no allegation, and there could have been. Had that deck been in disrepair, had that deck had a cracked plank and he tripped over that plank and went tumbling in, that would have been a defect that the owner should have fixed. Had a nail been protruding up and caused him to trip and fall, that would have been a defect.

If the focus was on the deck, if the plaintiff

could have determined that there was something defective with that deck, then the Bucki case is decided differently.

If he's at the edge getting ready to jump in, and if the wood was rotten and it cracked and the guy goes tumbling in, that's a different case.

There was no evidence offered at any time in Bucki or in any of these open and obvious cases that there was anything specifically defective with the pool other than that the defendant failed to warn the plaintiff that he should not be diving. That's why I say this is not a duty to warn case. This is a specific defect case.

THE COURT: I understand that. But Bucki stands for a proposition, I think, where the State Supreme Court said, "The danger of diving into shallow water was open and obvious to a 24-year-old man regardless of whether a sign was erected alerting him to the danger."

So the Supreme Court is, essentially, saying that diving into shallow water is the equivalent of playing with fire. All right. It's an open and obvious danger.

So we start with the proposition that if one engages in that, then one's assuming the risk of a serious injury. Okay? And this was the point of my

questions to Mr. Cavanagh. If that is the case, and the Restatement section that then applies is the -- I forget which section it is, but the section that talks about open and obvious dangers, then I'm not sure you ever reach the defect question.

In other words, if you're engaging in an activity that in itself assumes the risk of serious injury, and there's a lot of case law out there, not necessarily in Rhode Island, that I've run across that says assumption of the risk is a bar to products liability cases. And it seems to me that when these courts say that assumption of the risk is a bar to products liability cases, what they mean is that you don't get to that question of the defect, that that's the point of the bar.

Once you assume the risk, engage in this activity, that the defect, it doesn't matter. Even if I assumed that it was defective, it doesn't matter. Now, maybe I'm wrong. I'm not saying I've made that decision. I'm saying that's what I'm kind of getting out of this.

MR. REED: And I see where your struggle is. And again, I would reiterate, if you review all of these open and obvious cases and how they're decided, they look at whether or not the defendant had a duty to

warn the person that in the instance of a pool case that you should not be diving. If you look at from -- and they come to the realization, you know, because this is an open and obvious danger and this gentleman dove into the pool, that even if there was a warning there, it wasn't going to change his conduct. He was still going to act like a jerk and dive in a pool.

Jennifer Sheehan, although she was certainly negligent and she bears some responsibility here, did not appreciate, understand or have knowledge of the magnitude of her undertaking. Remember this is a subjective standard in Rhode Island under assumption of the risk. The defendant has to show that she appreciated the magnitude of the risk. And the magnitude of the risk, which has been defined under Rhode Island law, you look under Iadevaia or Drew, they do look at the actual injury. In Iadevaia, they looked at a serious back injury. And in fact, if you look at that case, it rejected the analysis which the defendant is offering.

The defendant has suggested that, you know, because she knew there was some danger, even though she says the danger was just scraping her face, she acknowledges that there's some danger in diving into the pool and that should be enough.

Well, in the Iadevaia case, you've got a poor gentleman who was working on a backhoe with a jackhammer, and he's started to feel this back pain. He was working on the jackhammer for three days, feeling the back pain, telling his foreman about it. The foreman said keep on working. Well, he finally sustained a more serious back injury, a herniated disc, and the defendant took the position, well, you know what, he assumed the risk of injury. He's out there jackhammering away, he's feeling his back pain, he's got a back injury. So it manifests itself a day later more serious for a full-blown herniated disc, I'm sorry, but he assumed the risk of that injury. The court said we don't buy that rationale. You've got to show that he understood the magnitude of the risk, the risk being a serious back injury. That's what Judge Gibney was referring to when she wrote that very well-reasoned opinion on assumption of the risk.

THE COURT: That's totally different because jackhammering with a twinge in your back, I don't think anyone would argue that that's the equivalent of playing with fire or a kind of open and obvious dangerous activity.

MR. REED: Well, let me say, playing with fire -- you know, whenever we take an absolute position, I

think we get into trouble. Playing with fire, is there a suggestion that if a person is lighting a cigarette with a cigarette lighter and that lighter is defective and that lighter fluid dribbles down on that person's arm and then that person gets ignited and seriously burns herself, we would all agree that that's a products liability case and that she did not assume that risk of injury.

And the same token here. When this woman decided to dive, she did not appreciate that she could hurt herself. The reason why was that she was -- that the conduct that she was doing was, she was doing a flat, shallow dive. And that flat, shallow drive, if executed properly, is not going to produce an injury. She did that the first time. Her expectation was she could do that safely the second time. But what happened the second time is she slipped and she fell, lost her balance on the defective platform. And that's the difference. Bucki, there's no allegation that there's a specific defect as we have here.

And I would add, when I saw the defendant's reply brief, they talk about this open and obvious danger and that they want to say as a matter of law per se all jurisdictions would say that diving into a shallow pool is, as a matter of law, an open and

obvious danger and, therefore, you assume the risk.

Well, not all jurisdictions say that. I'll cite a case. It's called Corbin versus Coleco Industries, it's a 1984 case, Seventh Circuit, 748 F.2d 411.

And I'll quote you what it says, your Honor.

It says, (Reading:) Danger of diving head first into four feet of water in a swimming pool was not, as a matter of law, open and obvious to a reasonable adult because whether a danger is open --

THE COURT: Wait. You've got to slow way down.

MR. REED: Okay. Let me start at the beginning what the language says.

(Reading:) The danger of diving head first into four feet of water in a swimming pool was not, as a matter of law, open and obvious to a reasonable adult, because whether a danger is open and obvious depends not just on what people can see, but also on what they know and believe about what they see. Even though people are generally aware of the danger of diving into shallow water, they believe that there is a safe way to do it, namely, by executing a flat, shallow drive.

This is what this poor lady was doing. She was doing a flat, shallow dive. I found this case just a week ago.

THE COURT: Even if I agreed with you and agreed

with Corbin, that's not the law in Rhode Island. That's the Seventh Circuit. And I have to look at what the law in Rhode Island is. Whether I agree with it or not, I have to apply the law of Rhode Island, don't I?

MR. REED: Fair enough. I think Bucki addresses what the law is. And again, Bucki, if you read that case closely, there was no allegation of a specific physical defect on the dock or anything like that. What that case stands for is the proposition that there is no duty for the landowner to warn a prospective diver that they should not dive because it's an open and obvious danger.

When they apply the open and obvious doctrine, please remember that's an objective standard, as opposed to the subjective standard under assumption of the risk.

And so the facts would be that this woman thought all she would do if she dove was going to scrape her face. She never thought in a million years that she could break her neck. That's a question of fact, and the jury may accept that. And if they accept that, I would suggest to you that there's no assumption of the risk.

If they reject it, and if they think that she was just diving intentionally the second time and maybe

was a little more daring and decided to go a little more deeper, then they're going to reject my argument, the premise, and they'll find assumption of the risk.

And I submit to you, your Honor, that that, at the very least, it's a question of fact for the trier of fact to decide. And to decide at this juncture that there was under the facts presented that this plaintiff as a matter of law assumed the risk of this serious quadriplegic injury does not follow the Almonte case, which is admittedly a Superior Court case but by a very respected jurist, and it's distinguished from Bucki because Bucki did not discuss assumption of the risk, did not make a specific determination that she assumed the risk. They just said under the objective standard that this is an open and obvious risk and, therefore, the owner had no duty to warn of that problem, and there was no specific identified single defect of the dock itself.

As I alluded to earlier, and I won't go into details, if there was some specific defect on the dock; i.e., it was disrepair or something like that, I would submit to you that there would be a different finding.

THE COURT: The First Circuit in Turcotte versus Ford Motor Company said, as to the assumption of the risk, (Reading:) The defense of assumption of the risk

remains viable in products liability cases, cites to the Restatement, 402A, comment (n), thus where a design defect is apparent or made known to the automobile purchaser, an action alleging such a defect as to cause of the injury cannot lie.

Now, if Bucki says that diving into a shallow water, or diving into water even without checking the depth, in Bucki, the plaintiff didn't even know the depth, the problem was he didn't check it. Here the plaintiff has admitted in her deposition that she knew the depth and that she knew it was risky and that she was engaging in the activity.

So Bucki says that diving in the shallow water of water of an unknown depth is an inherently dangerous, known, obvious risk qualifying under what the Restatement calls an open and obvious risk. And Turcotte and other cases say, if that's what happens, you don't have a products liability cause of action. How can I get to the -- I don't want you to repeat yourself. I'm just telling you the problem I've got.

It seems to me it's a very hard time getting to the place where you want me to get, which is to say let the jury decide whether this product defect that you claim caused this tragedy.

MR. REED: Can I offer an analogy?

THE COURT: Sure.

MR. REED: I looked at this assumption of the risk doctrine and looking at the fact that the plaintiff, if you look at she -- the defendant has to show that she knew and understood, again, the magnitude of the risk. Correlate that to a medical malpractice situation where a patient is going to undertake surgery, and there's two risks in the surgery. One risk is the risk of having a headache; the second risk is you could have a stroke, a debilitative stroke.

The physician who wants to do the surgery only tells the patient of the risk of a headache. So based upon that, she signs up for the procedure, and, lo and behold, the risk of a stroke materializes, and it debilitates her for the rest of her life. That plaintiff has a cause of action against that defendant because he failed to disclose the material risks of an injury. Same correlation here. You switch it to the plaintiff. The plaintiff, when it's about to engage in conduct, you have to show subjectively that she understood, had knowledge of the risk of injury, understood its magnitude. And in this case, based upon her testimony, she has said that I didn't appreciate that I could be a quadriplegic. All I thought I could do, if I dove in the manner that I wanted to dive, was

that I was going to scrape my face. That was the risk.

How does that correlate to -- her conduct, one could argue, her conduct could be significantly different had she known that diving in the manner that she dove in could translate into a quadriplegic injury.

And that's why I think you get there. That's what Judge Gibney was talking about. You talk about like the hockey puck case, the Kennedy case, okay, flying pucks. That's a risk. Sure. They go flying up and you've got to be aware. I was at a ball game, the Red Sox game two weeks ago, and poor little girl got hit off the head, wasn't seriously injured, thank God. But what if you're sitting behind the goalie where we all have plexiglas. What if that plexiglas was defective and a puck comes sailing through, and goes right through that plexiglas glass and smacks someone in the face. Are you saying, well, wait a minute, you've assumed the risk. You're at a hockey game, flying puck syndrome. No, they're going to consider the nuance, the difference that, you know, there's a reasonable expectation that if there's an obstacle there that that's going to prevent an injury. That's what we have here.

The reasonable -- she got up on that deck. She thought she could control her dive. She didn't control

her dive in the second place, because she lost her balance, again a factor was because she was somewhat intoxicated. And this intoxication, even the defendant's own documents, brochures will talk about how when someone is under the effects of alcohol, they will try to attempt to do things that they wouldn't normally do under normal, reasonable circumstances such as diving into a pool, into shallow pools.

You know, the manufacturers are aware of this problem, aware of this risk, and, you know, maybe they should have done something more than just slap a warning that people don't follow, danger, shallow pool, don't dive. I agree with you, the majority of the public may adhere to, but a segment of it doesn't. This injury will reoccur itself, and it's an opportunity for us to present evidence against a manufacturer to improve its product.

THE COURT: So you're saying that there are things that we engage in that are risky, but if done correctly, and if everything operates correctly, are safe. And you know, going to a hockey game is an example of that. I can posit you other examples, but there's a narrow margin of safety there. And if something goes wrong, then you can have a serious accident. And I'll give you that. I'll give you an

example from my own experience. I had a skiing accident a couple of years ago where I was skiing in what's called sort of high altitude extreme skiing and I fell, and I slid 300 yards face first tumbling down a ski hill and, luckily, wasn't killed.

Now, we all know the danger that you could fall, but I didn't do anything special to fall. I actually just tripped as I was trying to get my alignment because my boot was not -- my foot was not really snugly in my boot and lifted too much and I tripped. Very unspectacular fall.

Now, I suppose you could say, well, anybody who skis in that kind of terrain knows that you can be injured or killed, and I would agree with that. But then you would also say that your boot shouldn't malfunction. Let's just assume it was a malfunction and not me for a moment, the boot shouldn't malfunction. So you still have a cause of action against, say, the boot manufacturer or the ski manufacturer, as the case may be.

The problem here is that she was doing something that was far out and away from the intentional use and design of the product. I mean, skis are meant to be skied on. Hockey, Mr. Cavanagh's a big hockey player. You know, hockey sticks -- skates are meant to be

skated on and so forth, right. And there's danger in the activity. But you're not supposed to ski on ice skates or, you know, use products for purposes that they're not intended for. She was using this product for something that it was not intended for. How do you get by that?

MR. REED: Well, your Honor, we all have been in pools. And you know, fun in the summertime, synonymous with a pool is diving into a pool. That's how -- jumping into a pool. In fact, there would be evidence at this trial that the advertisement materials that NAMCO, one of the defendants has produced, shows people sitting at the edge of the coping waiting to catch a ball, and that means they're going to tumble in. There's also video advertisement material showing two kids jumping --

THE COURT: Sitting on the coping is very different than diving.

MR. REED: This gentleman is standing waiting to receive a ball. Now, if that ball falls short, I submit to you that he's entering that water probably in a head-first fashion, in an uncontrolled fashion. He's not sitting on the coping. He's standing up on the coping facing it.

Why I say that, your Honor, is that the pool

industry wants to market this pool as all pools out in the public. They want to show people, kids, families having fun, splashing around, jumping in pools and whatnot. If they marketed a pool saying, no, you can't stand on this coping; all you have to do is sit in the pool. What are they -- they're marketing a bathtub. They're not marketing a pool. And this is why they're making dollars on this. And all I'm suggesting is that, this case, our engineers have delineated a specific defect of that pool. They're allowing children, they're allowing adults to get access to an area that is dangerous. It's too narrow.

THE COURT: Have you submitted that marketing material?

MR. REED: The other side has. I haven't submitted it for this motion, no, your Honor, but the other side has a copy of it.

THE COURT: Well, I'm talking about for this motion. I mean, I looked through all the exhibits. I don't remember seeing what you're talking about.

MR. REED: I didn't think I was going to have to defend this as arduously as I am. And it was an oversight. If that will have any bearing on your decision, the other side already has it, I'd be more than happy to provide you with a copy of the

advertisement material.

Again, your Honor, I mean, the Bucki case, it stands for the proposition that open and obvious does not relate to assumption of the risk but it relates to the duty to warn.

THE COURT: Can you point me to a case that makes the distinction that you want me to draw about open and obvious risks all relate to failure to warn? They don't relate to --

MR. REED: I believe I can, your Honor. And I believe it's a Massachusetts case, and it's called Sullivan. And what happened in that case, and I can get you the cite, and it was a summary judgment was allowed for the defendants. What was offered is a gentleman dove into the shallow end of a pool, an in-ground pool, and they said that it was an open and obvious danger and, therefore -- but the allegation, again, was that there was no -- that the defect was that they had a duty to warn the plaintiff not to dive in the pool. And the court took the position that because this is an open and obvious danger, there is no duty to warn. But they did -- and they talk about that case and now I lost my train of thought. Because the premise that you wanted me to suggest --

THE COURT: You're making a distinction between

a duty to warn case and a defective product case. And you're trying to sell me on this idea that the open and obvious assumption of the risk, and a Restatement position and all the cases that rely on it, relate to failure to warn. That's what you're saying to me. I'm asking for the cases that make that fine distinction.

MR. REED: That Sullivan case does make that fine distinction. And it talks about the analysis with the open and obvious doctrine. It speaks to that at length, and it talks about how it relates to the conduct of the plaintiff -- strike that, of the defendant. And it delineates or defines the scope of the duty of care, and the duty of care with respect to whether or not the defendant has an obligation to warn the user not to dive in a pool.

And then they say, and then they apply this objective reasonable man standard that says a reasonable man of reasonable prudence would not dive into a shallow pool, and so, therefore, because it's an open and obvious danger, you don't have to warn against that risk. I submit to you that's completely different than assumption of the risk.

THE COURT: All right. We'll take a look at it. And Mr. Cavanagh, do you want a couple of minutes to respond to anything?

MR. CAVANAGH: Kind of all over the place, that argument, with all due respect, and I think that evidences the problem with the other side mixing and matching the theories.

The idea that Nadia Comaneci would have to be on the rim, that's, in fact, it's designed that way because prohibited activity is don't dive.

So it makes no sense whatsoever when she engages intentionally in a prohibited activity to argue that she could have pulled it off but the pool didn't allow her to when the pool was designed so that she couldn't dive, that she shouldn't be able to dive. And the notion that decking would be better, someone like this woman is ready -- maybe she'd do a running start. It isn't the rim or the decking or the platform that exists in this pool right at the ladder where someone could stand. It's the choice to dive into shallow water, which is the cause of the accident. That's what this is all about. And our Supreme Court found in a case that was a failure to warn case , but, nevertheless, the language that our court used, the key language was, after what you read, your Honor, (Reading:) Regardless of whether a sign was erected the danger was open and obvious, therefore, as a matter of law, plaintiff must be held to have had knowledge

and appreciation of this risk.

Now, that would apply whether it be a failure to warn case, whether it be a defect case, whatever. It makes sense that it would apply under those circumstances. And what they try to do is say, well, we didn't think it would be that serious an injury. That isn't the test.

THE COURT: Come back to my discussion with Mr. Reed on -- we all know there's all these sports out there and activities out there that have risks to them. Are we saying that, and do the cases say that, look, if you engage in any of those risks, assumption of the risk bars a product defect claim? So let's take the Extreme Games that we had here for a number of years, kids would skateboard down the East Side hills, right? I can't think of anything that looks more dangerous to me than riding a skateboard down Waterman Street or Angell Street.

Now, it seems to me they're assuming the risk of serious injury. But if the wheel on the skateboard breaks, isn't there a product case that lies there?

MR. CAVANAGH: Possibly, but it was being used for the purpose for which it was designed. And someone is arguing that it was defective, that it didn't work, that what it was supposed to do was designed

improperly.

THE COURT: If that's the point, then isn't the question of whether it was being used for the purpose for which it was designed a question of fact for the jury? If he has the evidence that he says where the company has marketing brochures that show people walking on the coping and playing and frolicking --

MR. CAVANAGH: I've never seen one in this case. I've seen one that might have decking, which is a component part, that has decking. I've never seen anything where people are walking on the six-inch coping. That's the difference. That's been mentioned to us a lot, but that doesn't make any sense for us to advertise it in that way or to do it that way because you can't do it. That's why it's narrow, so people don't engage in that type of activity, which is spelled out all over the pool, don't do it. Which the Rhode Island Supreme Court has said everyone knows anyway even without a warning.

So the final point, I thought Fiske versus MacGregor dealt with your first question to me, and it does.

And it's interesting, I know this case because my dad represented MacGregor in that case, and I knew about axial loading injuries from that case as a young

lawyer and that's exactly, unfortunately, what happened in this case. It's something that a lot of people don't know and I certainly have learned it from dealing with my kids, is that when people break their neck, it's usually when the neck is in the axial loading position, which is not because it's bent back. It's because it's in an 90-degree angle to the spine and it hits an immovable object, which happened in this case, which happened in the Kelly Fiske case, and which happened to the Buffalo football player a couple of weeks ago.

And if we hold our little ones by their ankle, even if they only drop this far, if it's at the wrong angle, that's what happens. So it's a very dangerous injury but it's what happens when someone gets hit.

But in Kelly Fiske, our court, the Rhode Island Supreme Court dealt with this. And they talked about what you had mentioned to me, your Honor, that the Kennedy decision made the distinction between contributory negligence and assumption of the risk and it dealt with both of those doctrines.

And in the Fiske case, the plaintiff was arguing, as was suggested here, that assumption of the risk doesn't apply to a products case, and, in fact, argued that the comparative negligence statute didn't

apply to a products case. And the Rhode Island Supreme Court said, however, what plaintiff fails to realize is that the two doctrines can co-exist despite the fact that they do not overlap. Each doctrine concerns a different type of culpable conduct on the part of a plaintiff, one being a knowing encounter with danger, that would be the assumption of the risk; and the other with a negligent encounter with the risk or danger. In Kennedy, both doctrines were applied to a negligence count, and it was found through the granting of summary judgment that the plaintiff's conduct more closely resembled a knowing encounter with danger and, therefore, assumption of the risk should apply.

Then the court says, (Reading:) In the present case -- the Kelly Fiske case was a products liability case, defective helmet -- we see no reason why the same type of application should not be made. The jury, in a strict liability action or an implied warranty action should be able to consider a plaintiff's negligent encounter with danger if it decides that plaintiff's conduct does not reach the level of culpability that amounts to a knowing encounter with danger, that is assumption of the risk.

So clearly, they're saying that you can assign assumption of the risk in a products liability case and

the Kelly Fiske case was not an assumption of the risk case, but our Supreme Court said that both of those doctrines apply. And that would be a knockout to the products liability case.

I think you can approach it either way. They fail on proximate cause; they fail on proof of defect; they fail on intended use, and the record is just woefully inadequate for even the points that he made. They're not in the record. Thank you.

THE COURT: Thank you. I'll take this under advisement. I'll get you a decision as soon as I can. I, obviously, want to be very careful and read the additional cases that you've cited to me that I haven't read. So I appreciate that. I appreciate the good briefs and a good argument.

MR. CAVANAGH: Thank you, your Honor.

MR. REED: Thank you, Judge.

THE COURT: So you'll hear from me in a little while. Thank you.

(Court concluded at 2:50 p.m.)

C E R T I F I C A T I O N

I, Anne M. Clayton, RPR, do hereby certify that the foregoing pages are a true and accurate transcription of my stenographic notes in the above-entitled case.

/s/ Anne M. Clayton

______________________________________

Anne M. Clayton, RPR

June 4, 2008

________________________________________

Date